ACCEPTED
03-15-00113-CV
5110259
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/30/2015 6:02:54 PM
JEFFREY D. KYLE
CLERK

## No. 03-15-00113-CV

In the Court of Appeals
For the Third Judicial District
Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/30/2015 6:02:54 PM
JEFFREY D. KYLE
Clerk

## EMC CORPORATION

*Appellant,*

**v.**

## GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS, AND KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS

*Appellees.*

ON APPEAL FROM THE 353RD DISTRICT COURT, TRAVIS COUNTY, TEXAS
TRIAL COURT CAUSE NO. D-1-GN-14-000851

## APPELLANT'S BRIEF

RYAN LAW FIRM, LLP
Doug Sigel
Texas Bar No. 18347650
Doug.Sigel@RyanLawLLP.com
Ryan Cotter
Texas Bar No. 24075969
Ryan.Cotter@RyanLawLLP.com
100 Congress Avenue, Suite 950
Austin, Texas 78701

April 30, 2015

Attorneys for Appellant

## ORAL ARGUMENT IS REQUESTED

## Identity of the Parties and Counsel

**Appellant**

EMC Corporation

**Counsel for Appellant**

Doug Sigel
Ryan Cotter
Ryan Law Firm, LLP
100 Congress Avenue, Suite 950
Austin, Texas  78701
512.459.6600 Telephone
512.459.6601 Facsimile
Doug.Sigel@RyanLawLLP.com
Ryan.Cotter@RyanLawLLP.com

**Appellees**

Glenn Hegar, Comptroller of Public Accounts of the State of Texas
Ken Paxton, Attorney General of the State of Texas

**Counsel for Appellees**

Rance Craft
Assistant Solicitor General
Charles K. Eldred
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
512.936.2872 Telephone
512.474.2697 Facsimile
rance.craft@texasattorneygeneral.gov
charles.eldred@texasattorneygeneral.gov

# Table of Contents

Identity of the Parties and Counsel.............................................................................i

Table of Contents...........................................................................................................ii

Table of Authorities.....................................................................................................iii

Appendix ......................................................................................................................vi

Statement of the Case .................................................................................................. 1

Statement Regarding Oral Argument ........................................................................ 1

Issues Presented........................................................................................................... 1

Statement of Facts ....................................................................................................... 2

Summary of the Argument ......................................................................................... 4

Standards of Review .................................................................................................... 6

Argument....................................................................................................................... 7

  I.    Appellant is entitled to compute its franchise tax using the Multistate
      Tax Compact apportionment formula............................................................... 7

      A.   The plain language of Texas Tax Code §§ 141.001 and
          171.106(a) is unambiguous. .................................................................. 9

      B.   The Legislature did not impliedly repeal the Multistate Tax
          Compact when it enacted the revised franchise tax......................... 10

  II.  Texas cannot unilaterally repeal selected provisions of the Multistate
      Tax Compact because it is a binding interstate compact......................... 11

      A.   Texas may not unilaterally modify the terms of a contract. ........................... 12

      B.   The Multistate Tax Compact is a valid and binding interstate
          compact. ................................................................................................. 13

      C.   Texas did not withdraw from the Multistate Tax Compact. ........................... 14

  III. The Multistate Tax Compact election applies because the Texas
      franchise tax is an income tax........................................................................ 15

      A.   The Michigan Supreme Court, in an identical case, held that
          taxpayer was entitled to use the Multistate Tax Compact's three-
          factor apportionment formula. ............................................................ 16

      B.   The Georgia Tax Tribunal held that the Texas Franchise Tax is
          an income tax. ....................................................................................... 18

  IV. Disallowing taxpayers an election under the Multistate Tax Compact
      violates the United States and Texas Constitutions. ................................ 20

Conclusion ...................................................................................................................22

Certificate of Compliance..........................................................................................23

Certificate of Service ................................................................................23

## Table of Authorities

**CASES**

*Appraisal Review Bd. v. Spencer Square Ltd.*,
   252 S.W.3d 842 (Tex. App.—Houston [14th Dist.] 2008, no pet.)......................7

*Combs v. Health Care Serv. Corp*,
      401 S.W.3d 623 (Tex. 2013) .............................................................8

*Combs v. Roark Amusement & Vending, L.P.*,
      422 S.W.3d 632 (Tex. 2013) ..........................................................7, 8

*Dodd v. State*,
      650 S.W.2d 129 (Tex. App.—Houston [14th Dist.] 1983, no writ)...............10

*H. Alan Rosenberg v. Comm'r*,
      No. 1414626 (GA Nov. 25, 2014) ........................................... 19, 20

*Hans Rees' Sons, Inc. v. North Carolina ex rel. Maxwell*,
      283 U.S. 123 (1931)...................................................................20

*Hess v. Port Auth. Trans-Hudson Corp.*,
      513 U.S. 30 (1994)......................................................................12

*Houston Indep. Sch. Dist. v. S.W. Bell Tel. Co.*,
      376 S.W.2d 375 (Tex. App.—Austin, 1964),
      *rev'd on other grounds by* 397 S.W.2d 419 (Tex. 1965) ..............................10

*In re E.I. du Pont de Nemours and Co.*,
      92 S.W.3d 517 (Tex. 2002) .............................................................6

*In re Office of the Attorney Gen.*,
      422 S.W.3d 623 (Tex. 2013) ...........................................................8

*In re VanDeWater*,
      966 S.W.2d 730 (Tex. App.—San Antonio 1998) (orig. proceeding) ...........8

*Int'l Serv. Ins. Co. v. Jackson*,
     335 S.W.2d 420 (Tex. App.—Austin, 1960, writ ref'd n.r.e.) .......................11

*Int'l Bus. Machines Corp. v. Dep't of Treasury*,
     852 N.W.2d 865 (2014) ........................................................... 16, 17

*Jones v. Williams*,
     45 S.W.2d 130 (Tex. 1931) ........................................................9

*Maverick v. Ruiz*,
     897 S.W.2d 843 (Tex. App.—San Antonio 1995, no writ)...........................9

*Mid South Telecomm. Co. v. Best*,
     184 S.W.3d 386 (Tex. App—Austin 2006, no pet.)........................................6

*Norfolk & W. Ry. Co. v. Missouri State Tax Comm'n*,
     390 U.S. 317 (1968)........................................................................21

*State ex rel. Dyer v. Sims*,
     341 U.S. 22 (1951)........................................................................13

*Tex. Adjutant Gen.'s Office v. Ngakoue*,
     408 S.W.3d 350 (Tex. 2013) ........................................................8

*TGS-NoPec Geophysical Co. v. Combs*,
     340 S.W.3d 432 (Tex. 2011) ........................................................8

*TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*,
     397 S.W.3d 173 (Tex. 2013) ........................................................8

*U.S. Steel Corp. v. Multistate Tax Comm'n*,
     434 U.S. 452 (1978)........................................................... 13, 14

*Valence Operating Co. v. Dorsett*,
     164 S.W.3d 656 (Tex. 2005) ........................................................6

*Walker v. Packer*,
     827 S.W.2d 833 (Tex. 1992) ........................................................7

## STATUTES

Tex. Tax Code § 141.001 ...................................................................... passim

Tex. Tax Code § 141.001, Art. II, ¶ 4 ..............................................6, 15

Tex. Tax Code § 141.001, Art. II, ¶ 6 ..................................................16

Tex. Tax Code § 141.001, Art. III, ¶ 1 ....................................... 4, 9, 10

Tex. Tax Code § 141.001, Art. IV ................................................ 7, 9, 21

Tex. Tax Code § 141.001, Art. X ..........................................................14

Tex. Tax Code § 171.106(a) ....................................................... passim

U.S. Const. art. I, § 8 ..............................................................................21

U.S. Const. art. I, § 10 .........................................................................5, 14

## OTHER

Frederick L. Zimmermann & Mitchell Wendell,
  *The Law and Use of Interstate Compacts*, The Council of
  State Governments, January 1976 .....................................................11, 12

# Appendix

1.    Final Judgment

2.    Tex. Tax Code § 141.001 (Vernon 2002).

3.    Tex. Tax Code § 171.106 (Vernon 2002).

4.    Tex. Tax Code § 112.151 (Vernon 2002).

5.    Tex. Const. art. I, §16.

6.    U.S. Const. art. I, § 10.

7.    *Int'l Bus. Machines Corp. v. Dep't of Treasury*, 852 N.W.2d 865 (2014).

8.    *H. Alan Rosenberg v. Douglas J. Macginnittie, Commissioner, Georgia Department of Revenue*, No. 1414626 (GA Nov. 25, 2014).

## Statement of the Case

| | |
|---|---|
| *Nature of underlying case:* | Franchise tax refund suit under Chapters 112, 141, and 171 of the Texas Tax Code. |
| *Trial court:* | The 353rd Judicial District Court of Travis County, Texas, specially assigned to the Honorable Darlene Byrne |
| *Course of Proceedings:* | Both Parties filed cross-motions for summary judgment. |
| *Disposition:* | The trial court denied Appellant's motion for summary judgment and granted Appellees' cross-motion for summary judgment on February 18, 2015. Clerk's Record (CR) 1172; Appendix, Tab 1. |

## Statement Regarding Oral Argument

EMC Corporation ("EMC") requests oral argument. The underlying dispute involves proper application of the Multistate Tax Compact to the revised Texas Franchise Tax. Oral argument would aid the Court's determination of this case.

## Issues Presented

The central question in this case is whether, under Chapters 141 and 171 of the Texas Tax Code, Appellant is entitled to apportion margin using the Multistate Tax Compact apportionment formula, adopted and codified by Texas, for report years 2010 through 2012. To resolve this question, the following issues are presented:

1.      Whether the enactment of Section 171.106(a), containing the Texas apportionment formula, constitutes an implied repeal of the codification of the Multistate Tax Compact in Sections 141.001, arts. III, IV.

2.      Whether the Multistate Tax Compact is a binding compact on all party states, including Texas, which may not be unilaterally altered by Texas.

3.      Whether the Texas Franchise Tax is an "income tax" as defined by and within the scope of the Multistate Tax Compact.

4.      Whether disallowing Appellant's election to use the Multistate Tax Compact apportionment formula violates the United States and Texas Constitutions.

**Statement of Facts**

The material facts regarding EMC's business done in Texas are not in dispute.  EMC is a Massachusetts-based corporation authorized to conduct business in Texas.  (CR 4.)  EMC sells information technology hardware and cloud storage solutions to customers nationwide, including customers in Texas.  (CR 715.)  EMC only engages in retail and wholesale activities in Texas.  (*Id*.)  During the periods at issue, EMC engaged in a multistate, unitary business and determined that a portion of its United States income was subject to Texas franchise tax.  (CR 716.)

EMC timely filed its franchise tax reports for report years 2010 through 2012. (CR 721-1045.) During the relevant report years, EMC paid the following amounts in franchise tax:

$2,959,318.74 for 2010 Report Year

$4,982,013.01 for 2011 Report Year

$5,666,394.62 for 2012 Report Year

(CR 717.)

In its original reports, EMC apportioned its margin using the single-factor apportionment formula in Tex. Tax Code § 171.106(a). (CR 716.) After learning of the Multistate Tax Compact's three-factor apportionment formula election, adopted and codified as Chapter 141 of the Texas Tax Code, EMC amended and timely filed franchise tax reports and refund claims for report years 2010, 2011, and 2012 using the three-factor formula. (CR 717.)

The Comptroller audited EMC for these report years and denied EMC's refund claims. (CR 718.) The Comptroller issued his final decision upholding the denial of EMC's refund claims on January 27, 2014. (*Id.*) EMC's motion for rehearing was also denied, after which EMC filed this refund suit in Travis County District Court on March 20, 2014. (*Id.*)

The issues in this case were decided by cross-motions for summary judgment at the trial court with the Honorable Darlene Byrne presiding. The trial

court issued its final judgment on February 18, 2015, denying EMC's motion for summary judgment and granting the Comptroller's cross-motion for summary judgment based on the conclusion that EMC was not entitled to apportion its franchise tax using the Multistate Tax Compact's three-factor apportionment formula. (CR 1172; Tab 1.)

## Summary of the Argument

EMC properly amended its franchise tax reports electing to compute the tax using the Multistate Tax Compact apportionment formula for 2010 through 2012 report years. (CR 717-718.) Texas became a party to the Multistate Tax Compact when it adopted it in 1967 and subsequently codified it in full as Tex. Tax Code § 141.001 in 1982. As a party to the Multistate Tax Compact, Texas agreed to be bound by all of its terms, including the provision permitting taxpayers, such as EMC, the election to apportion their tax base using either the Multistate Tax Compact formula or an alternative state formula. Tex. Tax Code § 141.001, Art. III, ¶ 1. The Texas legislature has not withdrawn from or repealed any part of the Multistate Tax Compact since it was adopted and codified.

In 2006, the Texas legislature enacted the franchise tax as Chapter 171 of the Texas Tax Code to replace the existing earned surplus tax. The revised franchise tax included a single-factor apportionment formula, which differs from the Multistate Tax Compact's three-factor formula. The Texas legislature did not

expressly repeal any part of the Multistate Tax Compact when it enacted the revised franchise tax in 2006.

As a matter of statutory construction, the Multistate Tax Compact election and formula remain in effect because they do not irreconcilably conflict with the Texas formula. If a taxpayer elects to use the Multistate Tax Compact formula, the taxpayer apportions franchise tax using the Multistate Tax Compact formula; if the taxpayer does not elect to use the Multistate Tax Compact formula, it apportions its franchise tax using the Texas formula. The plain language of Sections 141.001 and 171.106(a) is unambiguous and the Texas legislature has not expressly repealed any part of the Multistate Tax Compact. Both statutes remain good law.

Further, the Multistate Tax Compact is a valid and binding interstate compact, and Texas is prohibited from unilaterally altering its terms without first withdrawing from the Multistate Tax Compact. The Contracts Clause, Art. I, § 10, of the United States Constitution protects interstate compacts such as the Multistate Tax Compact. Under the Contracts Clause, states may not enact any law that impairs the obligation of contracts. The Appellees' position mandating application of the formula in Section 171.106(a) impairs Texas' contractual obligation to permit taxpayers an election to apportion franchise tax using the Multistate Tax Compact formula.

The Multistate Tax Compact applies to all "income taxes," which is broadly defined to include tax on "an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions." Tex. Tax Code § 141.001, Art. II, ¶ 4. The Texas franchise tax is an income tax under the Multistate Tax Compact because its computation allows for the deduction of expenses that are not specifically and directly related to particular transactions (e.g. compensation) from gross income reported on the taxpayer's federal income tax return. The Multistate Tax Compact definition of income tax is broader than the common definition, and the Texas franchise tax fits squarely within it.

## Standards of Review

This Court reviews a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When both parties move for summary judgment and the trial court grants one motion and denies the other, this Court must review the summary judgment evidence presented by both parties, determine all questions of law presented, and render the judgment the trial court should have rendered. *Mid South Telecomm. Co. v. Best*, 184 S.W.3d 386, 389-90 Tex. App—Austin 2006, no pet.).

Statutory construction is a question of law on which the trial court's views are not entitled to deference. *In re E.I. du Pont de Nemours and Co.*, 92 S.W.3d

517, 522 (Tex. 2002); *see also Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (trial court's reasoning is not entitled to deference because it has no discretion in deciding what the law is or its proper application). Further, a de novo review is generally "conducted as if there had been no trial in the first instance." *Appraisal Review Bd. v. Spencer Square Ltd.*, 252 S.W.3d 842, 845 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

## Argument

This Court should reverse the trial court's judgment denying Appellant's motion for summary judgment granting Appellees' cross-motion for summary judgment, and render judgment in favor of Appellant that it properly apportioned its Texas franchise tax pursuant to the Multistate Tax Compact for report years 2010 through 2012.

**I.      Appellant is entitled to compute its franchise tax using the Multistate Tax Compact apportionment formula.**

As a matter of statutory construction, Texas taxpayers are entitled to elect to use the Multistate Tax Compact formula provided in Section 141.001, Art. IV, to compute their franchise tax, and the apportionment formula provided in Section 171.106(a) is the alternative to the Multistate Tax Compact formula.

The primary objective in interpreting a statute is to ascertain the legislature's intent. *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013). Ordinarily, the truest manifestation of what lawmakers intended is what

they enacted.  *Id.*  Statutes must be viewed as a whole and read "contextually, giving effect to every word, clause, and sentence."  *Tex. Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 354 (Tex. 2013) (citations omitted) (quoting *In re Office of the Attorney Gen.*, 422 S.W.3d 623, 629 (Tex. 2013)).  If a statute is unambiguous, the court must adopt the interpretation supported by the plain language, unless such an interpretation would lead to absurd results.  *TGS-NoPec Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011).  In addition, the Texas Supreme Court held that "we read unambiguous statutes as they are written, not as they make the most policy sense."  *Combs v. Health Care Serv. Corp*, 401 S.W.3d 623, 629 (Tex. 2013).

In a similar vein, "[t]ax policy gap-filling–specifically, deciding who is taxed–is best left to legislators, not courts or agencies."  *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 176 (Tex. 2013).  Any ambiguity in the Tax Code regarding the scope of taxation must be resolved in favor of taxpayers.  *Id*. at 182.

When two statutes address the same subject, they should be read together and harmonized with each other, regardless of whether they refer to one another.  *See In re VanDeWater*, 966 S.W.2d 730, 732-34 (Tex. App.—San Antonio 1998) (orig. proceeding).  Courts must harmonize apparent conflicts between different portions of statutes, if practicable, and must favor a construction that renders each

word operative.  *Maverick v. Ruiz*, 897 S.W.2d 843, 846 (Tex. App.—San Antonio 1995, no writ); *see also Jones v. Williams*, 45 S.W.2d 130, 137 (Tex. 1931).

### A. The plain language of Texas Tax Code §§ 141.001 and 171.106(a) is unambiguous.

Sections 141.001 and 171.106(a) are unambiguous and both stand separately as equally enforceable alternative methods of apportionment.  Section 141.001, Art. III, ¶ 1, provides that the taxpayer "may elect to apportion and allocate his income in the manner provided by the laws of such states and subdivisions without reference to this compact, *or may elect to apportion* or allocate in accordance with Article IV."  Thus, a taxpayer may elect to apportion its franchise tax using the Multistate Tax Compact formula or forgo the Multistate Tax Compact election and apportion its franchise tax using the Texas formula.

There is no overriding mandate in Section 171.106(a) that taxpayers must use the Texas formula instead of the Multistate Tax Compact formula.  Section 171.106 makes no mention of the Multistate Tax Compact or any of its provisions.  Accordingly, the only way in which Sections 171.106 and 141.001 compete or conflict is that they contain different formulas.  However, the fact that two statutes apparently conflict or compete does not mean an apparent conflict is always irreconcilable.  *See Maverick*, 897 S.W.2d at 846.

Rather, permitting taxpayers the option of making an election under Section 141.001 to apportion using the Multistate Tax Compact formula shows that Section

171.106(a) is the alternative method of apportionment. This interpretation harmonizes the apparent conflict because a taxpayer that does not elect to use the Multistate Tax Compact formula effectively elects to use the Texas formula. In other words, both provisions provide equally enforceable alternative calculation methods depending on the election the taxpayer makes.

**B. The Legislature did not impliedly repeal the Multistate Tax Compact when it enacted the revised franchise tax.**

The only argument to support the Comptroller's claim that Section 171.106(a) provides a mandatory and exclusive apportionment formula in Texas is that the Texas legislature impliedly repealed the permissive election contained in Section 141.001, Art. III, ¶ 1.

Courts are hesitant to find implied repeal when two statutes can reasonably be given effect. *Houston Indep. Sch. Dist. v. S.W. Bell Tel. Co.*, 376 S.W.2d 375, 380 (Tex. App.—Austin, 1964), *rev'd on other grounds by,* 397 S.W.2d 419, 420-421 (Tex. 1965). "[I]t may be presumed that laws are passed with deliberation, and with full knowledge of existing ones on the subject." *Id.* The presumption disfavoring implied repeal where express terms are not used is based on the probability that the legislature would have used express language clearly indicating the intent to repeal an existing statute. *Id.*

Courts only find implied repeal when two statutes at issue are "directly and irreconcilably in conflict." *Dodd v. State*, 650 S.W.2d 129, 130 (Tex. App.—

Houston [14th Dist.] 1983, no writ). "[T]he court will endeavor to harmonize and reconcile the various provisions and if both acts can stand together, the rule is to let them stand. The implication must be clear, necessary, irresistible, and free from reasonable doubt." *Int'l Serv. Ins. Co. v. Jackson*, 335 S.W.2d 420, 424 (Tex. App.—Austin, 1960, writ ref'd n.r.e.).

The enactment of Section 171.106 did not repeal the Multistate Tax Compact or any provision thereof. First, Section 171.106 makes no reference to Section 141.001 or any provision in chapter 141. Second, Section 171.106(a)'s use of the phrase "Except as provided by this section" is not a clear indication of the legislature's implication and is far from reasonable doubt. In addition, Sections 141.001 and 171.106 can be harmonized to reconcile the various provisions and stand together. This Court should construe the two statutes in favor of the taxpayer and conclude that Section 171.106(a) did not impliedly repeal Section 141.001.

II. **Texas cannot unilaterally repeal selected provisions of the Multistate Tax Compact because it is a binding interstate compact.**

The "interstate compact is the most binding legal instrument to provide formal cooperation between the States." Frederick L. Zimmermann & Mitchell Wendell, *The Law and Use of Interstate Compacts*, The Council of State Governments, at ix, January 1976. Thus, the Multistate Tax Compact is a binding legal instrument on the State of Texas.

Not only is the Multistate Tax Compact a statute, it is also a binding contract:

> Interstate compacts are not only statutes; they also are contracts. This means that the substantive law of contracts is applicable to them. This is certainly true of the vast body of case law and of the general characteristics of contracts which are recognized throughout the common law world.

*Id.* at 2.

In any event, it should be noted that the compact itself has the force of statute and, in case of conflict, its provisions would supersede any general statutes relating to contracts. *Id.* at 3. Texas is a signing compact member of and party to the Multistate Tax Compact. (CR 668.) The Multistate Tax Compact is an interstate compact that is not only law, but is also a contract that cannot be amended, modified, or otherwise altered without consent of all parties. *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 42 (1994). "If it has been enacted by statute, legislative alteration or repeal is necessary." Zimmermann & Wendell, *supra*, at 3.

**A. Texas may not unilaterally modify the terms of a contract.**

EMC properly elected the Multistate Tax Compact's three-factor apportionment formula because Texas is contractually obligated to offer taxpayers the election.

Signing compact members of the Multistate Tax Compact, such as the state of Texas, are contractually obligated to offer taxpayers the option to use the three-factor apportionment formula. "It requires no elaborate argument to reject the suggestion that an agreement solemnly entered into between States by those who alone have political authority to speak for a State can be unilaterally nullified, or given final meaning by an organ of one of the contracting States." *State ex rel. Dyer v. Sims*, 341 U.S. 22, 28 (1951). Members may not unilaterally ignore or repeal specific portions of the Multistate Tax Compact without first withdrawing from the Multistate Tax Compact. Texas has neither withdrawn from the Multistate Tax Compact nor repealed its enacting legislation in Section 141.001.

**B. The Multistate Tax Compact is a valid and binding interstate compact.**

In *U.S. Steel Corp. v. Multistate Tax Commission*, the U.S. Supreme Court stated:

> The Multistate Tax Compact was entered into by a number of States for the stated purposes of (1) facilitating proper determination of state and local tax liability of multistate taxpayers; (2) promoting uniformity and compatibility in state tax systems; (3) facilitating taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration; and (4) avoiding duplicative taxation.

*U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 452 (1978).

Further, the Supreme Court held that the Multistate Tax Compact was valid despite the lack of Congressional consent. *Id*. at 469-71. Consent is not required unless the compact is subject to the Supremacy Clause.

The Multistate Tax Compact is an interstate compact protected by the Contracts Clause, Art. I, § 10, of the United States Constitution. The Contracts Clause states that "[n]o state shall . . . pass any . . . law impairing the obligation of contracts." The Comptroller's interpretation and application of chapter 171 of the Tax Code impairs Texas's contractual obligation to allow taxpayers the three-factor apportionment formula election under the Multistate Tax Compact. Texas must abide by the terms of the Multistate Tax Compact and allow taxpayers the option of apportioning income under the Multistate Tax Compact. Because Texas is contractually and legally obligated to offer taxpayers the three-factor apportionment formula election under the Multistate Tax Compact, EMC properly made that election on its amended franchise tax return.

### C. Texas did not withdraw from the Multistate Tax Compact.

The Multistate Tax Compact specifies the only way in which Texas could withdraw:

> Any party State may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party State prior to the time of such withdrawal.

Tex. Tax Code § 141.001, Art. X.

No such statute repealing the Multistate Tax Compact was enacted by the Texas Legislature.

### III. The Multistate Tax Compact election applies because the Texas franchise tax is an income tax.

The Multistate Tax Compact defines an "income tax" as "a tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions." Tex. Tax Code § 141.001, Art. II, ¶ 4.

In 2006, the Texas Legislature enacted the franchise tax and replaced the earned surplus tax. To determine tax liability under the Texas franchise tax, each taxpayer multiplies their total revenue less the greater of four deductions ($1 million, cost of goods sold, compensation, or 30% of total revenue) by their Texas apportionment factor. The Texas apportionment factor is a "fraction, the numerator of which is the taxable entity's gross receipts from business done in this state . . . and the denominator of which is the taxable entity's gross receipts from its entire business." Tex. Tax Code § 171.106(a).

The Texas franchise tax is an income tax as defined in Article II, ¶ 4, because, as demonstrated above, its computation allows for the subtraction of many indirect expenses or overhead—i.e., expenses that are not specifically and

directly related to particular transactions—from gross income reported on the

taxpayer's federal return.

Further, "gross receipts tax" is defined by the Multistate Tax Compact as

"[a] tax, other than a sales tax, which is imposed on or measured by the gross

volume of business, in terms of gross receipts or in other terms, and in the

determination of which no deduction is allowed which would constitute the tax an

income tax." Tex. Tax Code § 141.001, Art. II, ¶ 6.

### A. The Michigan Supreme Court, in an identical case, held that taxpayer was entitled to use the Multistate Tax Compact's three-factor apportionment formula.

Other jurisdictions provide helpful guidance on this topic. In a 2014 case,

the Michigan Supreme Court examined the issue of whether a taxpayer (IBM)

could elect to use the three-factor apportionment formula under the Multistate Tax

Compact for its taxes or whether it was required to use the sales-factor

apportionment under the Michigan Business Tax Act ("BTA"). *Int'l Bus.*

*Machines Corp. v. Dep't of Treasury*, 852 N.W.2d 865, 868 (2014). It found that

IBM was "entitled to use the Compact's apportionment formula for its 2008

Michigan taxes[1] and that the Court of Appeals erred by holding otherwise on the

---

[1] The *IBM* court determined that the apportionment formula was applicable to both components of the taxpayer's BTA tax base: business income and modified gross receipts. While the latter was not technically an "income tax" in name, the court held that modified gross receipts fit within the broad definition of "income tax" under the Compact by taxing a variation of net income. *Id.* at 880.

basis of its erroneous conclusion that the Legislature had repealed the Compact's election provision by implication when it enacted the BTA." *Id*.

Michigan joined the Multistate Tax Compact in 1970. *Id*. at 870. In 1976, the Michigan Legislature replaced a corporate income tax with a single business tax. *Id*. "The Legislature, however, did not expressly repeal the Compact." *Id*. In 2008, the Michigan Legislature enacted the BTA, which imposed two main taxes: "the business income tax and the modified gross receipts tax." *Id*. In so doing, the Michigan Legislature expressly repealed the single business tax that had been in effect since 1976, "but again did not expressly repeal the Compact." *Id*. The Michigan Supreme Court summarized the treatment of the Compact by noting that "[t]hroughout the evolution of our state's method of business taxation, the Compact has remained in effect." *Id*. at 871. The Texas Legislature's treatment of the Compact has been identical: each time the franchise tax was changed or amended, the Compact stayed in place in the Tax Code and was not amended.

The Michigan Supreme Court next examined whether the "Legislature repealed the Compact's election provision by implication when it enacted the BTA." *Id*. The Court noted that "repeals by implication are disfavored" and there is a presumption that if the Legislature intended to repeal a statute, it would have done so explicitly. *Id*. Thus, repeal by implication can occur by the enactment of a subsequent inconsistent act or of an act that occupies the entire field. However,

there must be clear legislative intent. This was not clear legislative intent by the Michigan Legislature.

Further, there is a higher level of scrutiny than usual because implicit repeal is disfavored (plain meaning of *one* of the provisions is not enough). The BTA required use of sales-factor for apportionment—this was mandatory. The Court refused to interpret the requirement in a vacuum because it was not the only tax law pertaining to income apportionment. Michigan business tax law has always *required* use of a particular apportionment formula.

Finally, statutes must be read *in pari materia*. The election cannot have been a dead letter when enacted. Looking at the election as forward-looking—as contemplating the enactment of a mandatory apportionment formula—is the only way to give it meaning when enacted.

The Michigan Legislature expressly repealed inconsistent provisions as the business taxes changed. In addition, the Legislature retroactively banned use of the election on May 25, 2011, beginning January 1, 2011. It could have retroactively repealed the election beginning on an earlier date. The express repeal indicates there was no implicit repeal earlier. The above-described situation in Michigan is directly analogous to the issue before this Court.

B. **The Georgia Tax Tribunal held that the Texas Franchise Tax is an income tax.**

Although a Texas court has not yet addressed this issue, at least one other

jurisdiction has construed the Texas franchise as an "income tax," to which the Multistate Tax Compact election is applicable. In a November 25, 2014 decision by the Georgia Tax Tribunal, examining "the plain language of the statute, the policy underlying its enactment, the applicable rules of statutory construction, and the substantial weight of judicial, administrative and financial authority both in Georgia and other jurisdictions," it held that the "Texas Franchise Tax is indeed a tax 'measured on or with respect to income.'" *H. Alan Rosenberg v. Douglas J. Macginnittie, Commissioner, Georgia Department of Revenue*, No. 1414626 (GA Nov. 25, 2014). The Georgia Tax Tribunal concluded:

> [T]he Texas Franchise Tax is a tax based on or measured by "income" or "gross income" whether one uses (i) the broad and ordinary definition of "income" or (ii) one of the technical definitions of "gross income" in conducting the analysis.
>
> First, the concept of "total revenue" that serves as the initial basis for computing the Texas Franchise Tax base is based on or measured by "income" or "gross income," as those terms are broadly defined, because "total revenue" is computed by adding up all of the specified line items of "income" used in computing a pass-through entity's federal income tax base. . . .
>
> Alternatively, the Texas Franchise Tax is also based on or measured by "income" when focusing on the "taxable margin." The first option for computing the "taxable margin" is simply to take 70 percent of the "total revenue" base that is comprised of items form the entity's federal income tax base. See Tex. Tax Code Ann. § 171.101(a)(1). Using this method, a taxpayer's "taxable margin" would still be on or measured by "income," because it is comprised exclusively of the items used to compute the taxpayer's "income" on a federal return, before deductions. Alternatively, taxpayers may elect to compute their "taxable margin" by deducting the "cost of goods sold" from

their "total revenue."  See Tex. Tax Code Ann. § 171.101(a)(1). . . . [T]his method of computation of the Texas Franchise Tax is *also* one that is on or measured by "income" because [the reporting entity]'s tax base beg[ins] with the taxpayer's "total revenue" – which, as described above, is based on "income" or "gross income" – and then was further computed using a deduction for "cost of goods sold." . . .

*The Texas Franchise Tax is thus on or measured by "income," whether the focus is on the "total revenue" base or the "taxable margin" base.*

*Id.* at 23-24 (emphasis added).

The reasoning used by the Georgia Tax Tribunal is apt and should be applied by this Court.  It follows that, because the Texas Franchise Tax is an income tax, the Multistate Tax Compact election applies and EMC properly sought refunds for Report Years 2010, 2011, and 2012.

IV.  **Disallowing taxpayers an election under the Multistate Tax Compact violates the United States and Texas Constitutions.**

Requiring EMC to use the single-factor apportionment formula in Section 171.006(a) violates the Due Process, Commerce, and Contract Clauses of the United States Constitution and violates the Equal and Uniform Clause of the Texas Constitution.

State apportionment formulas violate the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution when they attribute to the state "a percentage of income out of all appropriate proportion to the business transacted by [a taxpayer] in that state." *Hans Rees' Sons, Inc. v. North Carolina ex rel.*

*Maxwell*, 283 U.S. 123, 135 (1931).  Further, state apportionment formulas that lead to a "grossly distorted result" violate the Commerce Clause, Art. I, § 8, of the U.S. Constitution because such formulas burden interstate commerce.  *Norfolk & W. Ry. Co. v. Missouri State Tax Comm'n*, 390 U.S. 317, 329 (1968).

The Comptroller's single-factor apportionment formula, as applied to EMC, violates both the Due Process and Commerce Clauses because it attributes to Texas a percentage of income that is disproportionate to the business EMC transacts in Texas and leads to a grossly distorted result.  EMC initially calculated its tax base—i.e. net income or margin—prior to apportionment by deducting compensation from total revenue.  (CR 716.)  EMC apportioned its margin to Texas using the single-factor apportionment formula in Section 171.106(a).  (*Id.*)  After EMC learned of the Multistate Tax Compact's three-factor apportionment formula, it amended its returns for 2010 through 2012 report years.  (CR 717.)  The Multistate Tax Compact formula apportions margin based on property, payroll, and sales factors.  Tex. Tax Code § 141.001, Art. IV.  EMC elected to apply the Multistate Tax Compact formula because it apportions income based on the average ratio of Texas property, payroll, and sales to everywhere property, payroll and sales.  For the 2010 through 2012 report years, EMC's apportionment factor using the Multistate Tax Compact formula was less than five percent.  (CR 717-718.)  The Texas apportionment formula for the same report years ranged from six

to eight percent.  (*Id.*)  The result of applying Texas' single-factor apportionment formula nearly doubled EMC's franchise tax liability and is grossly disproportionate representation of its business done in Texas.

EMC was entitled to elect to use the Multistate Tax Compact's three-factor apportionment formula in its amended franchise tax returns.  Denying EMC the Multistate Tax Compact election and requiring EMC to use the single-factor formula is an unconstitutional burden on interstate commerce.

### Conclusion

For the reasons set forth above, EMC respectfully asks this Court to reverse the district court's judgment and render judgment that EMC properly elected to apportion its franchise tax under the Multistate Tax Compact.

Respectfully submitted,

 /s/ Doug Sigel
Doug Sigel
Texas Bar No. 18347650
Doug.Sigel@RyanLawLLP.com
Ryan Cotter
Texas Bar No. 24075969
Ryan.Cotter@RyanLawLLP.com
RYAN LAW FIRM, LLP
100 Congress Avenue, Suite 950
Austin, Texas  78701
Telephone: (512) 459-6600
Facsimile: (512) 459-6601

Attorneys for Appellant

## Certificate of Compliance

This computer-generated document created in Microsoft Word complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains 4344 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1). In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

/s/ Doug Sigel
Doug Sigel

## Certificate of Service

I certify that a copy of the foregoing Appellant's Brief was served on Appellees, Glenn Hegar and Ken Paxton, through counsel of record, Rance Craft and Charles Eldred, Office of the Attorney General, P.O. Box 12548 (MC 59), Austin, Texas, 78711-2548, rance.craft@texasattorneygeneral.gov, charles.eldred@texasattorneygeneral.gov, by electronic service through eFile.TXCourts.gov on April 30, 2015.

/s/ Doug Sigel
Doug Sigel

# Tab 1
# Final Judgment

Cause No. D-1-GN-14-000851

| | | |
|---|---|---|
| EMC CORPORATION, | § | IN THE DISTRICT COURT |
|     Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| GLENN HEGAR, COMPTROLLER OF | § | TRAVIS COUNTY, TEXAS |
| PUBLIC ACCOUNTS OF THE STATE OF | § | |
| TEXAS, AND KEN PAXTON, ATTORNEY | § | |
| GENERAL OF THE STATE OF TEXAS | § | |
| | § | 353RD JUDICIAL DISTRICT |
|     Defendants. | § | |

Filed in The District Court of Travis County, Texas FEB 1 8 2015 At 9:30 o'clock ___.M. Velva L. Price, District Clerk

## FINAL JUDGMENT

On February 18, 2015, the cross motions for summary judgment of Plaintiff and Defendants came on for consideration, and the Court having considered the pleadings, including the motions, evidence, and argument of counsel, finds that Defendants, Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas', motion should be granted and that the Plaintiff, EMC Corporation's motion should be denied.

All relief requested by the parties and not specifically granted herein is denied. This judgment finally disposes of all parties and all claims and is appealable.

Signed this 18 day of _____ Feb. ____, 2015.

_____
JUDGE PRESIDING

1172

Tab 2

Tex. Tax Code § 141.001

(Vernon 2002)

# CHAPTER 141. MULTISTATE TAX COMPACT

§ 141.001. Adoption of Multistate Tax Compact

The Multistate Tax Compact is adopted and entered into with all jurisdictions legally adopting it to read as follows:

MULTISTATE TAX COMPACT

## ARTICLE I. PURPOSES

The purposes of this compact are to:

1. Facilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes.

2. Promote uniformity or compatibility in significant components of tax systems.

3. Facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration.

4. Avoid duplicative taxation.

## ARTICLE II. DEFINITIONS

As used in this compact:

1. "State" means a state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

2. "Subdivision" means any governmental unit or special district of a state.

3. "Taxpayer" means any corporation, partnership, firm, association, governmental unit or agency or person acting as a business entity in more than one state.

4. "Income tax" means a tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions.

5. "Capital stock tax" means a tax measured in any way by the capital of a corporation

considered in its entirety.

6. "Gross receipts tax" means a tax, other than a sales tax, which is imposed on or measured by the gross volume of business, in terms of gross receipts or in other terms, and in the determination of which no deduction is allowed which would constitute the tax an income tax.

7. "Sales tax" means a tax imposed with respect to the transfer for a consideration of ownership, possession or custody of tangible personal property or the rendering of services measured by the price of the tangible personal property transferred or services rendered and which is required by state or local law to be separately stated from the sales price by the seller, or which is customarily separately stated from the sales price, but does not include a tax imposed exclusively on the sale of a specifically identified commodity or article or class of commodities or articles.

8. "Use tax" means a nonrecurring tax, other than a sales tax, which (a) is imposed on or with respect to the exercise or enjoyment of any right or power over tangible personal property incident to the ownership, possession or custody of that property or the leasing of that property from another including any consumption, keeping, retention, or other use of tangible personal property and (b) is complementary to a sales tax.

9. "Tax" means an income tax, capital stock tax, gross receipts tax, sales tax, use tax, and any other tax which has a multistate impact, except that the provisions of Articles III, IV and V of this compact shall apply only to the taxes specifically designated therein and the provisions of Article IX of this compact shall apply only in respect to determinations pursuant to Article IV.

## ARTICLE III. ELEMENTS OF INCOME TAX LAWS

Taxpayer Option, State and Local Taxes

1. Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in two or more party states may elect to apportion and allocate his income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or may elect to apportion and allocate in accordance with Article IV. This election for any tax year may be made in all party states or subdivisions thereof or in any one or more of the party states or subdivisions thereof without reference to the election made in the others. For the purposes of this paragraph, taxes imposed by subdivisions shall be considered separately from state taxes and the apportionment and allocation also may be applied to the entire tax base. In no instance wherein Article IV is employed for all subdivisions of a state may the sum of all apportionments and allocations to subdivisions within a state be greater than the

apportionment and allocation that would be assignable to that state if the apportionment or allocation were being made with respect to a state income tax.

Taxpayer Option, Short Form

2. Each party state or any subdivision thereof which imposes an income tax shall provide by law that any taxpayer required to file a return, whose only activities within the taxing jurisdiction consist of sales and do not include owning or renting real estate or tangible personal property, and whose dollar volume of gross sales made during the tax year within the state or subdivision, as the case may be, is not in excess of $100,000 may elect to report and pay any tax due on the basis of a percentage of such volume, and shall adopt rates which shall produce a tax which reasonably approximates the tax otherwise due. The Multistate Tax Commission, not more than once in five years, may adjust the $100,000 figure in order to reflect such changes as may occur in the real value of the dollar, and such adjusted figure, upon adoption by the commission, shall replace the $100,000 figure specifically provided herein. Each party state and subdivision thereof may make the same election available to taxpayers additional to those specified in this paragraph.

Coverage

3. Nothing in this article relates to the reporting or payment of any tax other than an income tax.

## ARTICLE IV. DIVISION OF INCOME

1. As used in this article, unless the context otherwise requires:

(a) "Business income" means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.

(b) "Commercial domicile" means the principal place from which the trade or business of the taxpayer is directed or managed.

(c) "Compensation" means wages, salaries, commissions and any other form of remuneration paid to employees for personal services.

(d) "Financial organization" means any bank, trust company, savings bank, industrial bank, land bank, safe deposit company, private banker, savings and loan association, credit union, cooperative bank, small loan company, sales finance company, investment company, or any type of insurance company.

(e) "Nonbusiness income" means all income other than business income.

(f) "Public utility" means any business entity (1) which owns or operates any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, except by pipe line, or the production, transmission, sale, delivery, or furnishing of electricity, water or steam; and (2) whose rates of charges for goods or services have been established or approved by a federal, state or local government or governmental agency.

(g) "Sales" means all gross receipts of the taxpayer not allocated under paragraphs of this article.

(h) "State" means any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, and any foreign country or political subdivision thereof.

(i) "This state" means the state in which the relevant tax return is filed or, in the case of application of this article to the apportionment and allocation of income for local tax purposes, the subdivision or local taxing district in which the relevant tax return is filed.

2. Any taxpayer having income from business activity which is taxable both within and without this state, other than activity as a financial organization or public utility or the rendering of purely personal services by an individual, shall allocate and apportion his net income as provided in this article. If a taxpayer has income from business activity as a public utility but derives the greater percentage of his income from activities subject to this article, the taxpayer may elect to allocate and apportion his entire net income as provided in this article.

3. For purposes of allocation and apportionment of income under this article, a taxpayer is taxable in another state if (1) in that state he is subject to a net income tax, a franchise tax measured by net income, a franchise tax for the privilege of doing business, or a corporate stock tax, or (2) that state has jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not.

4. Rents and royalties from real or tangible personal property, capital gains, interest, dividends or patent or copyright royalties, to the extent that they constitute nonbusiness income, shall be allocated as provided in paragraphs 5 through 8 of this article.

5. (a) Net rents and royalties from real property located in this state are allocable to this state.

(b) Net rents and royalties from tangible personal property are allocable to this state: (1) if and to the extent that the property is utilized in this state, or (2) in their entirety if the taxpayer's commercial domicile is in this state and the taxpayer is not organized under

the laws of or taxable in the state in which the property is utilized.

(c) The extent of utilization of tangible personal property in a state is determined by multiplying the rents and royalties by a fraction, the numerator of which is the number of days of physical location of the property in the state during the rental or royalty period in the taxable year and the denominator of which is the number of days of physical location of the property everywhere during all rental or royalty periods in the taxable year. If the physical location of the property during the rental or royalty period is unknown or unascertainable by the taxpayer, tangible personal property is utilized in the state in which the property was located at the time the rental or royalty payer obtained possession.

6. (a) Capital gains and losses from sales of real property located in this state are allocable to this state.

(b) Capital gains and losses from sales of tangible personal property are allocable to this state if (1) the property had a situs in this state at the time of the sale, or (2) the taxpayer's commercial domicile is in this state and the taxpayer is not taxable in the state in which the property had a situs.

(c) Capital gains and losses from sales of intangible personal property are allocable to this state if the taxpayer's commercial domicile is in this state.

7. Interest and dividends are allocable to this state if the taxpayer's commercial domicile is in this state.

8. (a) Patent and copyright royalties are allocable to this state: (1) if and to the extent that the patent or copyright is utilized by the payer in this state, or (2) if and to the extent that the patent or copyright is utilized by the payer in a state in which the taxpayer is not taxable and the taxpayer's commercial domicile is in this state.

(b) A patent is utilized in a state to the extent that it is employed in production, fabrication, manufacturing, or other processing in the state or to the extent that a patented product is produced in the state. If the basis of receipts from patent royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the patent is utilized in the state in which the taxpayer's commercial domicile is located.

(c) A copyright is utilized in a state to the extent that printing or other publication originates in the state. If the basis of receipts from copyright royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the copyright is utilized in the state in which the taxpayer's commercial domicile is located.

9. All business income shall be apportioned to this state by multiplying the income by a

fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three.

10. The property factor is a fraction, the numerator of which is the average value of the taxpayer's real and tangible personal property owned or rented and used in this state during the tax period and the denominator of which is the average value of all the taxpayer's real and tangible personal property owned or rented and used during the tax period.

11. Property owned by the taxpayer is valued at its original cost. Property rented by the taxpayer is valued at eight times the net annual rental rate. Net annual rental rate is the annual rental rate paid by the taxpayer less any annual rental rate received by the taxpayer from subrentals.

12. The average value of property shall be determined by averaging the values at the beginning and ending of the tax period but the tax administrator may require the averaging of monthly values during the tax period if reasonably required to reflect properly the average value of the taxpayer's property.

13. The payroll factor is a fraction, the numerator of which is the total amount paid in this state during the tax period by the taxpayer for compensation and the denominator of which is the total compensation paid everywhere during the tax period.

14. Compensation is paid in this state if:

(a) the individual's service is performed entirely within the state;

(b) the individual's service is performed both within and without the state, but the service performed without the state is incidental to the individual's service within the state; or

(c) some of the service is performed in the state and (1) the base of operations or, if there is no base of operations, the place from which the service is directed or controlled is in the state, or (2) the base of operations or the place from which the service is directed or controlled is not in any state in which some part of the service is performed, but the individual's residence is in this state.

15. The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period.

16. Sales of tangible personal property are in this state if:

(a) the property is delivered or shipped to a purchaser, other than the United States government, within this state regardless of the f. o. b. point or other conditions of the

sale; or

(b) the property is shipped from an office, store, warehouse, factory, or other place of storage in this state and (1) the purchaser is the United States government or (2) the taxpayer is not taxable in the state of the purchaser.

17. Sales, other than sales of tangible personal property, are in this state if:

(a) the income-producing activity is performed in this state; or

(b) the income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance.

18. If the allocation and apportionment provisions of this article do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the tax administrator may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

(a) separate accounting;

(b) the exclusion of any one or more of the factors;

(c) the inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or

(d) the employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

## ARTICLE V. ELEMENTS OF SALES AND USE TAX LAWS

### Tax Credit

1. Each purchaser liable for a use tax on tangible personal property shall be entitled to full credit for the combined amount or amounts of legally imposed sales or use taxes paid by him with respect to the same property to another state and any subdivision thereof. The credit shall be applied first against the amount of any use tax due the state, and any unused portion of the credit shall then be applied against the amount of any use tax due a subdivision.

Exemption Certificates, Vendors May Rely

2. Whenever a vendor receives and accepts in good faith from a purchaser a resale or other exemption certificate or other written evidence of exemption authorized by the

appropriate state or subdivision taxing authority, the vendor shall be relieved of liability for a sales or use tax with respect to the transaction.

## ARTICLE VI. THE COMMISSION

### Organization and Management

1. (a) The Multistate Tax Commission is hereby established. It shall be composed of one "member" from each party state who shall be the head of the state agency charged with the administration of the types of taxes to which this compact applies. If there is more than one such agency the state shall provide by law for the selection of the commission member from the heads of the relevant agencies. State law may provide that a member of the commission be represented by an alternate but only if there is on file with the commission written notification of the designation and identity of the alternate. The attorney general of each party state or his designee, or other counsel if the laws of the party state specifically provide, shall be entitled to attend the meetings of the commission, but shall not vote. Such attorneys general, designees, or other counsel shall receive all notices of meetings required under paragraph 1(e) of this article.

(b) Each party state shall provide by law for the selection of representatives from its subdivisions affected by this compact to consult with the commission member from that state.

(c) Each member shall be entitled to one vote. The commission shall not act unless a majority of the members are present, and no action shall be binding unless approved by a majority of the total number of members.

(d) The commission shall adopt an official seal to be used as it may provide.

(e) The commission shall hold an annual meeting and such other regular meetings as its bylaws may provide and such special meetings as its executive committee may determine. The commission bylaws shall specify the dates of the annual and any other regular meetings, and shall provide for the giving of notice of annual, regular and special meetings. Notices of special meetings shall include the reasons therefor and an agenda of the items to be considered.

(f) The commission shall elect annually, from among its members, a chairman, a vice-chairman and a treasurer. The commission shall appoint an executive director who shall serve at its pleasure, and it shall fix his duties and compensation. The executive director shall be secretary of the commission. The commission shall make provision for the bonding of such of its officers and employees as it may deem appropriate.

(g) Irrespective of the civil service, personnel or other merit system laws of any party

state, the executive director shall appoint or discharge such personnel as may be necessary for the performance of the functions of the commission and shall fix their duties and compensation. The commission bylaws shall provide for personnel policies and programs.

(h) The commission may borrow, accept or contract for the services of personnel from any state, the United States, or any other governmental entity.

(i) The commission may accept for any of its purposes and functions any and all donations and grants of money, equipment, supplies, materials and services, conditional or otherwise, from any governmental entity, and may utilize and dispose of the same.

(j) The commission may establish one or more offices for the transacting of its business.

(k) The commission shall adopt bylaws for the conduct of its business. The commission shall publish its bylaws in convenient form, and shall file a copy of the bylaws and any amendments thereto with the appropriate agency or officer in each of the party states.

(l) The commission annually shall make to the governor and legislature of each party state a report covering its activities for the preceding year. Any donation or grant accepted by the commission or services borrowed shall be reported in the annual report of the commission, and shall include the nature, amount and conditions, if any, of the donation, gift, grant or services borrowed and the identity of the donor or lender. The commission may make additional reports as it may deem desirable.

Committees

2. (a) To assist in the conduct of its business when the full commission is not meeting, the commission shall have an executive committee of seven members, including the chairman, vice-chairman, treasurer and four other members elected annually by the commission. The executive committee, subject to the provisions of this compact and consistent with the policies of the commission, shall function as provided in the bylaws of the commission.

(b) The commission may establish advisory and technical committees, membership on which may include private persons and public officials, in furthering any of its activities. Such committees may consider any matter of concern to the commission, including problems of special interest to any party state and problems dealing with particular types of taxes.

(c) The commission may establish such additional committees as its bylaws may provide.

Powers

3. In addition to powers conferred elsewhere in this compact, the commission shall have power to:

 (a) Study state and local tax systems and particular types of state and local taxes.

 (b) Develop and recommend proposals for an increase in uniformity or compatibility of state and local tax laws with a view toward encouraging the simplification and improvement of state and local tax law and administration.

 (c) Compile and publish information as in its judgment would assist the party states in implementation of the compact and taxpayers in complying with state and local tax laws.

 (d) Do all things necessary and incidental to the administration of its functions pursuant to this compact.

Finance

4. (a) The commission shall submit to the governor or designated officer or officers of each party state a budget of its estimated expenditures for such period as may be required by the laws of that state for presentation to the legislature thereof.

 (b) Each of the commission's budgets of estimated expenditures shall contain specific recommendations of the amounts to be appropriated by each of the party states. The total amount of appropriations requested under any such budget shall be apportioned among the party states as follows: one-tenth in equal shares; and the remainder in proportion to the amount of revenue collected by each party state and its subdivisions from income taxes, capital stock taxes, gross receipts taxes, sales and use taxes. In determining such amounts, the commission shall employ such available public sources of information as, in its judgment, present the most equitable and accurate comparisons among the party states. Each of the commission's budgets of estimated expenditures and requests for appropriations shall indicate the sources used in obtaining information employed in applying the formula contained in this paragraph.

 (c) The commission shall not pledge the credit of any party state. The commission may meet any of its obligations in whole or in part with funds available to it under paragraph 1(i) of this article: provided that the commission takes specific action setting aside such funds prior to incurring any obligation to be met in whole or in part in such manner. Except where the commission makes use of funds available to it under paragraph 1(i), the commission shall not incur any obligation prior to the allotment of funds by the party states adequate to meet the same.

 (d) The commission shall keep accurate accounts of all receipts and disbursements. The receipts and disbursements of the commission shall be subject to the audit and

accounting procedures established under its bylaws. All receipts and disbursements of funds handled by the commission shall be audited yearly by a certified or licensed public accountant and the report of the audit shall be included in and become part of the annual report of the commission.

(e) The accounts of the commission shall be open at any reasonable time for inspection by duly constituted officers of the party states and by any persons authorized by the commission.

(f) Nothing contained in this article shall be construed to prevent commission compliance with laws relating to audit or inspection of accounts by or on behalf of any government contributing to the support of the commission.

## ARTICLE VII. UNIFORM REGULATIONS AND FORMS

1. Whenever any two or more party states, or subdivisions of party states, have uniform or similar provisions of law relating to an income tax, capital stock tax, gross receipts tax, sales or use tax, the commission may adopt uniform regulations for any phase of the administration of such law, including assertion of jurisdiction to tax, or prescribing uniform tax forms. The commission may also act with respect to the provisions of Article IV of this compact.

2. Prior to the adoption of any regulation, the commission shall:

(a) As provided in its bylaws, hold at least one public hearing on due notice to all affected party states and subdivisions thereof and to all taxpayers and other persons who have made timely request of the commission for advance notice of its regulation-making proceedings.

(b) Afford all affected party states and subdivisions and interested persons an opportunity to submit relevant written data and views, which shall be considered fully by the commission.

3. The commission shall submit any regulations adopted by it to the appropriate officials of all party states and subdivisions to which they might apply. Each such state and subdivision shall consider any such regulation for adoption in accordance with its own laws and procedures.

## ARTICLE VIII. INTERSTATE AUDITS

1. This article shall be in force only in those party states that specifically provide therefor by statute.

2. Any party state or subdivision thereof desiring to make or participate in an audit of any accounts, books, papers, records or other documents may request the commission to perform the audit on its behalf. In responding to the request, the commission shall have access to and may examine, at any reasonable time, such accounts, books, papers, records, and other documents and any relevant property or stock of merchandise. The commission may enter into agreements with party states or their subdivisions for assistance in performance of the audit. The commission shall make charges, to be paid by the state or local government or governments for which it performs the service, for any audits performed by it in order to reimburse itself for the actual costs incurred in making the audit.

3. The commission may require the attendance of any person within the state where it is conducting an audit or part thereof at a time and place fixed by it within such state for the purpose of giving testimony with respect to any account, book, paper, document, other record, property or stock of merchandise being examined in connection with the audit. If the person is not within the jurisdiction, he may be required to attend for such purpose at any time and place fixed by the commission within the state of which he is a resident: provided that such state has adopted this article.

4. The commission may apply to any court having power to issue compulsory process for orders in aid of its powers and responsibilities pursuant to this article and any and all such courts shall have jurisdiction to issue such orders. Failure of any person to obey any such order shall be punishable as contempt of the issuing court. If the party or subject matter on account of which the commission seeks an order is within the jurisdiction of the court to which application is made, such application may be to a court in the state or subdivision on behalf of which the audit is being made or a court in the state in which the object of the order being sought is situated. The provisions of this paragraph apply only to courts in a state that has adopted this article.

5. The commission may decline to perform any audit requested if it finds that its available personnel or other resources are insufficient for the purpose or that, in the terms requested, the audit is impracticable of satisfactory performance. If the commission, on the basis of its experience, has reason to believe that an audit of a particular taxpayer, either at a particular time or on a particular schedule, would be of interest to a number of party states or their subdivisions, it may offer to make the audit or audits, the offer to be contingent on sufficient participation therein as determined by the commission.

6. Information obtained by any audit pursuant to this article shall be confidential and available only for tax purposes to party states, their subdivisions or the United States. Availability of information shall be in accordance with the laws of the states or subdivisions on whose account the commission performs the audit, and only through the appropriate agencies or officers of such states or subdivisions. Nothing in this article shall be construed to require any taxpayer to keep records for any period not otherwise

required by law.

7. Other arrangements made or authorized pursuant to law for cooperative audit by or on behalf of the party states or any of their subdivisions are not superseded or invalidated by this article.

8. In no event shall the commission make any charge against a taxpayer for an audit.

9. As used in this article, "tax," in addition to the meaning ascribed to it in Article II, means any tax or license fee imposed in whole or in part for revenue purposes.

## ARTICLE IX. ARBITRATION

1. Whenever the commission finds a need for settling disputes concerning apportionments and allocations by arbitration, it may adopt a regulation placing this article in effect, notwithstanding the provisions of Article VII.

2. The commission shall select and maintain an arbitration panel composed of officers and employees of state and local governments and private persons who shall be knowledgeable and experienced in matters of tax law and administration.

3. Whenever a taxpayer who has elected to employ Article IV, or whenever the laws of the party state or subdivision thereof are substantially identical with the relevant provisions of Article IV, the taxpayer, by written notice to the commission and to each party state or subdivision thereof that would be affected, may secure arbitration of an apportionment or allocation, if he is dissatisfied with the final administrative determination of the tax agency of the state or subdivision with respect thereto on the ground that it would subject him to double or multiple taxation by two or more party states or subdivisions thereof. Each party state and subdivision thereof hereby consents to the arbitration as provided herein, and agrees to be bound thereby.

4. The arbitration board shall be composed of one person selected by the taxpayer, one by the agency or agencies involved, and one member of the commission's arbitration panel. If the agencies involved are unable to agree on the person to be selected by them, such person shall be selected by lot from the total membership of the arbitration panel. The two persons selected for the board in the manner provided by the foregoing provisions of this paragraph shall jointly select the third member of the board. If they are unable to agree on the selection, the third member shall be selected by lot from among the total membership of the arbitration panel. No member of a board selected by lot shall be qualified to serve if he is an officer or employee or is otherwise affiliated with any party to the arbitration proceeding. Residence within the jurisdiction of a party to the arbitration proceeding shall not constitute affiliation within the meaning of this paragraph.

5. The board may sit in any state or subdivision party to the proceeding, in the state of the taxpayer's incorporation, residence or domicile, in any state where the taxpayer does business, or in any place that it finds most appropriate for gaining access to evidence relevant to the matter before it.

6. The board shall give due notice of the times and places of its hearings. The parties shall be entitled to be heard, to present evidence, and to examine and cross-examine witnesses. The board shall act by majority vote.

7. The board shall have power to administer oaths, take testimony, subpoena and require the attendance of witnesses and the production of accounts, books, papers, records, and other documents, and issue commissions to take testimony. Subpoenas may be signed by any member of the board. In case of failure to obey a subpoena, and upon application by the board, any judge of a court of competent jurisdiction of the state in which the board is sitting or in which the person to whom the subpoena is directed may be found may make an order requiring compliance with the subpoena, and the court may punish failure to obey the order as a contempt. The provisions of this paragraph apply only in states that have adopted this article.

8. Unless the parties otherwise agree the expenses and other costs of the arbitration shall be assessed and allocated among the parties by the board in such manner as it may determine. The commission shall fix a schedule of compensation for members of arbitration boards and of other allowable expenses and costs. No officer or employee of a state or local government who serves as a member of a board shall be entitled to compensation therefor unless he is required on account of his service to forego the regular compensation attaching to his public employment, but any such board member shall be entitled to expenses.

9. The board shall determine the disputed apportionment or allocation and any matters necessary thereto. The determinations of the board shall be final for purposes of making the apportionment or allocation, but for no other purpose.

10. The board shall file with the commission and with each tax agency represented in the proceeding: the determination of the board; the board's written statement of its reasons therefor; the record of the board's proceedings; and any other documents required by the arbitration rules of the commission to be filed.

11. The commission shall publish the determinations of boards together with the statements of the reasons therefor.

12. The commission shall adopt and publish rules of procedure and practice and shall file a copy of such rules and of any amendment thereto with the appropriate agency or officer in each of the party states.

13. Nothing contained herein shall prevent at any time a written compromise of any matter or matters in dispute, if otherwise lawful, by the parties to the arbitration proceeding.

## ARTICLE X. ENTRY INTO FORCE AND WITHDRAWAL

1. This compact shall enter into force when enacted into law by any seven states. Thereafter, this compact shall become effective as to any other state upon its enactment thereof. The commission shall arrange for notification of all party states whenever there is a new enactment of the compact.

2. Any party state may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal.

3. No proceeding commenced before an arbitration board prior to the withdrawal of a state and to which the withdrawing state or any subdivision thereof is a party shall be discontinued or terminated by the withdrawal, nor shall the board thereby lose jurisdiction over any of the parties to the proceeding necessary to make a binding determination therein.

## ARTICLE XI. EFFECT ON OTHER LAWS AND JURISDICTION

Nothing in this compact shall be construed to:

(a) Affect the power of any state or subdivision thereof to fix rates of taxation, except that a party state shall be obligated to implement Article III 2 of this compact.

(b) Apply to any tax or fixed fee imposed for the registration of a motor vehicle or any tax on motor fuel, other than a sales tax; provided that the definition of "tax" in Article VIII 9 may apply for the purposes of that article and the commission's powers of study and recommendation pursuant to Article VI 3 may apply.

(c) Withdraw or limit the jurisdiction of any state or local court or administrative officer or body with respect to any person, corporation or other entity or subject matter, except to the extent that such jurisdiction is expressly conferred by or pursuant to this compact upon another agency or body.

(d) Supersede or limit the jurisdiction of any court of the United States.

## ARTICLE XII. CONSTRUCTION AND SEVERABILITY

This compact shall be liberally construed so as to effectuate the purposes thereof. The provisions of this compact shall be severable and if any phrase, clause, sentence or provision of this compact is declared to be contrary to the constitution of any state or of the United States or the applicability thereof to any government, agency, person or circumstance is held invalid, the validity of the remainder of this compact and the applicability thereof to any government, agency, person or circumstance shall not be affected thereby. If this compact shall be held contrary to the constitution of any state participating therein, the compact shall remain in full force and effect as to the remaining party states and in full force and effect as to the state affected as to all severable matters.

Tab 3

Tex. Tax Code § 171.106

(Vernon 2002)

§ 171.106. Apportionment of Taxable Capital and Taxable Earned Surplus to This State

(a) Except as provided by Subsections (c) and (d), a corporation's taxable capital is apportioned to this state to determine the amount of the tax imposed under Section 171.002(b)(1) by multiplying the corporation's taxable capital by a fraction, the numerator of which is the corporation's gross receipts from business done in this state, as determined under Section 171.103, and the denominator of which is the corporation's gross receipts from its entire business, as determined under Section 171.105.

(b) Except as provided by Subsections (c) and (d), a corporation's taxable earned surplus is apportioned to this state to determine the amount of tax imposed under Section 171.002(b)(2) by multiplying the taxable earned surplus by a fraction, the numerator of which is the corporation's gross receipts from business done in this state, as determined under Section 171.1032, and the denominator of which is the corporation's gross receipts from its entire business, as determined under Section 171.1051.

(c) A corporation's taxable capital or earned surplus that is derived, directly or indirectly, from the sale of management, distribution, or administration services to or on behalf of a regulated investment company, including a corporation that includes trustees or sponsors of employee benefit plans that have accounts in a regulated investment company, is apportioned to this state to determine the amount of the tax imposed under Section 171.002 by multiplying the corporation's total taxable capital or earned surplus from the sale of services to or on behalf of a regulated investment company by a fraction, the numerator of which is the average of the sum of shares owned at the beginning of the year and the sum of shares owned at the end of the year by the investment company shareholders who are commercially domiciled in this state or, if the shareholders are individuals, are residents of this state, and the denominator of which is the average of the sum of shares owned at the beginning of the year and the sum of shares owned at the end of the year by all investment company shareholders. The corporation shall make a separate computation to allocate taxable capital and earned surplus. In this subsection, "regulated investment company" has the meaning assigned by Section 851(a), Internal Revenue Code.

(d) A corporation's taxable capital or taxable earned surplus that is derived, directly or indirectly, from the sale of management, administration, or investment services to an employee retirement plan is apportioned to this state to determine the amount of the tax imposed under Section 171.002 by multiplying the corporation's total taxable capital or earned surplus from the sale of services to an employee retirement plan company by a fraction, the numerator of which is the average of the sum of beneficiaries domiciled in

Texas at the beginning of the year and the sum of beneficiaries domiciled in Texas at the end of the year, and the denominator of which is the average of the sum of all beneficiaries at the beginning of the year and the sum of all beneficiaries at the end of the year. The corporation shall make a separate computation to apportion taxable capital and earned surplus. In this section, "employee retirement plan" means a plan or other arrangement that is qualified under Section 401(a), Internal Revenue Code, or satisfies the requirements of Section 403, Internal Revenue Code, or a government plan described in Section 414(d), Internal Revenue Code. The term does not include an individual retirement account or individual retirement annuity within the meaning of Section 408, Internal Revenue Code.

(e) On or before January 1, 1998, each entity registered with the State Securities Board under The Securities Act (Article 581, Vernon's Texas Civil Statutes) that provides management, administration, or investment services to an employee retirement plan, must file a report with the comptroller containing such information as the comptroller deems necessary in order to determine the fiscal impact of Subsection (d). The State Securities Board and the Securities Commissioner shall cooperate with the comptroller in obtaining the information. The Securities Commissioner shall impose the penalties provided in The Securities Act (Article 581-1 et seq., Vernon's Texas Civil Statutes) against any entity that the comptroller certifies is delinquent in the filing of the report required by this section.

(f) On or before September 1, 1998, the comptroller shall issue a report which evaluates the statewide fiscal impact of Subsection (d). If the comptroller determines that implementing Subsection (d) will not have a negative fiscal impact on this state, Subsection (d) shall be effective for reports or returns originally due on or after January 1, 1999. If the comptroller determines that there will be a negative fiscal impact, that subsection shall not be implemented.

(g) If this Act and another Act of the 75th Legislature, Regular Session, 1997, make the same substantive change from the current law but differ in text, this Act prevails regardless of the relative dates of enactment.

(h) A banking corporation shall exclude from the numerator of the bank's apportionment factor interest earned on federal funds and interest earned on securities sold under an agreement to repurchase that are held in this state in a correspondent bank that is domiciled in this state. In this subsection, "correspondent" has the meaning assigned by 12 C.F.R. Section 206.2(c).

Tab 4

Tex. Tax Code § 112.151

(Vernon 2002)

# CHAPTER 112. TAXPAYERS' SUITS

§ 112.151. Suit for Refund

(a) A person may sue the comptroller to recover an amount of tax, penalty, or interest that has been the subject of a tax refund claim if the person has:

 (1) filed a tax refund claim under Section 111.104 of this code;

 (2) filed, as provided by Section 111.105 of this code, a motion for rehearing that has been denied by the comptroller; and

 (3) paid any additional tax found due in a jeopardy or deficiency determination that applies to the tax liability period covered in the tax refund claim.

(b) The suit must be brought against both the comptroller and the attorney general and must be filed in a district court.

(c) The suit must be filed before the expiration of 30 days after the issue date of the denial of the motion for rehearing or it is barred.

(d) The amount of the refund sought must be set out in the original petition. A copy of the motion for rehearing filed under Section 111.105 of this code must be attached to the original petition filed with the court and to the copies of the original petition served on the comptroller and the attorney general.

(e) A person may not intervene in the suit.

(f) Repealed by Acts 1997, 75th Leg., ch. 1423, § 19.128, eff. Sept. 1, 1997.

# Tab 5

# Tex. Const. art. I, §16

# Texas Const. Art. 1, § 16

Sec. 16. No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made.

# Tab 6

U.S. Const. art. I, § 10

# U.S.C.A. Const. Art. I § 10, cl. 1

No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility

# Tab 7

*Int'l Bus. Machines Corp. v. Dep't of Treasury*, 852 N.W.2d 865 (2014)

**496 Mich. 642**
**Supreme Court of Michigan.**

INTERNATIONAL BUSINESS
MACHINES CORP.
v.
DEPARTMENT OF TREASURY.

Docket No. 146440. | July 14, 2014.

**Synopsis**
**Background:** Corporate taxpayer that did business in multiple states filed complaint challenging decision of Department of Treasury rejected taxpayer's election of three-factor apportionment formula under Multistate Tax Compact for calculating business income and requiring taxpayer to apportion its income using sales-factor formula under Business Tax Act (BTA). The Court of Claims granted Department's motion for summary disposition based on determination that BTA repealed Compact by implication. Taxpayer appealed, and the Court of Appeals, 2012 WL 6913772, affirmed. Taxpayer's application for leave to appeal was granted.

**Holdings:** The Supreme Court, Viviano, J., held that:

[1] enactment of BTA did not repeal Compact by implication, and

[2] modified gross receipts tax fell within scope of Compact's definition of "income tax" that taxpayer could calculate using Compact's three-factor apportionment test.

Judgment of the Court of Appeals reversed; remanded to Court of Claims.

Zahra, J., filed concurring opinion.

McCormack, J., filed dissenting opinion in which Young, C.J., and Kelly, J., concurred.

**Attorneys and Law Firms**

**\*\*867** Miller, Canfield, Paddock and Stone, PLC, Lansing (by Clifford W. Taylor and Gregory A. Nowak), and Silverstein & Pomerantz LLP (by Amy L. Silverstein, Edwin P. Antolin, and Johanna W. Roberts, pro hac vice) for IBM Corporation.

Bill Schuette, Attorney General, Aaron D. Lindstrom, Solicitor General, and Michael R. Bell, Assistant Attorney General, for the Department of Treasury.

**\*\*868** Honigman Miller Schwartz and Cohn LLP, Detroit (by Lynn A. Gandhi) for the Council on State Taxation.

Honigman Miller Schwartz and Cohn LLP, Detroit (by Lynn A. Gandhi) and Morrison & Foerster LLP (by Craig B. Fields and Mitchell A. Newark, pro hac vice) for Lorillard Tobacco Company.

Joe Huddleston, Shirley K. Sicilian, and Sheldon H. Laskin, pro hac vice, for the Multistate Tax Commission.

Jeffrey B. Litwak, pro hac vice.

Richard L. Masters, pro hac vice, for the Interstate Commission for Juveniles and the Association of Compact Administrators of the Interstate Compact on the Placement of Children.

BEFORE THE ENTIRE BENCH.

**Opinion**

VIVIANO, J.

**\*644** In this case, we must determine whether plaintiff International Business Machines Corporation (IBM) could elect to use the three-factor apportionment **\*645** formula under the Multistate Tax Compact[1] (the Compact) for its 2008 Michigan taxes, or whether it was required to use the sales-factor apportionment formula under the Michigan Business Tax Act (BTA).[2] The Department of Treasury (the Department) rejected IBM's attempt to use the Compact's apportionment formula and, instead, required IBM to apportion its income using the BTA's sales-factor formula.

We conclude that IBM was entitled to use the Compact's three-factor apportionment formula for its 2008 Michigan taxes and that the Court of Appeals erred by holding otherwise on the basis of its erroneous conclusion that the Legislature had repealed the Compact's election provision by implication when it enacted the BTA. We further hold that IBM could use the Compact's apportionment formula for that portion of its tax base subject to the modified gross receipts tax of the BTA.

Accordingly, we reverse the Court of Appeals judgment in favor of the Department, reverse the Court of Claims order granting summary disposition in favor of the Department, and remand to the Court of Claims for entry of an order granting summary disposition in favor of IBM.

## I. FACTS AND PROCEEDINGS

IBM is a corporation based in New York that provides information technology products and services worldwide. In December 2009, IBM filed its Michigan Business Tax annual return for the 2008 tax year. Line 10 of IBM's return, the "Apportionment Calculation" line, read "SEE ATTACHED ELECTION." IBM filed a separate **\*646** statement along with its return, entitled "Election to use MTC Three Factor Apportionment," indicating that it elected to apportion its business income tax base and modified gross receipts tax base using the three-factor apportionment formula provided in the Compact. Under these calculations, IBM sought a refund of $5,955,218. The Department disagreed. It determined that IBM could not elect to use the Compact's formula and that IBM was entitled to a refund of only $1,253,609 when calculated under the BTA's sales-factor apportionment formula.

IBM filed a complaint in the Court of Claims, challenging the Department's decision. Thereafter, IBM moved for

summary disposition under MCR 2.116(C)(10), and the Department moved for summary disposition under MCR 2.116(I)(2). After a hearing on the motions, the Court of **869 Claims denied summary disposition to IBM and granted summary disposition in favor of the Department. The Court of Claims determined that the BTA mandated the use of the sales-factor apportionment formula.

In an unpublished opinion, the Court of Appeals affirmed the Court of Claims order granting summary disposition in favor of the Department.[3] The Court of Appeals first determined that there was a facial conflict between the BTA and the Compact insofar as the BTA mandates use of the sales-factor formula while the Compact permits taxpayers to elect to use a three-factor apportionment formula.[4] On the basis of this conflict, the Court of Appeals concluded that the Legislature had repealed the Compact's election provision by implication *647 when it enacted the BTA.[5] The Court of Appeals then stated that it did not need to decide whether the modified gross receipts tax was an "income tax" under the Compact subject to the Compact's apportionment formula in light of its conclusion that the Compact's election provision had been repealed by implication.[6]

IBM sought leave to appeal in this Court. We granted IBM's application and asked the parties to address

> (1) whether the plaintiff could elect to use the apportionment formula provided in the Multistate Tax Compact, MCL 205.581, in calculating its 2008 tax liability to the State of Michigan, or whether it was required to use the apportionment formula provided in the Michigan Business Tax Act, MCL 208.1101 *et seq.;* (2) whether § 301 of the Michigan Business Tax Act, MCL 208.1301, repealed by implication Article III(1) of the Multistate Tax Compact; (3) whether the Multistate Tax Compact constitutes a contract that cannot be unilaterally altered or amended by a member state; and (4) whether the modified gross receipts tax component of the Michigan Business Tax Act constitutes an income tax under the Multistate Tax Compact.[7]

## II. STANDARD OF REVIEW

[1] [2] We review de novo a Court of Claims decision on a motion for summary disposition.[8] We also review de novo issues of statutory interpretation.[9]

III. HISTORY OF BUSINESS TAXATION IN MICHIGAN

Because we believe it important to our analysis in this case, we begin with a discussion of the history of business taxation in Michigan. Michigan's taxation of business income or activity began in 1953, when the Legislature enacted a business activities tax that taxed the adjusted receipts of a taxpayer.[10] This tax remained **870 in effect until Michigan adopted its first corporate income tax as part of the Income Tax Act of 1967 (ITA).[11] Against the backdrop of the ITA, Michigan joined the Multistate Tax Compact in 1970 when the Legislature enacted MCL 205.581.[12] The Compact "symbolized the recognition that, as applied to multistate businesses, traditional state tax administration was inefficient and costly to both State and taxpayer."[13] Thus, the goals of the Compact include facilitating and promoting equitable and uniform taxation of multistate taxpayers.[14] To this end, the *649 Compact operates in conjunction with Michigan's tax acts, containing several provisions designed to ensure uniform taxation of multistate taxpayers.

In 1976, the Legislature replaced the corporate income tax with a single business tax.[15] Unlike its predecessor, the Single Business Tax Act (SBTA) taxed business activity, not income, and operated as "a form of value added tax."[16] In enacting the SBTA, the Legislature expressly amended the ITA to the extent necessary to implement the SBTA and expressly repealed provisions of the ITA that would conflict with the SBTA.[17] The Legislature, however, did not expressly repeal the Compact.[18]

The SBTA remained in effect until 2008, when the Legislature enacted the BTA, which is at issue in this case.[19] Representing another shift in business taxation, the BTA imposed two main taxes: the business income tax and the modified gross receipts tax.[20] In enacting the BTA, the Legislature expressly repealed the SBTA, but again did not expressly repeal the Compact.[21] However, the BTA was short-lived. Effective January 1, 2012, Michigan returned to a corporate income tax.[22] At **871 the same time, the *650 Legislature stayed true to its past practice of repealing conflicting tax acts and expressly repealed the BTA.[23]

Throughout the evolution of our state's method of business taxation, the Compact has remained in effect. Another constant throughout this history is that the Legislature has always required a multistate taxpayer with business income or activity both within and without the state to apportion its tax base.[24] This process, known as formulary apportionment, has allowed Michigan to tax the portion of a taxpayer's multistate business carried on in Michigan without violating the Due Process Clause of the United States Constitution.[25] We now address whether a multistate taxpayer retained the privilege of electing the apportionment method provided by the

Compact for the 2008 tax year.

## IV. WHETHER IBM COULD ELECT TO USE THE COMPACT'S APPORTIONMENT FORMULA FOR ITS 2008 TAXES

To determine whether IBM could elect to use the Compact's three-factor apportionment formula to calculate its 2008 Michigan taxes, we must decide if the Legislature repealed the Compact's election provision by implication when it enacted the BTA.[26]

## *651 A. LEGAL PRINCIPLES

[3] [4] [5] [6] [7] We begin our analysis "with the axiom that repeals by implication are disfavored."[27] We will presume, "in most circumstances, that if the Legislature had intended to repeal a statute or statutory provision, it would have done so explicitly."[28] Nevertheless, "[w]hen the intention of the legislature is clear, repeal by implication may be accomplished by the enactment of a subsequent act inconsistent with a former act" or "by the occupancy of the entire field by a subsequent enactment."[29] **872 However, "where the intent of the Legislature is claimed to be unclear, it is our duty to proceed on the assumption that the Legislature desired both statutes to continue in effect unless it manifestly appears that such view is not reasonably plausible."[30] Repeals by implication will

be allowed "only when the inconsistency and repugnancy are plain and unavoidable."[31] We will "construe statutes, claimed to be in conflict, harmoniously" to find "*any other* reasonable *652 construction*" than a repeal by implication.[32] Only when we determine that two statutes "are so incompatible that both cannot stand" will we find a repeal by implication.[33]

[8] [9] In attempting to find a harmonious construction of the statutes, we "will regard all statutes upon the same general subject-matter as part of one system...."[34] Further, "[s]tatutes *in pari materia,* although in apparent conflict, should, so far as reasonably possible, be construed in harmony with each other, so as to give force and effect to each...."[35] This Court has stated:

It is a well-established rule that in the construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although they were enacted at different times, and contain no reference to one another. The endeavor should be made, by tracing the history of legislation on the subject, to ascertain the uniform and consistent purpose of the legislature, or to discover how the policy of the legislature with reference to the subject-matter has been changed or modified from time to time. In other words, in determining the meaning of a particular statute, resort may be had to

the established policy of the legislature as disclosed by a general course of legislation. With this purpose in view therefore it is proper to consider, not only acts passed at **\*653** the same session of the legislature, but also acts passed at prior and subsequent sessions.[36]

In this case, the Compact's election provision and § 301 of the BTA share the common purpose of setting forth the methods of apportionment of a taxpayer's multistate business income; therefore, we must construe them together as statutes *in pari materia.*[37]

## B. APPLICATION

[10] With the history of Michigan business taxation and applicable legal principles in mind, we turn to the specific statutes at issue. IBM sought to apportion its **\*\*873** BTA tax base using the Compact's three-factor apportionment formula.[38] In so doing, IBM relied on the Compact's election provision, which reads in pertinent part:

(1) Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in 2 or more party states may elect to apportion and allocate his income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or may elect

to apportion and allocate in accordance with article IV.... [39]

This provision allows a taxpayer subject to an income tax to elect to use a party state's apportionment formula or the Compact's three-factor apportionment formula.

**\*654** However, the Department rejected IBM's attempts to apportion its income through the Compact's apportionment formula. Instead, it required IBM to apportion its BTA tax base consistently with the BTA and its sales-factor formula. Section 301 of the BTA reads as follows:

(1) Except as otherwise provided in this act, each tax base established under this act shall be apportioned in accordance with this chapter.

(2) Each tax base of a taxpayer whose business activities are confined solely to this state shall be allocated to this state. Each tax base of a taxpayer whose business activities are subject to tax both within and outside of this state shall be apportioned to this state by multiplying each tax base by the sales factor calculated under section 303.[40]

We recognize that the language of the BTA is mandatory in nature.[41] Under the statute, a taxpayer's BTA tax base must be apportioned through the BTA's sales-factor apportionment formula.[42] The Department argues that this mandatory language precludes the use of any other apportionment formula and, reading it in isolation, we would agree. However, as stated previously, § 301 of the BTA is

not the only provision of Michigan's tax laws pertaining to the apportionment of business income—the Compact's election provision shares the same purpose. Therefore, we cannot interpret § 301 of the BTA in a vacuum.[43] Rather, we must **\*655** consider it along with the Compact "by tracing the history of legislation on the subject, to ascertain the uniform and consistent purpose of the legislature."[44]

The BTA is not the first Michigan business tax act to contain a mandatory apportionment formula. All our past business tax acts mandated that a taxpayer with **\*\*874** income or activity that was taxable within and without the state allocate and apportion its tax base consistently with each respective act.[45] These acts further mandated that the tax base be apportioned through a specific apportionment formula.[46] The mandatory apportionment language of the BTA is nearly identical to the language of its predecessors.

The Department argues that the Legislature repealed the Compact's election provision when it enacted **\*656** the BTA because § 301 of the BTA is the first tax provision with apportionment language directly in conflict with the Compact's election provision. The import of this argument is that the Compact's election provision was a dead letter when it was enacted because both the ITA and the election provision required use of the same three-factor apportionment formula. However, the Department's argument overlooks that the Compact's election provision, by using the terms "may elect," contemplates a divergence between a party state's mandated apportionment formula and the Compact's own formula—either at the time of the Compact's adoption by a party state or at some point in the future.[47] Otherwise, there would be no point in giving taxpayers an election between the two. In fact, reading the Compact's election provision as forward-looking—i.e., contemplating the future enactment of a state income tax with a mandatory apportionment formula different from the Compact's apportionment formula—is the only way to give meaning to the provision when it was enacted in Michigan.[48] Viewed in this light, the BTA's mandatory apportionment language may plausibly be read as compatible with the Compact's election provision.

Moreover, our review of the statutes *in pari materia* indicates a uniform and consistent purpose of the Legislature for the Compact's election provision to operate alongside Michigan's tax acts.[49] Just as it did **\*657** when it enacted the ITA,[50] the Legislature, **\*\*875** in enacting the BTA, had full knowledge of the Compact and its provisions.[51] Even with such knowledge on both occasions, the Legislature left the Compact's election provision intact. By contrast, the Legislature expressly repealed or amended other inconsistent acts regarding the taxation of businesses.[52] Had the Legislature believed that the Compact's election provision no longer had a place in Michigan's tax system or conflicted with the purpose of the BTA,

it could have taken the necessary action to eliminate the election provision.

Because the Legislature gave no clear indication that it intended to repeal the Compact's election provision, we proceed under the assumption that the Legislature intended for both to remain in effect.[53] After reading the statutes *in pari materia,* we conclude that a reasonable construction exists other than a repeal by implication.[54] Under Article III(1) of the Compact, the Legislature provided a multistate taxpayer with a choice between the apportionment method contained in the Compact or the apportionment method required by Michigan's tax laws. If a taxpayer elects to apportion its income through the Compact, Article IV(9) mandates that the **\*658** taxpayer do so using a three-factor apportionment formula. Alternatively, if the taxpayer does not make the Compact election, then the taxpayer must use the apportionment formula set forth in Michigan's governing tax laws. In this case, IBM's tax base arose under the BTA. Had it not elected to use the Compact's apportionment formula, IBM would have been required to apportion its tax base consistently with the mandatory language of the BTA-i.e., through the BTA's sales-factor apportionment formula.[55] Thus, we believe the BTA and the Compact are compatible and can be read as a harmonious whole.

Subsequent action by the Legislature indicates that it did not impliedly repeal the Compact's election provision when it enacted the BTA.[56] On May 25, 2011, the **\*\*876** Legislature expressly amended the Compact's election provision by adding the following language:

> [E]xcept that *beginning January 1, 2011* any taxpayer subject to the Michigan business tax act, 2007 PA 36, MCL 208.1101 to 208.1601, or the income tax act of 1967, 1967 PA 281, MCL 206.1 to 206.697, shall, for purposes of that act, apportion and allocate in accordance with the provisions **\*659** of that act and shall not apportion or allocate in accordance with article IV.[[57]

There is no dispute that the Legislature specifically intended to retroactively repeal the Compact's election provision for taxpayers subject to the BTA beginning January 1, 2011. The Legislature could have—but did not—extend this retroactive repeal to the start date of the BTA. In addressing this legislation, the dissent suggests that "the 2011 Legislature may have simply been acting expressly to confirm what the 2007 Legislature believed it had already done implicitly."[58] We would agree with that conclusion if the Legislature had retroactively repealed the Compact's election provision beginning January 1, 2008, the effective date of the BTA. However, by only repealing the Compact's election provision starting January 1, 2011, the Legislature created a window in which it did not expressly preclude use of the Compact's election provision for BTA taxpayers. Further, we believe that the express repeal of the Compact's election provision effective January 1, 2011, is evidence that the Legislature had not impliedly repealed

the provision when it enacted the BTA.[59] Therefore, a review of the 2011 amendments supports our conclusion that the Compact's election provision remained in effect for the 2008 tax year.

## C. RESPONSE TO THE DISSENT

[11] The dissent's analysis has a tantalizing simplicity to it. It homes in on the plain language and mandatory **\*660** nature of the BTA's apportionment provision. However, the dissent spends very little time considering the language of the Compact, its history, or the history of business taxation in Michigan. While this approach may be proper in construing the BTA in a typical case, it is incomplete when we are faced with the question of implied repeal. Under such circumstances, that the dissent has arrived at the better or even the best interpretation *of the BTA* does not end the inquiry. Rather, because there is a presumption *against* implied repeals,[60] it is our task to determine if there is *any other reasonable construction* that would harmonize the two statutes and avoid a repeal by implication.[61]

Repeals by implication are rare, and properly so, given that we will presume under most circumstances that "if the Legislature **\*\*877** had intended to repeal a statute or statutory provision, it would have done so explicitly."[62] They are even more unlikely in the realm of our state's taxation laws.[63] This certainly creates a very **\*661** high bar, but we disagree with the dissent that we have made it absolute.

Rather, by using the applicable canons of construction and faithfully applying our precedents in this area, we have arrived at a reasonable construction that harmonizes the BTA and the Compact.[64]

The dissent agrees that "every attempt" must be made to construe the BTA and the Compact harmoniously. But, in the end, the dissent fails to heed this call. Instead, because of its rigid focus on the mandatory language of the BTA—to the exclusion of the language and history of the Compact, and its place in Michigan's taxation scheme—the dissent's analysis is at odds with our longstanding implied-repeal jurisprudence.

## D. CONCLUSION AS TO THE ISSUE OF IMPLIED REPEAL

[12] In sum, because we are able to harmonize the BTA and the Compact's election provision, we conclude that the statutes are not " 'so incompatible that both cannot stand.' "[65] We believe that our interpretation allows the Compact's election provision to serve its purpose of providing uniformity to multistate taxpayers in light of Michigan's enactment of an apportionment formula different from the Compact's formula. Any conflict apparent from a first reading of these statutes is reconcilable when the statutes are read *in pari materia.*[66] Therefore, the Department has failed to overcome **\*662** the presumption against repeals by implication. Accordingly, the Court of Appeals erred by holding that the Legislature repealed

the Compact's election provision by implication when it enacted the BTA. Instead, we hold that the Compact's election provision was available to IBM for the 2008 tax year.[67]

**\*\*878 V. WHETHER THE MODIFIED GROSS RECEIPTS TAX IS AN INCOME TAX UNDER THE COMPACT**

[13] Having determined that IBM could elect to use the Compact's apportionment formula for the 2008 tax year, we must next consider whether IBM could apportion its entire BTA tax base through the Compact's apportionment formula. IBM's 2008 BTA tax base contained two components: the business income tax base and the modified gross receipts tax (MGRT) base. The parties quarrel over whether both components may be apportioned under the Compact. The Compact election is available to "[a]ny taxpayer subject to an income tax."[68] While it is undisputed that the business income tax is an income tax, the Department argues that the **\*663** MGRT is not an income tax, but rather a gross receipts tax not subject to the Compact's election provision. Therefore, we must determine whether the MGRT is an income tax under the Compact and, thus, apportionable under the Compact's three-factor apportionment formula.

[14] The Compact defines "income tax" as follows:

> [A] tax imposed on or

> measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, 1 or more forms of which expenses are not specifically and directly related to particular transactions.[69]

Under the Compact's broad definition, a tax is an income tax if the tax measures net income by subtracting expenses from gross income, with at least one of the expense deductions not being specifically and directly related to a particular transaction.[70]

"Modified gross receipts tax" is not defined by the BTA, but MCL 208.1203(2) states, "[The MGRT] levied and imposed under this section is upon the privilege of **\*664** doing business and not upon income or property." Although this statement indicates that the MGRT is not a tax upon income under the BTA, we must still determine whether the MGRT fits under the broad definition of "income tax" under the Compact.

The MGRT base is "a taxpayer's gross receipts ... less purchases from other **\*\*879** firms...."[71] The BTA defines "gross receipts" as

> the entire amount received by the taxpayer as determined by using the taxpayer's method of accounting used for federal income tax purposes, less

any amount deducted as bad debt for federal income tax purposes that corresponds to items of gross receipts ..., from any activity whether in intrastate, interstate, or foreign commerce carried on for direct or indirect gain, benefit, or advantage to the taxpayer or to others.... [72]

Not only is the gross receipts amount reduced by numerous exclusions, it is also subject to a deduction for the "amount deducted as bad debt for federal income tax purposes that corresponds to items of gross receipts included in the modified gross receipts tax base."[73] This total—the entire amount received by the taxpayer from any activity minus the bad-debt deduction and the numerous exclusions under MCL 208.1111—is the gross receipts base from which the MGRT liability originates.

After the taxpayer determines its gross receipts through the above calculation, the taxpayer then reduces the gross receipts base by "purchases from other firms."[74] The "purchases from other firms" deductions include, among other things, "inventory acquired during **\*665** the tax year, including freight, shipping, delivery, or engineering charges included in the original contract price"; "assets ... acquired during the tax year of a type that are, or under the internal revenue code will become, eligible for depreciation, amortization, or accelerated capital cost recovery for federal income tax purposes"; and materials and supplies to the extent not included in inventory or depreciable property.[75] There are also deductions for compensation paid in certain industries and for payments to independent contractors.[76] Once gross receipts is reduced by any applicable deductions, the taxpayer arrives at its MGRT base, which is then subject to the MGRT at a rate of .80 percent after allocation or apportionment to this state.[77]

Having examined how a taxpayer's MGRT base is calculated, we now turn to the question whether the MGRT fits within the Compact's definition of "income tax." For the MGRT to be an income tax under the Compact, a tax must measure net income by starting with gross income and subtracting expenses, with at least one of the expense deductions not specifically and directly related to a particular transaction.[78] The Compact and the BTA do not define "gross income." Therefore, we look elsewhere to determine what normally constitutes gross income. The Internal Revenue Code defines "gross income" as "all income from whatever source derived" and includes a nonexclusive list of items that includes things such as "gross income derived **\*666** from business" and "gains derived from dealings in property."[79] **\*\*880** 26 C.F.R. § 1.61–1 provides that "[g]ross income includes income realized in any form, whether in money, property, or services." 26 C.F.R. § 1.61–3 further provides that gross income for manufacturing, merchandising, or mining businesses is "the total sales, less the cost of goods sold, plus any income from investments and from incidental or outside operations or sources." Moreover, *Black's Law Dictionary* states that gross income means "[t]otal income from all sources before deductions, exemptions, or other

tax reductions."[80]

These definitions of gross income are similar to the definition of gross receipts under the BTA—the entire amount received by the taxpayer as determined from any gainful activity. Like gross income under the Internal Revenue Code, gross receipts are subject to myriad exclusions and deductions. Notably, gross receipts are subject to a reduction for the purchase of inventory during the tax year, including freight, shipping, delivery, or engineering charges included in the original contract price. This is similar to the IRS's definition of "gross income" for manufacturing, merchandising, or mining businesses—total sales less the cost of goods sold.[81] In addition, several of these exclusions or deductions are not specifically and directly related to particular transactions.[82] Depreciable **\*667** assets can be assets used over a certain number of years and, thus, not related to a single transaction.[83] Materials and supplies purchased during a tax year can be used at any time for the operation of a business and for any amount of transactions. Finally, the purchase of inventory, which includes such things as goods held for resale or raw materials, some of which can stay in a taxpayer's warehouse for an indeterminate amount of time, can be an expense not specifically or directly related to a particular transaction.[84]

We hold that the MGRT fits within the broad definition of "income tax" under the Compact by taxing a variation of net income—the entire amount received by the taxpayer as determined from any gainful activity minus inventory and certain other deductions that are expenses not specifically and directly related to a particular transaction. Therefore, IBM could elect to use the Compact's apportionment formula for that portion of its tax base subject to the MGRT for the 2008 tax year.[85]

## VI. CONCLUSION

We conclude that Court of Appeals erred by holding that the BTA repealed the Compact's election provision by implication. Therefore, IBM could elect to use **\*\*881** the Compact's apportionment formula during the 2008 tax **\*668** year. We further hold that IBM could use the Compact's apportionment formula to apportion its MGRT base under the BTA. Accordingly, we reverse the Court of Appeals' judgment in favor of the Department, reverse the Court of Claims' order granting summary disposition in favor of the Department, and remand to the Court of Claims for entry of an order granting summary disposition in favor of IBM.

CAVANAGH and MARKMAN, JJ., concurred with VIVIANO, J.

ZAHRA, J. (concurring).

I agree with the lead opinion's holding that IBM was entitled to use the

Compact's elective three-factor apportionment and allocation formula for its 2008 Michigan taxes. I also agree with both the lead opinion and the dissenting opinion that the tax bases at issue here are "income taxes" within the meaning of the Compact. Whether the Legislature repealed the Compact's election provision by implication when it enacted the BTA is a very close question. I would not reach that question because the Legislature made clear that taxpayers are entitled to use the Compact's election provision for the 2008, 2009, and 2010 tax years.

Assuming that the Legislature impliedly repealed the Compact's election provision in 2008 by enacting the BTA, IBM could nonetheless avail itself of the Compact's election provision for tax years 2008 through 2010 because the Legislature, in 2011, clearly intended to provide multistate taxpayers the benefit of the Compact's election provision for these tax years. Specifically, on May 25, 2011, the Legislature necessarily *re-enacted* all the provisions of the Compact, and ordered that act to take immediate effect.[1] MCL 8.3u provides that

> **\*669** [t]he provisions of any law or statute which is re-enacted, amended or revised, so far as they are the same as those of prior laws, shall be construed as a continuation of such laws and not as new enactments. If any provision of a law is repealed and in substance re-enacted, a reference in any other law to the repealed provision shall be deemed a reference to the re-enacted provision.

Pursuant to this provision, we must construe the Compact as though it had not been impliedly repealed.[2] That said, the BTA's exclusive apportionment method remains in conflict with the election provision of the Compact. This conflict, in my view, is easily resolved because the Legislature in 2011 also expressly supplemented the Compact. This new provision is not "the same as those of prior laws" and is a "new enactment," which expressly provides that a taxpayer could elect to apportion its income under article IV of the Compact

> except that beginning January 1, 2011 any taxpayer subject to the Michigan business tax act, 2007 PA 36, MCL 208.1101 to 208.1601, or the income tax act of 1967, 1967 PA 281, MCL 206.1 to 206.697, shall, for purposes of that act, apportion and allocate in accordance with the provisions of that act and shall not apportion or allocate in accordance with article IV.[3]

**\*\*882** There can be no dispute given this language that the Legislature specifically intended to retroactively repeal the Compact's election provision beginning January 1, 2011. Further, I conclude that this language contemplates that any

taxpayer could avail itself of the Compact's election provision for tax years 2008 through 2010. This is because the Legislature, either under the **\*670** original enactment of the Compact[4] (assuming the Legislature did not repeal the Compact's election provision by implication when it enacted the BTA) or under the above re-enactment and supplementation of the Compact[5] (assuming the Legislature repealed the Compact's election provision by implication when it enacted the BTA), chose to commence its express repeal of the Compact's election provision on January 1, 2011, even though the conflict between the BTA and the Compact had existed from the 2008 tax year. Simply put, the contrapositive of the Compact's supplemental provision must mean that before January 1, 2011, a taxpayer could, "for purposes of that act [the ITA or the BTA], apportion and allocate in accordance with the provisions of [the ITA or the BTA] and [may] apportion or allocate in accordance with article IV" of the Compact. This is, in my opinion, the most reasonable understanding of this legislation.

In sum, the Legislature in 2011 *created* a window in which it intended the Compact's election provision to apply. In this case, IBM sought to "apportion and allocate" its taxes under the BTA well before January 1, 2011, and therefore may apportion or allocate its taxes in accordance with article IV of the Compact. For this reason, I concur in the result reached in the lead opinion.

Dissenting Opinion by McCORMACK, J.

McCORMACK, J. (dissenting).

I respectfully dissent because I conclude that the Michigan Business Tax Act (BTA), MCL 208.1101 *et seq.,* requires taxpayers to apportion their multistate income in accordance with the BTA's sales-only apportionment formula and without resort to the Multistate Tax Compact's election provision. I reach this result because the Legislature's **\*671** command—"each tax base established under this act *shall be apportioned in accordance with this chapter,*" MCL 208.1301(1) (emphasis added)—is plain, unambiguous, and permits only one interpretation. Further, there is no constitutional barrier that prevents the Legislature from making the Compact's alternative election provision unavailable to taxpayers. I would affirm the judgment of the Court of Appeals.

## I. AN IRRECONCILABLE CONFLICT OF STATUTES

The threshold issue is, at its core, one of statutory interpretation. When the language of a statute is unambiguous, we give effect to its plain meaning. *Ter Beek v. City of Wyoming,* 495 Mich. 1, 8, 846 N.W.2d 531 (2014). It is hard to imagine a more unambiguous command than the mandatory directive found in § 301 of the BTA: "Except as otherwise provided in this act, each tax base established under

this act shall be apportioned in accordance with this chapter." MCL 208.1301(1). There is no "otherwise provided" exception in the BTA that would aid IBM in its **883 attempt to avoid the statute's sales-only apportionment requirement. And, within Chapter 208 of the Michigan Compiled Laws, it is the BTA alone that provides the formula by which taxpayers are to apportion their multistate income. See MCL 208.1301(2); MCL 208.1303(1). Neither the Compact nor its apportionment provisions are referred to anywhere in the BTA.

I share the lead opinion's view that we must make every attempt "to construe statutes, claimed to be in conflict, harmoniously[.]" *Wayne Co. Prosecutor v. Dep't of Corrections,* 451 Mich. 569, 577, 548 N.W.2d 900 (1996).[1] When later enacted legislation irreconcilably *672 conflicts with a prior act, however, "the last expression of the legislative will must control." *Jackson v. Mich. Corrections Comm.,* 313 Mich. 352, 356, 21 N.W.2d 159 (1946).

Section 301(1) of the BTA directs that taxes established under the BTA be apportioned "in accordance with this chapter." "[T]his chapter" requires taxpayers to use a sales-only apportionment formula.[2] The Compact, however, provides that "[a]ny taxpayer subject to an income tax [3] ... may elect to apportion" its income in accordance with the Compact's three-factor apportionment formula. MCL 205.581, Art. III(1). Reading these provisions side by side, I see two, and only two, possible

results: either taxes established under the BTA need not be apportioned "in accordance with this chapter," as § 301 demands, or taxpayers may not elect to use the Compact formula to apportion tax bases established under the BTA. While I agree with the lead opinion that statutes that appear to be conflict should be read together and reconciled, if reasonably possible, *Rathbun v. State of Michigan,* 284 Mich. 521, 544, 280 N.W. 35 (1938), I disagree that this is a case where reconciliation is possible. The differing opinions offered *673 by this Court here make the underlying conflict undeniably plain. The Compact and the BTA are irreconcilably in conflict; one statute—either the Compact or the BTA—must prevail over the other. And neither alternative is easily dismissed. Traditional rules of construction lead me to resolve the conflict in favor of the later enacted and more specific legislation. See *Kalamazoo v. KTS Indus., Inc.,* 263 Mich.App. 23, 38–39, 687 N.W.2d 319 (2004) (resolving a direct conflict between two statutes in favor of the subsequently enacted legislation).

The lead opinion agrees that the plain language of § 301 is mandatory. But it asserts that § 301 can nevertheless be interpreted as permitting taxpayers to make the Compact election. I do not see how this interpretation of the BTA is reasonable. If a taxpayer can elect an alternative apportionment formula, then § 301 is **884 in no sense *mandatory.* Quite the opposite: § 301's mandatory apportionment "in accordance with this chapter" becomes *optional.* By interpreting § 301 as permitting

taxpayers to make the Compact election, the lead opinion has not, as it claims, settled on a harmonious construction of the BTA and the Compact. Rather, it has resolved the conflict in favor of the Compact, the *earlier* enacted statute. But our precedent is clear: when an irreconcilable conflict exists, as in this case, the later enacted legislation controls. *Jackson,* 313 Mich. at 356, 21 N.W.2d 159; see also *Washtenaw Co. Rd. Comm'rs v. Pub. Serv. Comm.,* 349 Mich. 663, 680, 85 N.W.2d 134 (1957). Because I am not convinced that the two statutes can be read harmoniously, I believe that, for tax years 2008 through 2010, the enactment of the BTA impliedly repealed the Compact's election provision.

The lead opinion tries to give some effect to § 301 by stating that a taxpayer "must use the apportionment formula set forth in" the BTA if it does not make the **\*674** Compact election. *Ante* at 875. This construction does not make § 301's mandatory directive "mandatory" at all. When a taxpayer is given a choice as to whether they will apportion their income in accordance with the BTA's sales-only formula, the number of alternative options—a single one, or more—is irrelevant. As long as an alternative option exists, the taxpayer may, not must, use the apportionment formula set forth in the BTA. And once the lead opinion's "mandatory" construction is revealed to be anything but that, I do not believe that the lead opinion has persuasively explained *why* the BTA did not impliedly amend or repeal the Compact's election provision. Rather, the lead opinion,

relying on the fact that the Legislature has expressly repealed and amended tax statutes in the past, simply states that "[h]ad the Legislature believed that the Compact's election provision no longer had a place in Michigan's tax system ..., it could have taken the necessary action to eliminate the election provision." *Ante* at 875. Because it did not, the lead opinion "proceed[s] under the assumption that the Legislature intended for [the Compact's election provision] to remain in effect." *Ante* at 875. This, of course, simply assumes the lead opinion's conclusion that there was no repeal. Yes, repeals by implication are disfavored, and that the Legislature knows how to effect an express repeal is irrefutable. But by demanding that the Legislature take "the necessary action"—i.e., *expressly* amend or repeal the Compact—the lead opinion has elevated the presumption against implied repeals into an absolute bar.

Having failed to adequately explain why the statutory language itself permits the result it reaches, the lead opinion anchors its analysis in a historical overview of business taxation in Michigan. While informative, I find this approach ultimately unpersuasive. The lead opinion argues that because the Compact was enacted at a time when Michigan law applied the same three-factor apportionment **\*675** formula as that provided in the Compact, the Legislature, in enacting it, must have anticipated the future enactment of a tax act requiring a different apportionment formula and intended for the Compact to prevail should a conflict arise. But even

assuming that the lead opinion is correct, that interpretation reads into the Compact a policy choice by the *1970* Legislature that the *2008* Legislature was free to disagree with, either by enacting an income tax with a different, mandatory apportionment formula, as it did in 2008, or by repealing the election provision outright, as it did in 2011. See *Studier v. Mich. Pub. Sch. Employees' Retirement Bd.,* 472 Mich. 642, 661, 698 N.W.2d 350 (2005) ("[A] fundamental principle of the jurisprudence **885** of both the United States and this state is that one legislature cannot bind the power of a successive legislature.").

The lead opinion underscores its error by attaching particular significance to 2011 PA 40, which expressly amended the Compact to make the election unavailable to BTA taxpayers beginning January 1, 2011. The effect of this amendment on tax years 2011 and beyond is plain to see, but whether the amendment lends force to IBM's position in *this* dispute is not. In enacting this amendment, the 2011 Legislature may have simply been acting expressly to confirm what the 2007 Legislature believed it had already done implicitly. And even if the 2011 Legislature was expressing its view that the BTA did not, in fact, repeal the election provision, this Court is not bound by the prior Legislature's construction of the earlier enactment. See *Baxter v. Robertson,* 57 Mich. 127, 132, 23 N.W. 711 (1885) ("Legislative construction of past legislation has no judicial force except for the future. But it is always entitled to be considered with some care, so far as it

throws light on doubtful language, and for future cases it has authority."); *Frey v. Michie,* 68 Mich. 323, 327, 36 N.W. 184 (1888) ("It is unnecessary to say more than that a **\*676** legislative interpretation of old laws has no judicial force. Whether right or wrong must be determined by the statutes themselves."). The question we must answer in this case concerns what the Legislature intended when it enacted the BTA-not what it intended when it enacted the Compact forty years earlier or amended it three years later. While in answering this question the 2011 amendment may be considered "with some care, so far as it throws light on doubtful language," *Baxter,* 57 Mich. at 132, 23 N.W. 711, that light does not shine on the lead opinion's argument.

In my view the BTA made the Compact election unavailable. Because the statutes are irreconcilably in conflict, the latter, as the more specific and later enacted statute, must be given effect over the former. For this reason, I disagree with the lead opinion that the BTA's mandatory directive can be interpreted so as to allow BTA taxpayers to make the Compact election instead. As a result, I find it necessary to address IBM's argument that the Legislature was not constitutionally permitted to make the BTA's sales-only apportionment formula exclusive and mandatory without first repealing the Compact in its entirety.

## II. THE LEGISLATURE WAS NOT BARRED FROM UNILATERALLY AMENDING THE COMPACT

IBM asks this Court to invoke the authority of "compact law" and hold that the Legislature, even had it intended to alter the Compact's election provision when it enacted the BTA, was prohibited from doing so.[4] I would decline that invitation.

**\*677** The United States Constitution provides that "[n]o State shall, without the **\*\*886** Consent of Congress ... enter into any Agreement of Compact with another State[.]" U.S. Const., art. I, § 10, cl. 3. As the Supreme Court explained in *U.S. Steel Corp. v. Multistate Tax Comm.,* 434 U.S. 452, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978), the clause is not to be read strictly, but only as requiring congressional consent for compacts that tend to increase the political power of the states in a way that "may encroach upon or interfere with the just supremacy of the United States." *Id.* at 471, 98 S.Ct. 799 (quotation marks and citation omitted). Those compacts that receive congressional authorization *and* fall within the scope of the Compact Clause are treated as federal law. *Cuyler v. Adams,* 449 U.S. 433, 440, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981). Compacts without congressional approval, however, are not transformed into federal law; thus their construction is a matter of state statutory law.

Notwithstanding the fact that the Multistate Tax Compact, as a compact without congressional approval, does not carry the supreme force of federal law, IBM believes that the Legislature could not impose an exclusive apportionment formula because the Compact supersedes conflicting state law in any event. This is contrary to our well-established rule that a statute can be amended, repealed, or superseded, in whole or in **\*678** part, expressly or impliedly, by a subsequently enacted statute. *LeRoux v. Secretary of State,* 465 Mich. 594, 615, 640 N.W.2d 849 (2002) ("Absent the creation of contract rights, the later Legislature is free to amend or repeal existing statutory provisions."). The essence of IBM's argument is that because a compact is an agreement between Michigan and the other member states, it is not like any other state law subject to traditional principles of statutory construction, but rather it has some greater force and authority. As a result, any variation from the Compact's terms is strictly prohibited. In support of this proposition, IBM cites as persuasive authority *McComb v. Wambaugh,* 934 F.2d 474, 479 (C.A.3, 1991), and *CT Hellmuth & Assoc., Inc. v. Washington Metro. Area Transit Auth.,* 414 F.Supp. 408, 409 (D.Md., 1976). Neither case, in my view, supports such a rule.

In *McComb,* the plaintiff, as guardian ad litem for a minor child, brought a suit against the city of Philadelphia and its employees under 42 U.S.C. § 1983. The suit sought damages for injuries the child suffered as a result of parental abuse. Before he was injured the child was under the protective custody of a Virginia court. The Virginia court ordered that the child be returned to his

parental home in Philadelphia, where the abuse occurred. Plaintiff argued that the Virginia court order, in conjunction with the Interstate Compact for Placement of Children (ICPC), a compact to which Pennsylvania and Virginia are parties that had not been congressionally approved, extended the jurisdiction of the Virginia court into Pennsylvania and thereby imposed a legal duty on the Philadelphia social workers. The United States Court of Appeals for the Third Circuit rejected this argument, ultimately concluding that the ICPC did not apply when a child is returned by the **\*679** sending state to a natural parent residing in another state. *McComb,* 934 F.2d at 482.

IBM cites the Third Circuit's discussion of the scope of the ICPC for its argument here:

> Because Congressional consent was neither given nor required, the [ICPC] does not express federal law. Consequently, this Compact must be construed as state law....
>
> Nevertheless, uniformity of interpretation is important in the construction of a Compact because in some contexts it is **\*\*887** a contract between the participating states. *Having entered into a contract, a participant state may not unilaterally change its terms. A Compact also takes precedence over statutory law in member states.* [*McComb,* 934 F.2d at 479 (citations omitted; emphasis added).]

The *McComb* court did not cite any

authority for the above emphasized rule—that compacts without congressional approval cannot be unilaterally amended and must take precedent over conflicting state law—and I have found none. Moreover, the unsupported statement contradicts the one that precedes it. Either the compact must be construed as state law or it must be construed as something with greater authority than state law, but the *McComb* court said both. Finally, this statement was dictum, because the court did not identify any potential conflict between the ICPC and Pennsylvania law and the court ultimately determined that the ICPC did not apply. *Id.* at 482.

In *CT Hellmuth,* the plaintiff sought to compel disclosure of documents under Maryland law. The defendant, an interstate agency formed by an interstate compact between Maryland, Virginia, and the District of Columbia, argued that its status as an interstate agency exempted it from the Maryland law. In granting the defendant's motion for summary judgment, the court remarked that

> **\*680** when enacted, a compact constitutes not only law, but a contract which may not be amended, modified, or otherwise altered without the consent of all parties. It, therefore, appears settled that one party may not enact legislation which would impose burdens upon the compact absent the concurrence of the other signatories. [*CT Hellmuth,* 414 F.Supp. at 409.]

*CT Hellmuth* and the cases it relied upon,

however, involved congressionally approved compacts, which, as explained, supersede subsequent state law by virtue of the Supremacy Clause. *Cuyler,* 449 U.S. at 440, 101 S.Ct. 703.

IBM's claim that the Compact trumps the BTA simply because of its status as a compact relies on the faulty premise that the distinction between compacts that have congressional approval and those that do not is unimportant, and that *all* compacts are immune to unilateral modification by their member states because "[a] Compact ... takes precedence over statutory law in member states." *McComb,* 934 F.2d at 479. This assumes too much. Any immunity, if it exists, is a result of a compact's dual nature as both state law and a contract among its member states. See *Green v. Biddle,* 21 U.S. (8 Wheat.) 1, 5 L.Ed 547 (1823) (recognizing that an interstate compact can be a contract). As a result the Legislature is free to amend or repeal an existing statutory provision *as long as it does not impair a contractual obligation. LeRoux,* 465 Mich. at 615, 640 N.W.2d 849; see U.S. Const., art. I, § 10, cl. 1; Const. 1963, art. 1, § 10. In other words, the Legislature is prohibited from unilaterally amending the Compact only if that amendment impairs contractual obligations created by the Compact itself. When viewed as a matter of *contract* law, I believe that it was within the Legislature's power to require BTA taxpayers to apportion their multistate income solely in accordance with § 301.

## *681 III. UNILATERAL AMENDMENT OF MCL 205.581, ART. III(2) DOES NOT VIOLATE THE STATE OR FEDERAL CONTRACTS CLAUSE

In evaluating whether § 301 of the BTA unconstitutionally impairs a contract, the threshold question is whether the Compact did, in fact, create a contractual relationship in the first instance. I do not believe **\*\*888** that it did. Two factors weigh heavily in this conclusion. First, the member states' courses of conduct indicate that there is no contractual obligation to strictly adhere to Articles III and IV of the Compact. Second, the Compact is silent regarding a member state's authority to enact exclusive apportionment formulas that differ from the Compact's formula.

Starting with the obvious: taxpayers like IBM were *not* parties to the Compact. To the extent that the Compact can be viewed as a contract, it is an agreement between its member states, not between taxpayers and the states.[5] The Compact member states' courses of performance are critical to understanding the nature of the agreement. As the Supreme Court recently explained, a party's course of performance is "highly significant" evidence of the party's understanding of the Compact's terms. *Tarrant Regional Water Dist. v. Herrmann,* 569 U.S. ——, 133 S.Ct. 2120, 2135, 186 L.Ed.2d 153 (2013) (citation and quotation marks omitted).[6] Here, it is plain that the member states did *not* view **\*682** strict adherence to Articles III and IV as a binding contractual obligation, as

Compact members have deviated from the Compact's election provision and apportionment formula without objection from other members. Arkansas, for example, has retained the Compact's election provision but changed the Compact formula to place additional emphasis on the sales factor. Ark Code 26–5–101, Art. IV(9). Nondeviating members have not pursued actions against those states that have deviated, and no member state has intervened on IBM's behalf in this case. Further, the Multistate Tax Commission—the organization charged with administering the Compact—has urged us to reject IBM's rigid interpretation of the Compact. These facts weigh heavily in favor of rejecting IBM's argument that the Compact creates a binding contractual obligation on its member states to refrain from amending the election provision.[7]

Deference to principles of state sovereignty leads me to the same conclusion. As this Court explained in *Studier,* 472 Mich. at 661, 698 N.W.2d 350, there is a "strong presumption that statutes do not create contractual rights." This presumption is grounded in the principle that "surrenders of legislative power are subject to strict limitations that have developed in order to protect the sovereign prerogatives of state governments." *Id.* IBM has not overcome this presumption here. The Compact's silence on the effect of a member state's ability to elect an exclusive apportionment formula indicates that Michigan did not contract away its right to do exactly **\*683** that. *Id.* at 662, 698

N.W.2d 350. While it is true that the Compact **\*\*889** does not expressly allow Michigan to adopt a different apportionment formula, neither does the Compact surrender the state's right to do so. When the state's sovereign power of taxation is implicated, as it is here, any uncertainty should be resolved in favor of concluding that the state did *not* cede that power. See *Tarrant,* 133 S.Ct at 2132 (recognizing that states "do not easily cede their sovereign powers"). Admittedly, any sovereignty concerns are abated by the fact that a member state may withdraw from the Compact, unilaterally and without repercussion, at any time. MCL 205.581, Art X(2). But this withdrawal provision is equally strong evidence that the member states did not intend to be contractually bound, as it demonstrates the member states' desire to retain control over their sovereignty with respect to taxation. Moreover, if continued participation in the Compact is, essentially, completely voluntary, I fail to see how its terms can be construed as creating binding contractual obligations, especially in light of the presumption against such an interpretation. *Studier,* 472 Mich. at 661, 698 N.W.2d 350.[8]

## IV. CONCLUSION

I would affirm the judgment of the Court of Appeals because the Legislature expressly provided that taxes **\*684** established under the BTA "shall be in accordance with" the BTA's sales-only apportionment formula. Allowing

taxpayers to apportion their multistate income in accordance with the Compact's formula violates this unambiguous directive. And because the state was not contractually obligated to allow taxpayers to make the Compact election, the BTA does not offend the state or federal constitutions.

YOUNG, C.J., and KELLY, J., concurred with McCORMACK, J.

## Parallel Citations

852 N.W.2d 865

## Footnotes

1       MCL 205.581 *et seq.*

2       MCL 208.1101 *et seq.*

3       *IBM v. Dep't of Treasury,* unpublished opinion per curiam of the Court of Appeals, issued November 20, 2012 (Docket No. 306618), 2012 WL 6913772.

4       *Id.* at 3.

5       *Id.* at 3–4. It also determined that the Compact was not a binding contract.

6       *Id.* at 5. Judge RIORDAN concurred in all respects except regarding the issue of repeal by implication. He determined that the panel did not need to conclude that the BTA had impliedly repealed the Compact because MCL 208.1309 allowed the taxpayer to petition for another apportionment formula. He concluded that the plain language of the BTA required IBM to apportion its income tax consistently with the BTA.

7       *IBM v. Dep't of Treasury,* 494 Mich. 874, 832 N.W.2d 388 (2013).

8       *Malpass v. Dep't of Treasury,* 494 Mich. 237, 245, 833 N.W.2d 272 (2013).

9       *Id.*

10      See 1953 PA 150. See also *Armco Steel Corp. v. Dep't of Revenue,* 359 Mich. 430, 444, 102 N.W.2d 552 (1960) ("This tax is part of a general scheme of State taxation of business activities in Michigan. It is a tax on Michigan activities measured, in amount, by adjusted receipts derived from or attributable to Michigan sources....").

11      See MCL 206.61, as enacted by 1967 PA 281. The stated purpose of the ITA was "to meet deficiencies in state funds by providing for the imposition, levy, computation, collection, assessment, and enforcement by lien and otherwise of taxes on or measured by net income activities...." Title, 1967 PA 281.

12      1969 PA 343. Section 1 of 1969 PA 343, codified under MCL 205.581, includes the mandatory provisions of the Compact that must be enacted for a state to become a member. See *US Steel Corp. v. Multistate Tax Comm.,* 434 U.S. 452, 455–456, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978).

13      *U.S. Steel Corp.,* 434 U.S. at 456, 98 S.Ct. 799.

14     See MCL 205.581, Art. I ("The purposes of this compact are to: (1) Facilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment on tax bases and settlement of apportionment disputes[,] (2) Promote uniformity or compatibility in significant components of tax systems[,] (3) Facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration[,] and (4) Avoid duplicative taxation.").

15     See MCL 208.1 *et seq.,* as enacted by 1975 PA 228.

16     *Trinova Corp. v. Dep't of Treasury,* 433 Mich. 141, 149, 445 N.W.2d 428 (1989).

17     See 1975 PA 233.

18     See *id.*

19     2007 PA 36; MCL 208.1101 *et seq.*

20     See MCL 208.1201; MCL 208.1203.

21     Enacting section 1 of 2006 PA 325 provides: "The single business tax act, 1975 PA 228, MCL 208.1 to 208.145, is repealed effective for tax years that begin after December 31, 2007."

22     See 2011 PA 38.

23     See 2011 PA 39, which reads in part:
    Enacting section 1. The Michigan business tax act, 2007 PA 36, MCL 208.1101 to 208.1601, is repealed effective on the date that the secretary of state receives a written notice from the department of treasury that the last certificated credit or any carryforward from that certificated credit has been claimed.
    Enacting section 2. This amendatory act does not take effect unless House Bill No. 4361 of the 96th Legislature is enacted into law.

24     See MCL 205.553, as amended by 1954 PA 17; 1970 CL 206.115; 1979 CL 208.41; MCL 208.1301.

25     *Malpass,* 494 Mich. at 245–246, 833 N.W.2d 272.

26     This is the principal argument offered by the Department in disallowing use of the Compact's apportionment formula. In the alternative, the Department argues the Compact can be harmonized with the BTA by reading the Compact's election provision and apportionment formula into MCL 208.1309. We address this argument in note 55 of this opinion.

27     *Wayne Co. Pros. v. Dep't of Corrections,* 451 Mich. 569, 576, 548 N.W.2d 900 (1996). The implied repeal doctrine has "remained stable over approximately four centuries of common law in the United Kingdom and then here in the United States." Markham, *The Supreme Court's New Implied Repeal Doctrine: Expanding Judicial Power to Rewrite Legislation under the Ballooning Conception of "Plain Repugnancy,"* 45 Gonz L. Rev 437, 464 (2010). Lord Edward Coke recognized the implied repeal doctrine as far back as 1614. See *id.,* p. 456–458 (discussing Lord Coke's seminal case on the implied repeal doctrine—*Doctor Foster's Case,* 77 Eng Rep 1222 (KB, 1614)).

28     *Wayne Co. Pros.,* 451 Mich. at 576, 548 N.W.2d 900.

29   *Washtenaw Co. Rd. Comm'rs v. Pub. Serv. Comm.,* 349 Mich. 663, 680, 85 N.W.2d 134 (1957).

30   *Wayne Co. Pros.,* 451 Mich. at 577, 548 N.W.2d 900.

31   *Tillotson v. Saginaw,* 94 Mich. 240, 244–245, 54 N.W. 162 (1892).

32   *Wayne Co. Pros.,* 451 Mich. at 576–577, 548 N.W.2d 900 (emphasis added; citations and quotation marks omitted).

33   *Valentine v. Redford Twp. Supervisor,* 371 Mich. 138, 144, 123 N.W.2d 227 (1963). As with any issue of statutory interpretation, our goal "is to give effect to the Legislature's intent, focusing first on the statute's plain language." *Malpass,* 494 Mich. at 247–248, 833 N.W.2d 272 (citation and quotation marks omitted).

34   *Rathbun v. Michigan,* 284 Mich. 521, 544, 280 N.W. 35 (1938) (citation and quotation marks omitted).

35   *Id.* (citation and quotation marks omitted).

36   *Id.* at 543–544, 280 N.W. 35 (citation and quotation marks omitted).

37   *Id.* at 543, 280 N.W. 35 ("Statutes *in pari materia* are those ... which have a common purpose....").

38   MCL 205.581, Art. IV(9) ("All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is 3.").

39   MCL 205.581, Art. III(1).

40   MCL 208.1301.

41   See *Fradco v. Dep't of Treasury,* 495 Mich. 104, 114, 845 N.W.2d 81 (2014) ("The Legislature's use of the word 'shall' ... indicates a mandatory and imperative directive.").

42   MCL 208.1301(1).

43   See also *People v. Stephan,* 241 Mich.App. 482, 497, 616 N.W.2d 188 (2000) (recognizing that interpreting the unambiguous language of two conflicting statutes does not end the analysis because "courts do not construe individual statutes in a vacuum" but rather construe statutes together under the doctrine of *in pari materia* ).

44   *Rathbun,* 284 Mich. at 543–544, 280 N.W. 35 (stating further that courts " 'will regard all statutes upon the same general subject matter as part of one system' ") (citation omitted).

45   See MCL 205.552, as amended by 1954 PA 17 (providing that "[t]he adjusted receipts of a taxpayer derived from or attributable to Michigan sources shall be determined in accordance with the provisions of section 3 of this act"); 1970 CL 206.103 (providing that "[a]ny taxpayer having income from business activity which is taxable both within and without this state ... shall allocate and apportion his net income as provided in this act"); 1979 CL 208.41 (providing that "[a] taxpayer whose business activities are taxable both within and without this state, shall apportion his tax base as provided in this chapter").

46   See MCL 205.553(b), as amended by 1954 PA 17 (requiring that a taxpayer with adjusted receipts attributable to activity within and without Michigan apportion the receipts consistent with a three-factor

formula); 1970 CL 206.115 (requiring that "[a]ll business income ... shall be apportioned to this state" through the standard three-factor apportionment formula); 1979 CL 208.45 (requiring that "[a]ll of the tax base ... shall be apportioned to this state" through the three-factor apportionment formula). In 1991, the Legislature began to phase out the SBTA's equally weighted, three-factor apportionment formula, requiring a progressively more sales-factor-focused apportionment formula. See MCL 208.45, as amended by 1991 PA 77. However, the new apportionment formula was still mandatory.

47 MCL 205.581, Art. III(1). See also *Black's Law Dictionary* (9th ed) (defining an "election" as "[t]he exercise of a choice; esp., the act of choosing from several possible rights or remedies in a way that precludes the use of other rights or remedies").

48 See *Moore v. Fennville Pub. Schs. Bd. of Ed.,* 223 Mich.App. 196, 201, 566 N.W.2d 31 (1997) ("It is the duty of the courts to interpret statutes so as to render no provision meaningless.").

49 *Rathbun,* 284 Mich. at 543–544, 280 N.W. 35.

50 Although the ITA's apportionment method is largely consistent with the Compact's apportionment method, caselaw during the period in which both were in effect reflects some potential for inconsistency. See *Consumers Power Co. v. Dep't of Treasury,* 235 Mich.App. 380, 386 n. 6, 597 N.W.2d 274 (1999) (discussing definitional differences between the ITA and the Compact); *Chocola v. Dep't of Treasury,* 132 Mich.App. 820, 831, 348 N.W.2d 290 (1984); *Donovan Const. Co. v. Dep't of Treasury,* 126 Mich.App. 11, 337 N.W.2d 297 (1983).

51 *In re Reynolds Estate,* 274 Mich. 354, 362, 264 N.W. 399 (1936) ( "The Legislature, in passing [a new act], is presumed to have done so with a full knowledge of existing statutes.").

52 See notes 21 and 23 of this opinion.

53 See *Wayne Co. Pros.,* 451 Mich. at 577, 548 N.W.2d 900.

54 *Id.* at 576–577, 548 N.W.2d 900.

55 Despite the above framework, the Department argues that if the BTA and the Compact can be harmonized, it is only through MCL 208.1309(1), which allows a taxpayer to petition to use another apportionment method. We disagree. The Department's "harmonization" would actually be an abrogation of the election provision. Section 309 requires that a taxpayer *petition* the Department for another apportionment method and prove that the BTA's apportionment provision does not fairly represent the taxpayer's business activity in the state. Thus, the Department's interpretation takes the choice out of the taxpayer's hands and is inconsistent with the plain language of the Compact. Therefore, we decline to accept the Department's proposed harmonization.

56 See *Baxter v. Robertson,* 57 Mich. 127, 132, 23 N.W. 711 (1885) ( "Legislative construction of past legislation ... is always entitled to be considered with some care, so far as it throws light on doubtful language....").

57 2011 PA 40 (emphasis added).

58 *Post* at 885.

59 See 1A Singer, Sutherland Statutory Construction (7th ed), § 23:11, p. 485 ("[T]he later express repeal of a particular statute may be some indication that the legislature did not previously intend to repeal the statute by implication.").

60 See *Jackson v. Mich. Corrections Comm.,* 313 Mich. 352, 356, 21 N.W.2d 159 (1946).

61     *Wayne Co. Pros.,* 451 Mich. at 576–577, 548 N.W.2d 900 (emphasis added). See also *Rathbun,* 284 Mich. at 544–545, 280 N.W. 35 (If we "can by *any fair, strict, or liberal construction* find for the two provisions a reasonable field of operation, without destroying their evident intent and meaning, preserving the force of both, and construing them together in harmony with the whole course of legislation upon the subject, it is [our] duty to do so.") (emphasis added).

62     *Wayne Co. Pros.,* 451 Mich. at 576, 548 N.W.2d 900. See also *Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 381, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) ("The rarity with which we have discovered implied repeals is due to the relatively stringent standard for such findings, namely, that there be an 'irreconcilable conflict' between the two federal statutes at issue.").

63     1A Singer, Sutherland Statutory Construction (7th ed), § 23:10, p. 484, citing *Sylk v. United States,* 331 F.Supp. 661, 665 (E.D.Pa., 1971) ("On subjects to which the legislature pays continuous, close attention, such as internal revenue laws, the presumption against implied repeal may have greater force.").

64     Contrary to the dissent's suggestion, the question is not whether the 2008 Legislature could disregard a policy choice by the 1970 Legislature—obviously it could—but instead what action it must take to make its intentions clear in the absence of express repealing language in the statute.

65     *Valentine,* 371 Mich. at 144, 123 N.W.2d 227 (citation omitted).

66     The Department also cannot show that the Legislature intended to occupy the entire field covered by the Compact when it enacted the BTA to establish a repeal by implication. *Washtenaw Co. Rd. Comm'rs.,* 349 Mich. at 680, 85 N.W.2d 134. The BTA and the Compact, while having some overlapping provisions, occupy two different fields. The BTA is a stand-alone tax act that governs the taxation of businesses. The Compact acts as an overlay to Michigan's taxation system. It is specifically designed to leave the member states with "complete control over all legislation and administrative action affecting the rate of tax, the composition of the tax base ..., and the means and methods of determining tax liability and collecting any taxes determined to be due." *U.S. Steel Corp.,* 434 U.S. at 457, 98 S.Ct. 799.

67     Because we are able to harmonize the statutes and conclude that no repeal by implication occurred, we decline to discuss whether the Compact is binding and, thus, whether the Legislature even could repeal the Compact by implication. That inquiry involves constitutional issues, which we will not reach because they are unnecessary to resolve the case. See *Booth Newspapers, Inc. v. Univ. of Mich. Bd. of Regents,* 444 Mich. 211, 234, 507 N.W.2d 422 (1993) ("In addition, there exists a general presumption by this Court that we will not reach constitutional issues that are not necessary to resolve a case.").

68     MCL 205.581, Art. III(1).

69     MCL 205.581, Art. II(4). The Compact also defines "gross receipts tax" in Art. II(6) as follows:
        [A] tax, other than a sales tax, which is imposed on or measured by the gross volume of business, in terms of gross receipts or in other terms, and in the determination of which no deduction is allowed which would constitute the tax an income tax.

70     We need not put a definitive label on the MGRT, a task with which commentators have struggled. See, e.g., McIntyre & Pomp, *A Policy Analysis of Michigan's Mislabeled Gross Receipts Tax,* 53 Wayne L.Rev 1283 (2007) (concluding that the MGRT is akin to a sales-subtraction value added tax but that it is not a transactional tax); Gandhi, *Computing the Tax Base: The Michigan Business Tax,* 53 Wayne L.Rev 1369 (2007) (concluding that the MGRT is a reverse-build of Michigan's now-repealed Single Business Tax); Grob & Roberts, *The Michigan Business Tax Replaces the State's Much–Vilified SBT,* 17–Oct J Multistate Tax'n & Incentives 8 (2007) (concluding that the MGRT is something between a gross receipts tax and a gross margin tax). Instead, we are only tasked with determining whether the MGRT qualifies as an income tax under the Compact.

71     MCL 208.1203(3).

72    MCL 208.1111(1).

73    *Id.*

74    MCL 208.1203(3).

75    MCL 208.1113(6)(a) through (c). "Inventory" is defined as "[t]he stock of goods held for resale in the regular course of trade of a retail or wholesale business" and "[f]inished goods, goods in process, and raw materials of a manufacturing business purchased from another person." MCL 208.1111(4)(a) and (b).

76    MCL 208.1113(6)(d) through (g).

77    MCL 208.1203(1).

78    MCL 205.581, Art. II(4).

79    26 U.S.C. § 61.

80    *Black's Law Dictionary* (9th ed), p. 831.

81    "Cost of goods sold" is determined by a taxpayer's inventory. See 33A Am Jur 2d, Federal Taxation, § 6500 ("A taxpayer must use inventories to determine the cost of goods sold if the production, purchase, or sale of merchandise is an income-producing factor."). See also *Thor Power Tool Co. v. Comm'r of Internal Revenue,* 439 U.S. 522, 530 n. 9, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979); *Hygienic Prods. Co. v. Comm'r of Internal Revenue,* 111 F.2d 330, 331 (C.A.6, 1940).

82    While the Compact does not define the phrase "not specifically and directly related to particular transactions," the use of the words "specifically," "directly," and "particular" connotes a close relation to an individual transaction. See *Random House Webster's College Dictionary* (2001). That is, the tax cannot be a tax focusing on specific transactions, i.e., a transactional tax.

83    See 26 U.S.C. §§ 167, 168.

84    MCL 208.1111(4)(a), (b).

85    Our holding is limited to the determination that the MGRT is included within the Compact definition of "income tax." As noted earlier in note 70, we do not need to reach the issue whether the MGRT, generally, is an income tax.

1    2011 PA 40.

2    See also 1A Singer, Sutherland Statutory Construction (7th ed.), Repeal and Reenactment, § 23:29.

3    2011 PA 40.

4    1969 PA 343.

5   2011 PA 40.

1   The lead opinion implies that if the Compact is found to irreconcilably conflict with the BTA, the Compact, as the earlier enacted statute, will necessarily have been repealed by implication. Our caselaw does not demand such a result. See *Metro. Life Ins. Co. v. Stoll,* 276 Mich. 637, 641, 268 N.W. 763 (1936) ("It is the rule that where two laws *in pari materia* are in irreconcilable conflict, the one last enacted will control or be regarded as an exception to or qualification of the prior statute.") In any event, regardless of whether the BTA impliedly repealed the Compact beginning January 1, 2008, the issue remains the same—whether the Compact election was available for tax years 2008 through 2010.

2   Taxpayers may petition the Treasury to use an alternative apportionment method if the apportionment provisions of the BTA "do not fairly represent the extent of the taxpayer's business activity in this state[.]" MCL 208.1309(1).

3   I agree with the lead opinion that the tax bases at issue here are "income taxes" within the meaning of the Compact. MCL 205.581, Art. II(4).

4   To the extent that IBM is separately arguing that the Compact is a binding contract among its member states and that unilateral amendment of the Compact offends the Contract Clause, that argument is discussed later in this opinion.
    The California First District Court of Appeal recently decided this very issue in *Gillette Co. v. Franchise Tax Bd.,* 209 Cal.App.4th 938, 147 Cal.Rptr.3d 603 (2012), review granted and opinion superseded sub nom *Gillette v. Franchise Tax Bd.,* 151 Cal.Rptr.3d 106, 291 P.3d 327 (2013). The *Gillette* Court held that "under established compact law, the [Multistate Tax] Compact superseded subsequent conflicting state law ... [and] the federal and state Constitutions prohibit states from passing laws that impair the obligations of contracts." *Gillette,* 147 Cal.Rptr.3d at 615. For the reasons stated herein, I believe that *Gillette* was wrongly decided.

5   While the Treasury has not made the argument in its brief on appeal, it is not entirely clear to me why IBM has standing to enforce the Compact *as a contract,* given that IBM is neither a party to the Compact nor is it clear that they were intended as a third-party beneficiary. See *Schmalfeldt v. North Pointe Ins. Co.,* 469 Mich. 422, 670 N.W.2d 651 (2003); MCL 600.1405. In any event, because I conclude that no such contractual relationship was formed, I find it unnecessary to address this issue *sua sponte.*

6   Michigan law recognizes a similar principle. See *Klapp v. United Ins. Group Agency, Inc.,* 468 Mich. 459, 478–479, 663 N.W.2d 447 (2003).

7   It bears emphasizing that Compact members have not only refrained from bringing legal action against one another for deviating from Articles III and IV, they have endorsed the Commissioner's interpretation of the Compact: in the *Gillette* litigation, all of the member states jointly filed an amicus brief urging the Supreme Court of California to reject the lower court's construction of the Compact as a binding contract.

8   In arguing that unilateral amendment of the Compact would offend the state and federal constitutions, IBM cites *Green,* 21 U.S. 1, in which the Supreme Court analyzed an interstate compact under the Contract Clause, U.S. Const., art. I, § 10, cl. 1. While I conclude that the Compact did not create a contractual obligation that precluded Michigan from unilaterally amending its election provision, it is important to note that the Supreme Court has since retreated from the "any deviation" standard it applied in *Green.* See *US Trust Co. v. New Jersey,* 431 U.S. 1, 21, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). Because IBM does not engage these post-*Green* developments, it has failed to explain how a constitutional violation arises under a modern analysis.

Tab 8

*H. Alan Rosenberg v. Douglas J. Macginnittie, Commissioner, Georgia Department of Revenue*, No. 1414626 (GA Nov. 25, 2014)



GA. TAX TRIBUNAL

FILED

NOV 2 5 2014

Yvonne Bouras

Tax Tribunal Administrator

H. ALAN ROSENBERG,

           **Petitioner,**

v.

DOUGLAS J. MACGINNITTIE,
Commissioner, Georgia Department of
Revenue,

           **Respondent.**

:
:
:
:
:
:
:
:
:
:
:
:
:

**TAX TRIBUNAL DOCKET
NO.: TAX-IIT-1414626**

## DECISION

### 2014 - 15 Ga. Tax Tribunal, November 25, 2014

## I.     INTRODUCTION

This case presents the important question of whether a Georgia taxpayer who receives pass-through income from an entity that was taxed in Texas under Sections 171.0001-171.909 of the Texas Tax Code (the "Texas Franchise Tax") is entitled to utilize the relief provisions of O.C.G.A. § 48-7-27(d)(1)(C) in computing that taxpayer's taxable Georgia income because the Texas Franchise Tax is a tax "on or measured by income."

As discussed below, the plain language of the statute, the policy underlying its enactment, the applicable rules of statutory construction, and the substantial weight of judicial, administrative and financial authority both in Georgia and other jurisdictions lead ineluctably to the conclusion that the Texas Franchise Tax is indeed a tax "measured on or with respect to income" for purposes of O.C.G.A. § 48-7-27(d)(1)(C). Petitioner H. Alan Rosenberg ("Petitioner" or the "Taxpayer") is therefore entitled to the benefit of these relief provisions.

Accordingly, the Petitioner's Motion for Summary Judgment on this issue in this case is **GRANTED** and Respondent's Motion for Summary Judgment is **DENIED**.

## II.    FINDINGS OF FACT

The parties have entered into a stipulation of facts pursuant to Ga. Comp. R. & Regs. 616-1-3-.18 as adopted in Standing Order dated June 1, 2013, and the facts are not in dispute.

### A.    Petitioner's ownership interests in multi-tiered partnerships.

Petitioner, H. Alan Rosenberg, was a resident of the state of Georgia during 2008 and filed a Georgia income tax return for that tax year. During 2008, Petitioner was the owner of membership interests in NDC Leasing, LLC ("NDC Leasing"), a limited liability company organized under Georgia law that is treated as a partnership for federal and Georgia income tax purposes. During 2008, Petitioner was also the owner of membership interests in National Distributing Company, Inc. ("National Distributing"), a corporation organized under Georgia law that is treated as an S Corporation for federal and Georgia income tax purposes.

NDC Leasing and National Distributing, through their direct and indirect ownership of various partnerships, LLCs, and other pass-through entities, are wholesalers and distributors of alcoholic beverages. As a requirement of conducting that business, they (or the entities in which they hold interests) possess licenses to distribute and/or sell alcohol in a number of states, including but not limited to Georgia and Texas.

During 2008, in addition to other sources of income, Petitioner reported pass-through income as a result of his interests in NDC Leasing and National Distributing.

During 2008, NDC Leasing and National Distributing owned interests in NDC Partners, LLC ("NDC Partners"). During 2008, NDC Partners was in turn the owner of membership interests in Republic National Distributing Company, LLC ("RNDC"), which operated in Texas

2

1080

during 2008. RNDC was the reporting entity on a 2009 Texas Franchise Tax Report that included RNDC and a number of its affiliates. The accounting period for the 2009 Texas Franchise Tax Report filed by RNDC was based on the 2008 calendar year.

In determining its "taxable margin" for purposes of computing the Texas Franchise Tax, RNDC used the "cost of goods sold" deduction provided for in Tex. Tax Code Ann. § 171.101(a)(1)(B)(ii)(a).

**B.     Petitioner's original Georgia individual income tax return.**

On his original 2008 Georgia income tax return, in addition to other sources of income, Petitioner included his distributive shares of the income of NDC Leasing and National Distributing. Therefore, through his indirect interests in RNDC, Petitioner reported an amount to Georgia (greater than one dollar) during 2008 that was subject to Texas Franchise Tax.[1]

With the distributive shares of income from NDC Leasing and National Distributing included in his Georgia income, Petitioner's originally-reported 2008 Georgia taxable net income was $1,317,585, and Petitioner reported total Georgia income tax liability of $78,795 for tax year 2008.

On his original 2008 income tax return, Petitioner did not make any adjustments related to the payment of Texas Franchise Tax by RNDC.

Petitioner did not file a tax return or pay personal income taxes to Texas during 2008 or any other year.

---

[1] The parties have stipulated that at least one dollar of income from RNDC indirectly flowed through to Petitioner through his direct interests in National Distributing and NDC Leasing. The parties have so far been unable to agree on the exact amount due to the complex nature of the tiered partnership ownership structure and the resulting complex calculations. It is not necessary to resolve the *amount* of the refund that is due in order to resolve *whether* the Taxpayer is entitled to summary judgment on the legal issue in this case, which is the subject of this motion.

3

1081

**C.      Petitioner's request for ruling and the Department of Revenue's response.**

On May 1, 2012, NDC Leasing and National Distributing filed a request with the Georgia Department of Revenue (the "Department") for a letter ruling concerning the application of O.C.G.A. § 48-7-27(d)(1) to the Texas Franchise Tax. In a letter dated July 13, 2012, the Department denied the ruling request, stating in part that because Georgia does not consider the Texas Franchise Tax to be an "income tax," individuals cannot subtract pass-through amounts that were taxed by Texas.

**D.      Petitioner's amended 2008 Georgia income tax return (claim for refund).**

In an amended return dated September 12, 2012, Petitioner changed his Georgia taxable net income from $1,317,585 to $857,302 and claimed a total tax refund in the amount of $41,293, plus statutory interest. The adjustments that Petitioner claimed pursuant to O.C.G.A. § 48-7-27(d)(1) yielded a refund claim in the amount of $27,617 for tax year 2008. A portion of the adjustments under O.C.G.A. § 48-7-27(d)(1) derived from the franchise taxes paid by RNDC to Texas. The remainder of those adjustments derived from taxes paid by RNDC to the District of Columbia.

The income tax credits that Petitioner claimed on his amended 2008 Georgia income tax return yielded a refund claim in the amount of $13,676 for tax year 2008. Those income tax credits stemmed from an amended Georgia income tax return filed by National Distributing to claim Georgia jobs tax credits that National Distributing did not claim on its original Georgia income tax return for the 2008 year.[2]

In a letter dated September 12, 2013, the Department denied Petitioner's claim for refund.

---

[2] The Petitioner has not sought summary judgment with respect to either (i) the District of Columbia adjustment or (ii) the Georgia income tax credits that were claimed. These amounts are still at issue and the parties continue to negotiate as to possible resolution of these issues.

4

1082

## E.  Petitioner's case in the Tax Tribunal.

In response to the Department's denial of Petitioner's claim for refund, Petitioner filed his Petition in this matter with the Tribunal on October 17, 2013. Under the Amended Consent Scheduling Order entered in this case, Petitioner filed Petitioner's Motion for Summary Judgment, ("Petitioner's Summary Judgment Motion"), Petitioner's Statement of Theory of Relief and Joint Stipulation of Facts ("Joint Stipulation"), Brief in Support of Motion for Summary Judgment ("Petitioner's Summary Judgment Brief"), and Petitioner's Motion for Oral Argument on June 27, 2104, moving for partial summary judgment on the issue for decision now before us. In response, Respondent filed Respondent's Motion for Summary Judgment ("Respondent's Cross-Motion for Summary Judgment"), Brief in Support of Respondent's Cross-Motion for Summary Judgment ("Respondent's Summary Judgment Brief"), Respondent's Theory of Recovery, and Respondent's Motion for Oral Argument. In response, Petitioner filed his Reply Brief ("Petitioner's Reply Brief") on August 15, 2014.

Oral argument on Petitioner's Motion for Summary Judgment and Respondent's Cross-Motion for Summary Judgment was held on October 3, 2014. In response to requests from the Tribunal, Petitioner submitted supplemental information electronically on October 16, 2014.

## III.  CONCLUSIONS OF LAW

### A.  Jurisdiction and venue.

The parties have stipulated that the Tribunal has jurisdiction over this appeal from the Department's denial of a claim for refund of income taxes pursuant to O.C.G.A. §§ 48-2-35(a)(4) and 50-13A-9(a) and that venue is proper before the Tribunal pursuant to O.C.G.A. § 48-2-35(a)(4).

5

**B.     Standard of review on summary judgment.**

The standards governing summary judgment are well established. To prevail at summary judgment under O.C.G.A. § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact as to each element of its claim and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. O.C.G.A. § 9-11-56(c); Lau's Corp., Inc. v. Haskins, 261 Ga. 491 (1991). Proceedings before the Tribunal are *de novo* in nature, and the evidence on the issues in a hearing before the Tribunal is not limited to the evidence presented to or considered by the Department prior to the Department's decision. O.C.G.A. § 50-13A-14; see Ga. Comp. R. & Regs. 616-1-3-.11 as adopted in Standing Order dated June 1, 2013.

**C.     Flow-through entity taxation.**

In approaching the issue in this case it is important to understand the context in which the Georgia General Assembly enacted the legislation which is at issue. This case must therefore be understood in the broader context of taxation of flow-through entities in a multi-state context.

The taxation of partnerships, S corporations and other forms of "flow-through" entities on a multistate basis has long been a complex and unsettled area. See, e.g., American Bar Association Subcommittee on State Taxation of S Corporations, Report of the Subcommittee on State Taxation of S Corporations: Model S Corporation Income Tax Act and Commentary, 42 The Tax Lawyer 1001 (1989); Multistate Tax Commission, The Multistate Tax Commission "Working Draft" of a Proposed Model Rule for a Partnership Composite Tax Return Applicable to Multijurisdictional Partnerships, 3 State Tax Notes 810 (1992); Carolyn Joy Lee, Bruce P. Ely and Dennis Rimkunas, State Taxation of Partnerships and LLCs and their Members, Journal of Multistate Taxation and Incentives, Volume 19, Number 10, February 2010. The issues that

6

arise when multiple states seek to tax the income of business enterprises conducted through flow-through entities are particularly complex.[3]

A flow-through entity is best understood as an entity that is not taxed as a corporation. Under Subchapter C of the Internal Revenue Code, an entity taxed as a corporation (a "C corporation") is taxed on its income as a separate entity, separate and distinct from its owners. It is subject to double taxation first on its earnings at the entity level (currently taxed up to a maximum rate of 39.6 percent for federal income tax purposes plus applicable state income taxes) and then a second time again to the shareholders (currently up to a maximum rate of 39.6 percent for individuals plus applicable state income taxes) when distributed to them. See generally, Corporations, Internal Revenue Service, http://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/Corporations.

By contrast with the C corporation double-tax paradigm, a flow-through entity computes taxable income derived by the enterprise at the entity level, but does not itself pay tax on that income. Rather, it is the entity's owners who pay the tax. As a consequence, such earnings are taxed only once – to the flow-through entity's owners.

The most frequently seen forms of flow-through entities are entities taxed as partnerships, corporations which have elected S corporation status, and single member LLCs which are

---

[3] Over the last twenty-five years, these issues have assumed ever greater importance for taxpayers and state tax authorities as a result of the proliferation of additional forms of flow-through entities, including Subchapter "S" corporations, limited liability companies ("LLCs"), limited liability partnerships ("LLPs"), limited liability limited partnerships ("LLLPs"), qualified Subchapter S subsidiaries ("QSSSs"), single member limited liability companies that are disregarded for income tax purposes ("SMLLCs") and, most recently, so called "series" limited liability companies. Indeed, since the adoption of the federal "check-the-box regulations" and the rise of the limited liability company as a preferred form of business entity, the number of business enterprises organized as flow-through entities for tax purposes continues to increase while the number of entities taxed as traditional "C" corporations is declining steadily. Looking at the federal statistics in this area is enlightening. See Staff of the Joint Committee on Taxation, Selected Issues Relating to Choice of Business Entity (July 27, 2012), https://www.jct.gov/publications.html?func=startdown&id=4478.

1085

disregarded for federal income tax purposes.[4]  Such entities are all generally referred to as "flow-through" entities for federal income tax purposes although each has a distinct tax regime.[5]

## D.  Flow-through tax treatment for state tax purposes.

The analysis becomes more complex as we move to the taxation of such entities by the several states.

It is quite possible and quite common for two different states to tax the same income.  As the Maryland Court of Appeals recently noted in Maryland State Comptroller of the Treasury v. Wynne, et ux., 431 Md. 147, 155 (2013), cert. granted, 134 S. Ct. 2660 (2014),

> A state may tax the income of its residents, regardless of where that income is earned.  A state may also tax a nonresident on income earned within the state.  Both of these propositions are consistent with the Due Process Cause of the Fourteenth Amendment.  Oklahoma Tax Comm's v Chickasaw Nation, 515 U.S. 450, 462-63 & n.11 (1995); New York ex rel. Cohn v. Graves, 300 U.S, 312-13 (1937).  However, they raise the possibility of what might be termed "double taxation" when both the state of the taxpayer's residence and the state where the income was generated tax the same income.

To ameliorate this harsh result, many states allow credits or adjustments to the computation of their income to ameliorate the resulting double-tax.  As to individuals, for

---

[4]  Under the check-the-box regulations, a non-corporate entity with at least two members is classified as a partnership unless it elects to be taxed as an association taxable as a corporation.  Treas. Reg. §§ 301.7701-2(c)(1), 301.7701-3(a), 301.7701-3(b)(1)(i).  An S corporation is a domestic corporation which satisfies the requirements of I.R.C. § 1361 and as to which its shareholders have made the election required by I.R.C. § 1362 on Form 2553. Finally, under the check-the-box regulations, a single member non-corporate business entity (most frequently a limited liability company) is disregarded for tax purposes and treated as an extension of its owner for all income tax purposes unless the entity elects to be classified as an association.  Treas. Reg. §§ 301.7701-2(c)(2), 301.7701-3(a), 301.7701-3(b)(1)(ii).

[5]  Entities taxed as partnerships are taxed under Subchapter K of the Internal Revenue Code while Subchapter S corporations are cleverly so named because they are taxed under Subchapter S.  It is often said that partnerships and S corporations are taxed alike, but, like all generalizations, this one is misleading as there are extremely significant differences in the tax rules that apply to these two types of entities.  For income tax purposes, disregarded entities are just that (except for employment tax purposes), but they are generally *not* disregarded for non-income tax purposes, e.g., sales and use taxes.

There are a number of other more exotic forms of flow-through or *quasi* flow-through entities including Regulated Investment Companies ("RICs"), I.R.C. § 852, Real Estate Investment Trusts ("REITs"), I.R.C. §857, Real Estate Mortgage Investment Conduits ("REMICs"), I.R.C. § 860A, Qualified REIT Subsidiaries ("QRSs"), I.R.C. § 856, Qualified Subchapter S Subsidiaries, ("QSSSs"), I.R.C. § 1361(b)(3)(A), and so called "Series LLCs" (Prop. Treas. Reg. §§ 301.6011-6, 301.6071-2, 301.7701-1(a)(5)).  Each of these has its own separate tax regime and none is at issue in this case.

1086

instance, Georgia provides a credit for taxes paid in foreign states on the same income. O.C.G.A. § 48-7-28.[6]

So for state income tax purposes, flow-through tax treatment works well when the entity, its owners, and all income earned are located within one taxing jurisdiction. In such circumstances, there is only one sovereign and only one tax imposed. But when a flow-through entity has business activities, income and owners located in multiple states, the complexities of compliance and the potential for owners of the entity to pay tax on the same income in multiple jurisdictions mounts quickly. O.C.G.A § 48-7-30(b); Form IT-711, Instructions to Georgia Partnership Tax Return.

A related, but slightly different issue arises when an entity that is recognized as a flow-through in one state engages in business in a state which does not recognize flow-through treatment. While it is true that as a broad working generalization and subject to various exceptions, most states follow the federal classification of an entity for tax purposes,[7] some states treat flow-through entities as separate taxpayers and impose various entity level taxes on such flow-through entities.[8] These include Texas and Tennessee (neither of which imposes an individual income tax) as well as a number of other jurisdictions. See Ely Chart.

---

[6] The degree to which one state is constitutionally required to give credits for taxes on multistate income has long been a subject of scholarly debate. The decision of the Maryland Court of Appeals on this issue in Wynne, has generated great interest and is currently pending before the United States Supreme Court on writ of certiorari. See Comptroller of the Treasury of Maryland v. Wynne, 134 S. Ct. 2600 (2014).

[7] Thus, for example, if an entity organized as a limited liability company in Georgia is taxed as a partnership for federal income tax purposes, Georgia will likewise tax the entity as a partnership for Georgia income tax purposes. O.C.G.A § 14-11-1104.

[8] In the area of state taxation of limited liability companies and limited liability partnerships, for many years, Bruce Ely and his cohorts have performed an invaluable service by annually publishing updated charts summarizing the State Tax Treatment of Limited Liability Companies and Limited Liability Partnerships. These charts summarize federal/state conformity/non-conformity on tax treatment of LLCs and LLPs as well as identifying other state taxes and fees that may apply. See Bruce P. Ely, Christopher R. Grissom, William T. Thistle II, and J. Sims Rhyne, An Update of the State Tax Treatment of LLCs and LLPs, State Tax Notes (February 3, 2014), cited as "Ely Chart" elsewhere in this decision.

9

**E.    The adjustment to taxable income provided under O.C.G.A. § 48-7-27(d)(1)(C).**

The Georgia General Assembly enacted O.C.G.A. § 48-7-27(d)(1)(C) to address just this latter issue.   The language of this adjustment provision, which is at the core of this case, provides:

> A Georgia individual resident who is a partner in a partnership, who is a member of a limited liability company taxed as a partnership, or who is a single member of a limited liability company which is disregarded for federal income tax purposes may make an adjustment to federal adjusted gross income for the entity's *income* taxed in another state which imposes on the entity a tax *on or measured by income*.

O.C.G.A. § 48-7-27(d)(1)(C) (emphasis added).

Under this relief provision, Georgia taxpayers will not be subjected to double taxation with respect to income from flow-through entities where such income is subject to taxation in another state because that state chooses to tax such income directly at the entity, rather than the owner, level.  This provision permits the affected Georgia taxpayer to make an "adjustment" to the taxpayer's Federal Adjusted Gross Income in computing the taxpayer's Georgia taxable income for income flowing out to that taxpayer from a flow through entity that has also been subject to tax "on or measured by income" in another state.[9]

---

Many states, such as Georgia, impose additional requirements to recognize flow-through treatment for S corporations.  See O.C.G.A § 48-27(d)(2).

[9] O.C.G.A. § 48-7-27(d)(1)(C) utilizes an "adjustment" mechanism to avoid double taxation at the state level on the same income.  This is the same approach adopted by the legislature in O.C.G.A. § 48-7-27(d)(1)(B) with respect to S corporations which are recognized as S corporations for tax purposes in Georgia but not in another state.

This adjustment approach is not the only possible solution to address the issue of taxation of the same income by two states, however.  Alternatively, the legislature could have adopted a credit mechanism similar to that contained at O.C.G.A. § 48-7-28, which is how the issue is addressed for individuals.  In the analogous area of double taxation of the same income by both the US and a foreign nation, the Internal Revenue Code adopts the "credit" approach to addressing the issue in the Foreign Tax Credit provisions of the Internal Revenue Code, I.R.C. §§ 901-906, http://www.irs.gov/taxtopics/tc856.html.

Each system ("adjustment" vs. "credit") has weaknesses, strengths and computational complexities arising from attempting to harmonize what, are by definition, different tax systems.

10

1088

Respondent has acknowledged that the provisions of O.C.G.A. § 48-7-27(d)(1)(C) apply to Georgia taxpayers who own interests in entities which conduct business in Tennessee through flow-through entities because Tennessee imposes its excise tax on flow-through entities that provide limited liability, such as LLCs, LLPs, and S corporations, at the rate of 6.5 percent of net income. Tenn. Code Ann. § 67-4-2007(a). The question presented in this case is whether the Texas Franchise Tax is a tax "on or measured by income" that should receive similar treatment.

The parties have stipulated that Petitioner was a resident of the state of Georgia during 2008 and filed a Georgia income tax return for that tax year. On that 2008 return, in addition to other sources of income, Petitioner reported pass-through income as a result of his interests in NDC Leasing and National Distributing. In turn, NDC Leasing and National Distributing (an LLC and an S corporation, respectively) owned indirect membership interests in RNDC, an LLC that operated in Texas during 2008 and paid Texas Franchise Taxes for that year. Therefore, the parties agree in this case that, through his indirect interests in RNDC, Petitioner reported an amount to Georgia (greater than one dollar) during 2008 that was subject to Texas Franchise Tax.

Because it is undisputed Petitioner received pass-through income from an entity that was taxed in Texas, if the Texas Franchise Tax on those entities is a tax "on or measured by income" the Petitioner in entitled to an adjustment from his federal adjusted gross income under O.C.G.A. § 48-7-27(d)(1)(C). The Petitioner's position is that the Texas Franchise Tax is indeed such a tax.

Respondent's position is that the Texas Franchise Tax is not a "tax on or measured by income." Respondent argues that the Texas Franchise Tax is instead a privilege tax or a gross-receipts tax and operates in a fundamentally different manner than an income tax. Because under

11

1089

Respondent's analysis, the Texas Franchise Tax is not an income tax or measured by income as determined by long accepted principles, it cannot serve as a basis for an adjustment pursuant to O.C.G.A. § 48-7-27(d)(1).

To resolve this question, it is first necessary to define the meaning of "income" for purposes of the phrase "on or measured by income" contained in O.C.G.A. § 48-7-27(d)(1)(C).

F. **Georgia law imposes income tax on an individual's "Georgia taxable net income," which is an individual's "federal adjusted gross income" as adjusted.**

In defining an individual's "Georgia taxable net income," O.C.G.A. § 48-7-27(a) provides that it consists of the individual's "federal adjusted gross income, as defined in the United States Internal Revenue Code of 1986," subject to a number of prescribed adjustments. Those adjustments include, *inter alia*, a deduction for either the individual's itemized nonbusiness deductions or a standard deduction; an exclusion for certain amounts of retirement income; and a number of other specified deductions and additions involving specified types of income (e.g., deductions for certain military or disability income). See generally O.C.G.A. § 48-7-27(a)-(b).

The adjustment provision at issue in this case—O.C.G.A. § 48-7-27(d)(1)(C)—cannot be interpreted in isolation, but instead must be considered in connection with all of the related adjustment provisions and related terms of art that appear throughout the Georgia Tax Code (and especially in Code Sections 48-7-21 and 48-7-27). See, e.g., Tew v. State, 320 Ga. App. 127, 130 (2013) ("[A] statute must be construed in relation to other statutes of which it is a part, and all statutes relating to the same subject matter, briefly called statutes in *pari materia* . . . .").

It is crucial that, like O.C.G.A. § 48-7-27(d)(1)(C), other statutory adjustment provisions located throughout O.C.G.A. § 48-7-27 also include numerous explicit references to terms of

12

1090

art—including "gross income," "taxable income," "net income," and "income taxes."[10] Similarly, the statute which provides for the computation of a corporation's "Georgia taxable net income" also includes a number of adjustment provisions which use terms of art involving the word "income." See generally O.C.G.A. § 48-7-21.[11]

---

[10] These provisions include, but are not limited to:

- A provision stating, in describing the amount of retirement income that an individual may exclude, that "[e]arned income in excess of $4,000.00, including but not limited to *net business income* earned by an individual from any trade or business . . . shall not be regarded as retirement income." (O.C.G.A. § 48-7-27(a)(5)(E)) (emphasis added);

- A provision stating: "The commissioner shall by regulation provide that . . . penalty and interest may be waived or reduced for any taxpayer whose estimated tax payments and tax withholdings are less than 70 percent of such taxpayer's Georgia income tax liability if the commissioner determines that such underpayment or deficiency is due to an increase in *net taxable income* attributable directly to amendments to this paragraph . . . ." (O.C.G.A. § 48-7-27(a)(5)(G)) (emphasis added);

- A provision stating that "[s]ocial security benefits and tier 1 railroad retirement benefits, to the extent included in *federal taxable income*," may be subtracted. (O.C.G.A. § 48-7-27(a)(7)) (emphasis added);

- A provision stating that there shall be added to "taxable income" any "[d]ividend or interest income, to the extent that the dividend or interest income is not included in *gross income* for *federal income tax purposes*," on obligations of any state except Georgia or its subdivisions. (O.C.G.A. § 48-7-27(b)(1)(A)) (emphasis added);

- A provision stating that there shall be added to "taxable income" any "[i]nterest or dividends on obligations of the United States" or its subdivisions "which by the laws of the United States are exempt from federal income taxes but not from *state income taxes*." (O.C.G.A. § 48-7-27(b)(1)(B)) (emphasis added); and

- A provision stating that "[t]here shall be added to *taxable income* any *income taxes* imposed by any tax jurisdiction except the State of Georgia to the extent deducted in determining *federal taxable income*." O.C.G.A. § 48-7-27(b)(3) (emphasis added).

[11] These provisions include, but are not limited to:

- A provision stating, "When interest income is derived from obligations of any state or political subdivision except this state and political subdivisions of this state, the interest income shall be added to *taxable income* to the extent that the interest income is not included in *gross income* for federal income tax purposes." (O.C.G.A. § 48-7-21(b)(1)(A)) (emphasis added);

- "There shall be subtracted from *taxable income* interest or dividends on obligations of the United States. . . to the extent such interest or dividends are includable in *gross income* for federal income tax purposes but exempt from state *income taxes* under the laws of the United States." (O.C.G.A. § 48-7-21(b)(1)(B)) (emphasis added);

- "There shall be added to taxable income any taxes on, or measured by, net income or net profits paid or accrued within the taxable year imposed by the authority of the United States or . . . by any state except the State of Georgia . . . to the extent such taxes are deducted in determining federal taxable income." (O.C.G.A. § 48-7-21(b)(2)) (emphasis added); and

- "No portion of any deductions or losses which occurred in a year in which the taxpayer was not subject to taxation in this state including, but not limited to, net operating losses may be deducted in any tax year. When the *federal adjusted gross income* or *net income* of a corporation includes such deductions or losses, an adjustment deleting them shall be made under rules established by the commissioner." O.C.G.A. § 48-7-21(b)(3) (emphasis added).

13

In contrast to the other adjustment provisions in O.C.G.A. §§ 48-7-21 and 48-7-27 which turn on the application of terms of art including "net income," "taxable income," "federal taxable income," or "income taxes," O.C.G.A. § 48-7-27(d)(1)(C) provides an adjustment to an individual whenever the individual receives pass-through income that has been subject to tax "*on or measured by income*." Therefore, to interpret the "on or measured by income" language that is at the core of this case, it is essential not only to look to the statutory and historical definitions of "income," but also to interpret the phrase in harmony with the related terms of art that appear throughout the Georgia Tax Code.

As the Georgia Court of Appeals explained in the context of interpreting the meaning of the phrase "income tax" in Chilivis v. Int'l Bus. Mach. Corp., 142 Ga. App. 160, 161 (1977), the state's General Assembly "must be assumed to have understood the technical meaning" of those numerous terms of art when it enacted the various adjustment provisions. So one must approach the statute mindful of both this rule and the rule that a statute must be construed "*in pari materia*" to harmonize all of its parts, "whenever possible."

## G.    The Texas Franchise Tax as a tax "on or measured by income."

### 1. "Income" for tax purposes means all sources of gain, generally without regard to expenses or other deductions.

Whether the Texas Franchise Tax is a tax "on or measured by income" for purposes of O.C.G.A. § 48-7-27(d)(1)(C) depends on the fundamental question of what "income" means under the statute. Neither the Georgia Tax Code nor the Internal Revenue Code specifically defines the term "income." Courts and scholars have long struggled to define the term. For example, writing in the Connecticut Law Review regarding the proper income tax treatment of gifts, one scholar wrote:

14

Determining the constitutional meaning of income is difficult since the [Sixteenth] Amendment nowhere defines the term. The current debate on the proper method of constitutional analysis has not focused on the Sixteenth Amendment, nor has the Supreme Court examined the issue recently. The Court's earlier pronouncements, which began in the 1920's, interpreted the term very strictly, limiting it to its plain or ordinary meaning, whatever that may be.[12]

One of the seminal authorities on this issue is the U.S. Supreme Court's decision in Eisner v. Macomber, 252 U.S. 189 (1920). Seeking to define "income" for purposes of the Sixteenth Amendment, after examining dictionary definitions and the intent of the amendment, the Court concluded: "Income may be defined as the gain derived from capital, from labor, or from both combined . . . ." Id. at 207 (quoting Doyle v. Mitchell Bros., 247 U.S. 179, 185 (1918)). The Court added that the gain must be realized (i.e., "separated" from the capital), and recited the Sixteenth Amendment's language that such realized gain is income, "from whatever source [it is] derived." Id. at 207. Notably, the U.S. Supreme Court in Macomber did *not* define "income" with reference to any expenses or deductions.

While Georgia courts have rarely considered the meaning of the term "income," the Georgia Court of Appeals used a definition nearly identical to the broad definition contained in Macomber in its 1936 decision in Brandon v. State Revenue Comm'n, 186 S.E. 872 (Ga. Ct. App. 1936). There, the court examined the nature of an income tax and defined "income" as follows:

> Whatever may be the strict or technical meaning of income, for tax purposes the term means an actual gain or an actual increase in wealth, and does not include a mere unrealized increase in value. Accordingly, as a subject of taxation, income is the gain derived from capital or labor, or both combined . . . .

Id. at 873; see also City of Fitzgerald v. Newcomer, 162 Ga. App. 646, 648 (1982) (noting as part of interpreting a contract: "It is undoubtedly true that 'profits' and 'income' are sometimes

---

[12] Marjorie Kornhauser, The Constitutional Meaning of Income and the Income Taxation of Gifts, 25 Conn. L. Rev. 1, 2 (1992).

15

used as synonymous terms; but, strictly speaking, 'income' means that which comes in or is received from any business, or investment of capital, *without reference to the outgoing expenditures . . . .*") (emphasis added).

More recently, the New Jersey Supreme Court also relied on Macomber to determine whether a federal "windfall profits tax" was a tax measured by income for purposes of that state's adjustment provision. See Amerada Hess Corp. v. Dir., Div. of Taxation, 526 A.2d 1029, 1042-44 (N.J. 1987), aff'd., 490 U.S. 66 (1989). That court concluded that the federal tax was a tax on income:

> Under ordinary dictionary definitions of "income," *i.e., all that comes in without regard to expenditures*, the windfall profit clearly constitutes "income." The windfall profit also meets a more restrictive definition, i.e., gross receipts less costs of goods sold.

Id. at 1042 (emphasis added). Black's Law Dictionary similarly defines the term "income" to mean "the money or other form of payments that one receives, usually periodically, from employment, business, investments, royalties, gifts, and the like"—again making no reference to any expenses or deductions. Black's Law Dictionary (9th ed. 2009).

Based on the consistent interpretations of the term "income" over the years in Macomber, Brandon, and Amerada Hess, and the similar definition in Black's Law Dictionary, for tax purposes, the term "income" means all amounts that come in, without regard to expenditures.

While the Internal Revenue Code does not itself define the term "income," it equates "income" with "gross income" by defining "gross income" to mean *"all income* from whatever source derived, including (but not limited to) the following items:

> (1)    compensation for services . . . ;
>
> (2)    gross income derived from business;
>
> (3)    gains derived from dealings in property;

16

(4)    interest;

(5)    rents;

(6)    royalties;

(7)    dividends;

(8)    alimony and separate maintenance payments;

(9)    annuities;

(10)    income from life insurance . . . contracts;

(11)    pensions;

(12)    income from discharge of indebtedness;

(13)    distributive share of partnership income;

(14)    income in respect of a decedent; and

(15)    income from an interest in an estate or trust."

26 U.S.C. § 61(a) (emphasis added). Under Georgia law, the Internal Revenue Code's definition of "gross income"—as an aggregate of "all income" with no reference to any deduction for expenditures—is adopted for Georgia tax purposes. See Ga. Comp. R. & Regs. 560-7-6-.02(1) ("Any term used in these Regulations has the same meaning as when used in a comparable context in the laws of the United States or Regulations of the Internal Revenue Service, relating to Federal income taxes, unless a different meaning is clearly required or the term is specifically defined in the Georgia Code or Regulations.").

While "income" is *generally* used interchangeably with "gross income" to refer to all sources of gain or receipts without regard for expenses or other deductions, in specific contexts the term "gross income" has been given a more limited definition which requires a deduction for the "cost of goods sold." Most notably, Treasury Regulation 1.61-3(a) states that for a

17

1095

manufacturing, merchandising, or mining business,[13] "gross income" means "the total sales, *less the cost of goods sold*, plus any income from investments and from incidental or outside operations or sources." This IRS regulation has been applied on multiple occasions in determining the "gross income" of businesses governed by that provision. See, e.g., Sullenger v. C.I.R., 11 T.C. 1076, 1077 (1948) ("[T]he Commissioner has always recognized, as indeed he must to stay within the Constitution, that the cost of goods sold must be deducted from gross receipts in order to arrive at gross income."); Kazhukauskas v. C.I.R., T.C. Memo. 2012-191, 2012 WL 2848694, at *9 (2012) ("Thus, cost of goods sold is an offset to gross receipts for purposes of computing gross income, and deductions are subtracted from gross income in arriving at taxable income."); Beamer v. Franchise Tax Bd., 563 P.2d 238 (Cal. 1977) (holding that Texas gas and oil production taxes were not taxes on "gross income" because they did not include any deduction for expenses). And the Amerada Hess case specifically noted both an "ordinary dictionary" definition of income and the "more restrictive" definition of income --"i.e., gross receipts less costs of goods sold." Amerada Hess, 526 A.2d at 1042.

So there is extensive support for the proposition that the term "gross income" is synonymous with "income" and includes all sources of income without regard for expenses or other deductions. There is also authority that "gross income" necessarily includes a deduction for the "cost of goods sold." Indeed, the Wisconsin Tax Appeals Commission in Delco Electronics noted the split of authority on just this issue. It did not resolve the question, however, because it was able to reach a decision on the deductibility of the tax in that case (the Michigan Single Business Tax) without reaching a conclusion as to the scope of the phrase "gross income." Delco Elecs. Corp. v. Wis. Dep't of Revenue, No. 95-I-112, 1997 WL 331967,

---

[13] RNDC operates a merchandising business in which it distributes alcohol.

18

1096

at *10 (Wis. Tax. App. Comm'n, June 16, 1997) ("We do not believe it is necessary here to define the outer limits of 'gross income,' because the issue can be resolved on other grounds.").

As in Delco Electronics, it is not necessary to determine the precise meaning of "income" in order to reach a resolution in this case. It will be seen that even under the narrower definition of "income" (providing for the cost of goods sold deduction) the Texas Franchise Tax is a tax "on or measured by income." That is to say, the Texas Franchise Tax is "on or measured by income" under either the broad definitions of "income" and "gross income" discussed above or the more restrictive definition of "gross income" found in the Treasury Regulation and other authorities.

**2. The Texas Franchise Tax is based on the same items of "income" used in computing the Federal income tax base.**

During 2008, Texas imposed its entity-level franchise tax on the "taxable margin" of each "taxable entity" doing business in Texas. Tex. Tax Code Ann. §§ 171.001(a), 171.002(a)-(b). The term "taxable entity" was defined to include, *inter alia*, "a partnership, limited liability partnership, corporation, banking corporation, savings and loan association, [and a] limited liability company . . . ." Tex. Tax Code Ann. § 171.0002(a). The Texas Comptroller has explicitly ruled that S corporations and LLCs are subject to the Texas Franchise Tax, and the parties have stipulated in this case that RNDC—an LLC that was doing business in Texas in 2008—reported and paid Texas Franchise Tax for that year. See Texas Policy Letter Ruling No. 200609761L (Sept. 6, 2006).

Because the Texas Franchise Tax is imposed on a taxable entity's "taxable margin," the Taxpayer must show that the "taxable margin" base is one that is "on or measured by income" for purposes of O.C.G.A. § 48-7-27(d)(1)(C). As will be seen, it is—because a business's "total

19

1097

revenue" and "taxable margin" for Texas Franchise Tax purposes are comprised of the same items that are used in determining "gross income" for federal and Georgia income tax purposes.

The starting point for determining the amount of the taxable margin is to compute the taxpayer's "total revenue from its entire business." Tex. Tax Code Ann. § 171.101(a). For taxable entities treated as partnerships for federal income tax purposes (such as NDC Leasing), Tex. Tax Code Ann. § 171.1011(c)(2) and the Instructions to the Texas Franchise Tax Report state that "total revenue" is computed by

a. Adding:

 i. The amount reported as income on line 1c of IRS Form 1065 (for gross receipts or sales less "returns and allowances");

 ii. The amount reported as income on line 6a of Schedule K of Form 1065 (dividend income);

 iii. The amount reported as income on line 5 of Schedule K of Form 1065 (interest income);

 iv. The amounts reported as income from line 3a of Schedule K of Form 1065 and line 17 of Form 8825 (rental income);

 v. The amount reported as income on line 7 of Schedule K of Form 1065 (royalty income);

 vi. The amounts reported as income on line 6 of Form 1065 and lines 8, 9a, and 10 of Schedule K of Form 1065 (net gains or losses attributable to capital assets or other sales of business property);

 vii. The amounts reported as income on lines 4 and 7 of Form 1065, line 11 of Schedule K of Form 1065 (to the extent not already included), and the amount

20

1098

from line 11, plus line 2 or line 45 of Form 1040, Schedule F (other income or loss); and

    viii.    Any "total revenue" reported by a lower-tier entity as includable in the taxable entity's total revenue under the tiered partnership election under Tex. Tax Code Ann. § 171.1015(b); and then

b.    Subtracting from that total:

    i.    The amount reported on line 12 of Form 1065 (bad debt expensed for federal income tax purposes);

    ii.    Foreign royalties and foreign dividends, to the extent included in gross revenue;

    iii.    Net distributive income from a taxable entity treated as a partnership or as an S corporation for federal income tax purposes (to avoid double Texas taxation of the revenue of those entities);

    iv.    Allowable deductions from IRS Form 1120, Schedule C, to the extent related to dividend income included in total revenue;

    v.    Items of income attributable to an entity that is disregarded for federal income tax purposes (again, to avoid double Texas taxation of the revenue of those entities);

    vi.    Dividends and interest from federal obligations; and

    vii.    "Other deductions" to the extent that they were included in the taxpayer's

21

1099

gross revenue. See Exhibit A, at 10-13 (Instructions to 2009 Texas Franchise Tax Report); see also Tex. Tax Code Ann. § 171.1011(c)(2).[14]

For all types of entities, Section 171.101(a)(1) of the Texas Tax Code then defines the "taxable margin" for taxable entities as the lesser of (A) 70 percent of the taxable entity's "total revenue"; or (B) "total revenue" less cost of goods sold; or (C) "total revenue" less compensation.[15]

The starting point for computing the Texas Franchise Tax is thus the sum of essentially every relevant item of business "income" that is included in the definition of "gross income" for federal income tax purposes. A comparison of (i) the line items of "income" included in the computation of "total revenue" for Texas Franchise Tax purposes with (ii) the line items shown on the tax forms for computing the federal gross income of a partnership or an S corporation reveals that the Texas "total revenue" and federal gross income bases are essentially identical. Compare Tex. Tax Code Ann. §§ 171.1011(c)(1) with 171.1011(c)(2). When one reviews the relevant federal tax returns filed by NDC Leasing, National Distributing, NDC Partners, and RNDC, and RNDC's Amended Texas Franchise Tax Report it can be seen that the "total revenue" for each partnership or S corporation under the Texas Franchise Tax is computed by adding the line items of "income" that were included on the relevant partnership or S corporation return that was filed for federal income tax purposes.

**3. Whichever alternative definition of "income" is used, the Texas Franchise Tax is a tax "on or measured by income."**

---

[14] The computation of "total revenue" for corporations treated as S corporations for federal income tax purposes (such as National Distributing) similarly tracks the line items from the entity's federal return (Form 1120S). See Instructions to 2009 Texas Franchise Tax Report; see also Tex. Tax Code Ann. § 171.1011(c)(1).

[15] RNDC determined its taxable margin using the "cost of goods sold" deduction provided for in Tex. Tax Code Ann. § 171.101(a)(1)(B)(ii)(a). Both "cost of goods sold" and "compensation" are computed under the Texas Tax Code in a manner that is substantially similar to the federal deduction afforded to such items. See Tex. Tax Code Ann. §§ 171.1012, 171.1013.

22

1100

So the Texas Franchise Tax is a tax based on or measured by "income" or "gross income" whether one uses (i) the broad and ordinary definition of "income" or (ii) one of the technical definitions of "gross income" in conducting the analysis.

First, the concept of "total revenue" that serves as the initial basis for computing the Texas Franchise Tax base is based on or measured by "income" or "gross income," as those terms are broadly defined, because "total revenue" is computed by adding up all of the specified line items of "income" used in computing a pass-through entity's federal income tax base. By using all of the specific and relevant line items from a pass-through entity's federal income tax return to compute "total revenue," it is tautological to conclude that "total revenue" under the Texas Franchise Tax is on or measured by "income."

Alternatively, the Texas Franchise Tax is also based on or measured by "income" when focusing on the "taxable margin." The first option for computing the "taxable margin" is simply to take 70 percent of the "total revenue" base that is comprised of items from the entity's federal income tax base. See Tex. Tax Code Ann. § 171.101(a)(1). Using this method, a taxpayer's "taxable margin" would still be on or measured by "income," because it is comprised exclusively of the items used to compute the taxpayer's "income" on a federal return, before deductions. Alternatively, taxpayers may elect to compute their "taxable margin" by deducting the "cost of goods sold" from their "total revenue." See Tex. Tax Code Ann. § 171.101(a)(1). This second option is how RNDC—a merchandiser— in fact computed its taxable margin for purposes of reporting its Texas Franchise Tax. So this method of computation of the Texas Franchise Tax is *also* one that is on or measured by "income" because RNDC's tax base began with the taxpayer's "total revenue" -- which, as described above, is based on 'income" or "gross income" -- and then was further computed using a deduction for "cost of goods sold." This method of calculation is

23

1101

in accord with the more restrictive definition of "gross income" that applies for federal income tax purposes to a merchandising business (such as RNDC). See Treas. Reg. § 1.61-3(a).

The Texas Franchise Tax is thus on or measured by "income," whether the focus is on the "total revenue" base or the "taxable margin" base. Because Petitioner received pass-through income that was subject to Texas Franchise Tax, it then follows that Petitioner is entitled to an adjustment for the "portion of the income on which such tax was actually paid." See O.C.G.A. § 48-7-27(d)(1)(D) (noting that in "multi-tiered situations, the adjustment for such individual shall be determined by allocating such income between the shareholders, partners, or members at each tier based upon their profit/loss percentage").

**H. The conclusion that Petitioner qualifies for the benefits of O.C.G.A. § 48-7-27(d)(1)(c) is consistent with the policy underlying this statute.**

The conclusion that the Texas Franchise Tax is a tax "on or measured by income" finds strong support in the policy underlying O.C.G.A. § 48-7-27(d)(1), which—according to the Georgia Court of Appeals in a case involving the taxation of an S corporation's pass-through income—is to allow shareholders or members of a pass-through entity "to avoid the double taxation that would otherwise occur if the shareholder paid taxes on any portion of his passed-through income on which the corporation had already paid income taxes . . . at the corporate level." Graham v. Hanna, 297 Ga. App. 542, 545-46 (2009). This policy underlying the adjustment provisions in O.C.G.A. § 48-7-27(d)(1) strongly supports Petitioner's contention that he is entitled to the Section 48-7-27(d)(1)(C) adjustment for the portion of his distributive shares of income on which RNDC already paid Texas Franchise Tax.

**I. The adjustment under O.C.G.A. § 48-7-27(d)(1)(C) for taxes "on or measured by income" is not limited to taxes that are "on or measured by *net* income."**

Respondent counters that the Texas Franchise Tax does not qualify for purposes of

24

O.C.G.A. § 48-7-27(d)(1)(C) because it is not a "net income" tax. The Department denied Petitioner's request for a letter ruling with respect to O.C.G.A. § 48-7-27(d)(1)(C) on the basis that the term "income" in that provision ought to be construed as "net income." This was the basis for denying Petitioner's refund claim and continues to be the basis urged before this Tribunal. But to so construe the statutory language imposes a restriction that is simply not contained in the statute.

**1. In contrast to "income" and "gross income," for tax purposes, "net income" is always defined to include the deduction of expenses.**

Unlike the terms "income" and "gross income"—which are not directly defined in the Georgia Tax Code—an individual's "net income" is specifically defined by reference to the individual's "federal adjusted gross income" less certain deductions and subject to certain addition adjustments. See O.C.G.A. § 48-7-27; see also Ga. Dep't of Revenue v. Ga. Chemistry Council, Inc., 270 Ga. App. 615, 617 (2004) (recognizing that an individual taxpayer's "net income" is the individual's "federal adjusted gross income, less deductions") (citing O.C.G.A. § 48-7-27(a)). The Georgia statutory definition of "net income" comports with a standard dictionary definition, as Black's defines "net income" as "the profit of a business arrived at by deducting operating expenses and taxes from gross receipts." Black's Law Dictionary (9th ed. 2009). Thus, whereas "income" and "gross income" are often used interchangeably, "net income" has a specified technical meaning that is different from "income" or "gross income." Yet despite the differences among those terms, the Department denied Petitioner's request for a letter ruling with respect to O.C.G.A. § 48-7-27(d)(1)(C) on the basis that the term "income" in that provision ought to be construed as "net income."

In addition to violating various rules of statutory construction (discussed below), the Department's position on this issue contradicts the Georgia Court of Appeals' direction in I.B.M.

25

that terms of art used in the tax code must be given their proper technical construction. In that case, the Department argued that a taxpayer should have added back to its taxable income all "franchise, excise, and privilege taxes paid in other states which were measured by income" under a statute which required the add-back of all "income taxes" imposed by other states. I.B.M., 142 Ga. App. at 160 (interpreting the predecessor version of current O.C.G.A. § 48-7-27(b)(3)). But the Court of Appeals rejected the Department's contention that "income tax" means "any tax, the amount of which is determined by income," instead holding that "income tax" is a "term of art" which refers to "taxes on income *and does not include taxes on subjects other than income, although measured by income.*" Id. (emphasis added). Therefore, based on the Court of Appeals' decision in I.B.M., "income tax" is a term of art which applies only to taxes "on income"—a set of taxes that is narrower than the set of taxes that are "measured by income," and which includes many taxes labeled as "franchise, excise, and privilege taxes" by other states. See id.; see also Amerada Hess, 526 A.2d at 1044 ("State taxes that are denominated franchise or excise taxes are often measured by income."). The Texas Franchise Tax is just such a tax -- a tax that is labeled a "franchise tax" but which is "on or measured by income".

### 2. Interpreting O.C.G.A. § 48-7-27(d)(1)(C) to add the term "net" income is inconsistent with well-settled rules of statutory construction.

The Department denied the Petitioner's ruling request reasoning that the adjustment in O.C.G.A. § 48-7-27(d)(1)(C) was intended to apply only to taxes on or measured by *net* income. Such an interpretation contravenes at least four well settled rules of statutory construction.

First, interpreting O.C.G.A. § 48-7-27(d)(1)(C) to apply only to pass-through income that was taxed in another state which imposes a tax "on or measured by *net* income" violates the rule of construction that statutes are to be interpreted "according to the natural and most obvious

26

import of the language, without resorting to subtle and forced constructions." Graham v. Hanna, 297 Ga. App. 542, 545 (2009). To interpret "income" to mean "net income"—despite the Georgia Tax Code's frequent use of both of these terms of art—would be to impose a "forced construction" on the plain language of the statute, in conflict with the "natural and most obvious" definition of "income."

Second, to interpret the statute as applying only to a tax "on or measured by *net* income" violates the rule that "a statute must be construed in relation to other statutes of which it is a part, and all statutes relating to the same subject-matter, briefly called statutes in *pari materia*, [must be] construed together, and harmonized whenever possible." Tew v. State, 320 Ga. App. 127, 130 (2013). To interpret the adjustment for "taxes on or measured *by income*" in O.C.G.A. § 48-7-27(d)(1)(C) to apply only to taxes "on or measured by net income" fails to harmonize the different terms of art used in the specific income tax adjustment provisions provided by the General Assembly, including but not limited to Code Sections 48-7-21, 48-7-23, 48-7-24, 48-7-27, and 48-7-28. Stated a bit differently, to read the word "net" into O.C.G.A. § 48-7-27(d)(1)(C) is to ignore the General Assembly's provision for numerous adjustments in Sections 48-7-21 and 48-7-27 which turn on the nature of the tax to which the taxpayer has been subjected.

Third, to accept Respondent's position on this issue would violate the rule that requires statutes to be interpreted to "avoid a construction that makes some language mere surplusage." Singletary v. State, 310 Ga. App. 570, 572 (2011). That conclusion is unavoidable, because an interpretation concluding that the adjustment for "taxes on or measured *by income*" in O.C.G.A. § 48-7-27(d)(1)(C) applies only to taxes "on or measured by *net income*" renders the use of the term "net" in Code Sections 48-7-21(b)(2), 48-7-28, and other sections of the Code "mere

27

1105

surplusage," because two different terms of art would be interpreted as having the same meaning. Contrast O.C.G.A. § 48-7-21(b)(2)) with O.C.G.A. § 48-7-27(d)(1)(C) (emphasis added); see also O.C.G.A. § 48-7-28 ("A resident individual who has an established business in another state . . . may deduct from the tax due upon the entire *net income* of the resident individual the tax paid upon the *net income* of the business . . . in another state when the business . . . is in a state that levies a tax upon *net income*.") (emphasis added).

Finally, interpreting O.C.G.A. § 48-7-27(d)(1)(C) so that it only applies with respect to pass-through income taxed in another state which imposes on the entity a tax "on or measured by *net* income" violates the rule which requires a presumption that all statutes are "enacted with full knowledge of existing law." Singletary, 310 Ga. App. at 572. To interpret Section 48-7-27(d)(1)(C) to apply only to taxes on or measured by "net income" fails to acknowledge or give effect to the numerous specific statutory adjustment provisions applicable to taxes on "net income"—such as Sections 48-7-21(b)(2) and 48-7-28—that existed prior to the codification of Section 48-7-27(d)(1)(C). See 2006 Ga. Laws Act 619, H.B. 1160 (Ga. Reg. Sess. 2006) (codifying Sections 48-7-27(d)(1)(C)-(D)).

3. **Respondent's arguments that it is unreasonable not to construe O.C.G.A. § 48-7-27(d)(1)(C) to limit it to taxes imposed on net income are not persuasive.**

   (a)    Use of the term "adjusted gross income" elsewhere in the statute does not establish that O.C.G.A. § 48-7-27(d)(1)(C) is meant to apply to "net income" when applied to an entity.

It is well settled that a statute should not be construed in a manner that leads to "an unreasonable result unintended by the legislature." Haugen v. Henry Cnty., 277 Ga. 743, 745 (2004). Respondent argues it would be "unreasonable" to construe "on or measured by income" as it is written, because the phrase "is preceded twice by references to the taxpayer's 'federal adjusted gross income' . . . ." The Respondent asserts that the phrase "on or measured by

28

income" must therefore have been intended to be modified by "federal adjusted gross income," which uses a "net income base."

This argument overlooks the fact that "adjusted gross income" is a defined term that is defined specifically in reference to the computation of an *individual's* taxable income and therefore would not have been used to describe the measure of an *entity's* income. See O.C.G.A. § 48-7-27(a) ("Georgia taxable net income of an *individual* shall be the taxpayer's federal adjusted gross income, as defined in the [IRC] of 1986," subject to specified adjustments) (emphasis added); I.R.C. § 62(a) ("For purposes of this subtitle . . . the term 'adjusted gross income' means, *in the case of an individual*, gross income minus the following deductions . . .") (emphasis added). Since "adjusted gross income" only applies to the income of an individual, it would be incorrect to construe "adjusted gross income" as used in Section 48-7-27(d)(1)(C) as modifying the phrase "on or measured by income" when used in reference to the income of a pass-through entity. Therefore, it is more reasonable to construe "on or measured by income" according to its ordinary meaning and not seek to impose a "forced construction" on the statute. See, e.g., I.B.M., 142 Ga. App. at 160 (stating that the legislature is assumed to have understood the technical meaning of its chosen language and holding that "the statute shall be construed in accordance with the accepted legal definition" of that language).

> (b) Use of the term "income tax" in O.C.G.A. § 48-7-27(b)(3) does not require that O.C.G.A. § 48-7-27(d)(1)(C) also be construed to be limited to "income taxes."

Respondent argues that it is necessary to add the concept of "net" income to O.C.G.A. § 48-7-27(d)(1)(C) in order to "harmonize" this provision with the other provisions of O.C.G.A. § 48-7-27, particularly subsection (b)(3). But this argument begs the question of why the legislature would have used the phrase "on or measured by income" if it intended for the

29

1107

adjustment to apply only to "income taxes"—a different term of art used elsewhere in the Code. We must assume that the General Assembly intended something different from "on or measured by net income" by not using that phrase. Dep't of Human Res. v. Clay, 247 Ga. App. 392, 396 (2000), disapproved on other grounds, Ga. Dep't of Transp. v. Heller, 285 Ga. 262 (2009) ("[A]ny decision to depart from the federal language must have been made for a reason. The question thus becomes, 'Why did the legislature elect to make the state statute different from the federal statute?' The answer cannot be . . . [b]ecause it wanted the meaning to be identical.").

> (c)     It is reasonable to apply O.C.G.A. § 48-7-27(d)(1)(C)'s adjustment provision as written, even if some of the taxes "measured by income" under that provision are not "income taxes" pursuant to the add-back adjustment in O.C.G.A. § 48-7-27(b)(3).

Respondent also argues that the phrase "on or measured by income" in O.C.G.A. § 48-7-27(d)(1)(C) must be interpreted to apply only to taxes "on or measured by *net* income," because to hold otherwise might result in a "double benefit" to taxpayers who are permitted the (d)(1)(C) adjustment but who are not required to make the Section 48-7-27(b)(3) add-back. Respondent argues the add-back provision in subsection (b)(3) of Section 48-7-27 is the "mirror image" of subsection (d)(1). According to the Department, the two must therefore be interpreted in identical fashion.

Respondent's argument ignores the fact that in 2006 the General Assembly enacted subsection (d)(1) to provide "additional adjustments" for taxpayers who would otherwise be subject to double taxation. See 2006 Ga. Laws Act 619, H.B. 1160; see also Graham v. Hanna, 297 Ga. App. at 546. It must be presumed that the legislature's choice of language that is *different* from the language in the then existing add-back provision was intended to have different consequences. See, e.g., Dep't of Human Res. v. Clay, 247 Ga. App. at 396 ("[A]ny decision to depart from [prior] language must have been made for a reason.") If the legislature

30

had intended for the (d)(1)(C) adjustment to apply only when the add-back applies, it could have said so with a cross reference, or it would *at least* have used the same language in both provisions.

Second, Respondent argues that the legislature could not have intended that a taxpayer be entitled to the (d)(1)(C) adjustment because the Texas Franchise Tax is "measured by income" while also permitting the Texas Franchise Tax to be subject to the "add-back" provision in O.C.G.A. § 48-7-27(b)(3)). The difficulty with this argument is this Tribunal has not been asked to decide, and specifically is not deciding, whether the Texas Franchise Tax is an "income tax" for purposes of the O.C.G.A. § 48-7-27(b)(3) add-back. That is an entirely different issue for another day. So any argument based on this point is purely conjectural.

Third, even assuming for purposes of argument that the Texas Franchise Tax is indeed an add-back for purposes of O.C.G.A. § 48-7-27(b)(3), the resulting "double benefit" with which Respondent is concerned is slight when compared with the potential "double taxation" that the statute was designed to resolve. That difference is the natural consequence of the different language in those provisions: Section 48-7-27(b)(3) requires the addition of "any income taxes" imposed by other taxing jurisdictions (to the extent deducted from federal taxable income), while Section 48-7-27(d)(1)(C) permits the subtraction of the portion of any "income" taxed in another state, so long as that tax was "on or measured by income." Thus, while the add-back statute requires the addition of the income tax liability in the other jurisdiction, O.C.G.A. § 48-7-27(d)(1)(C) permits a subtraction adjustment for the entire income base that was subject to tax in the other state—an adjustment that is typically substantially larger than the mere add-back of taxes paid.[16] For example, as applied to this Taxpayer, the Georgia tax impact of the add-back (if

---

[16] Note the same would be true even when a *net* income base is at issue.

31

applicable) would be approximately $640, while the amount of the Taxpayer's claim for refund that is attributable to the Texas Franchise Tax is in excess of $20,000.[17]

Therefore, even assuming it is required, there is nothing "unreasonable" about the potential that a taxpayer may receive the (d)(1)(C) adjustment but will not be required to make the (much smaller) add-back adjustment for the same taxes. This distortion must be contrasted with the results that occur if the statute is to be interpreted so as to interpret O.C.G.A. § 48-7-27(d)(1)(C) in a manner that undercuts the legislature's intent, just so that it is co-extensive with a *different statutory provision* that uses *different language*, would certainly be the type of "unreasonable result unintended by the legislature" that the rules of statutory construction forbid.

> (d)    The differences between the Georgia and Texas tax bases do not make the application of O.C.G.A. § 48-7-27(d)(1)(C) to the Texas Franchise Tax unreasonable.

Respondent's argument that the difference between the Georgia and Texas tax bases requires the conclusion that the Texas Franchise Tax is not "on or measured with respect to income" simply does not withstand analysis. All states that impose a tax based on or measured by income (or on net income for that matter) impose a tax on a base that ultimately differs—sometimes substantially—from the "federal taxable income" base because of each state's specific addition and subtraction adjustments. It is not only taxes which are measured by "income" that might generate the need to perform certain modifications in order to compute the adjustment under O.C.G.A. § 48-7-27(d)(1)(C) properly. Substantial differences might also arise in the computation of a tax based on *net income* such that similar modifications are necessary to

---

[17] The Taxpayer computed the approximate Georgia tax impact of the add-back provision with respect to the Texas Franchise Tax by taking the following steps: (1) determining the Texas Franchise Tax paid by RNDC for the 2008 tax year—$904,285.00; (2) multiplying that amount by the Taxpayer's distributive share percentage of RNDC's income for that year (1.179960646%) to determine the amount that would be required to be added to the Taxpayer's adjusted gross income; and (3) multiplying the amount of the add-back by the Georgia tax rate of 6 percent.

32

compute the Georgia adjustment.[18]  Under this argument, no tax would qualify under O.C.G.A. § 48-7-27(d)(1)(C) unless the tax bases were substantially identical.

Instead of focusing on the differences between two states' tax bases as evidence of why O.C.G.A § 48-7-27(d)(1)(C) should be interpreted more narrowly than the plain language indicates, the rules of statutory construction and common sense suggest a much simpler conclusion: that the legislature passed the law with the intention of preventing double taxation, and that it drafted the statute to apply to a broad set of taxes in order to maximize the adjustment provision's impact.  By focusing on the statute's remedial intent, it is much more reasonable to conclude that the statute should be applied as written.  The Department can, if it chooses to do so, exercise its regulatory authority to provide guidance regarding such base modifications, so that taxpayers only receive an adjustment "for the portion of the income on which such tax was actually paid" by the pass-through entity.  See O.C.G.A. § 48-7-27(d)(1)(D).  The Department has the authority and ability to promulgate regulations and/or provide other guidance to explain how taxpayers should compute such adjustments.  See, e.g., O.C.G.A. § 48-2-12.  So the adjustment to all taxes "on or measured by income" does not yield any "unreasonable results"

---

[18]  For example, a partnership that is subject to tax in Tennessee and which receives dividends from an 80-percent-owned corporation can take a dividends-received deduction for Tennessee excise tax purposes; however, that dividend income is included in the partnership's (and, ultimately, partner's) federal taxable income, and would therefore show up in the partner's tax base for purposes of computing the Georgia adjustment under Section 48-7-27(d)(1)(C). To compute the "portion of income on which such [Tennessee] tax was actually paid," the partner would have to—among other modifications—eliminate the dividend from the Tennessee tax base. Under the Department's view, does that substantial modification affect whether the Tennessee tax was "measured by income" for purposes of the adjustment? It should not. Such modifications are an inevitable consequence of the legislature's decision to provide an adjustment for taxes "measured by income." There are numerous other examples of adjustments that can cause significant differences between federal taxable income and a state tax base—including a state *net income* tax base—such as bonus depreciation (see, e.g., Tenn. Code Ann. § 67-4-2006(b)(1)) and related-party intangible expense add-backs (see, e.g., Ala. Code § 40-18-35(b)(1)).

33

1111

under O.C.G.A. § 48-7-27(d)(1)(C). And note again that Respondent is well equipped with the tools available to address such issues if they do in fact arise.[19]

The application of the O.C.G.A. § 48-7-27(d)(1)(C) adjustment to all taxes "on or measured by income" does not lead to any unreasonable results. Rather, those differences are the natural consequence of the legislature's decision to extend the remedial adjustment to all taxes on or measured by "income," rather than limiting it only to those taxes on or measured by "net income." It is much more reasonable to conclude that such differences (to the extent they are perceived as problematic) should be resolved by applying the straightforward and ordinary meaning of the statute and permitting taxpayers to take the adjustments, but then requiring all necessary modification adjustments to the tax base (pursuant to O.C.G.A. § 48-7-27(d)(1)(D)), rather than to undermine the legislative intent by interpreting the remedial statute more narrowly than the legislature provided. See Ins. Dep't of Ga. v. St. Paul Fire & Cas. Ins. Co., 253 Ga. App. 551, 554 (2002) ("[U]ncertainties or ambiguities in remedial statutes should be resolved in favor of a liberal interpretation . . . .").

**J.** **Other states that have considered the issue have concluded that the Texas franchise tax is either a tax "on or measured by income" or an "income tax."**

  1. **A number of states have concluded that the Texas Franchise Tax is a tax "on or measured by income" or an "income tax."**

---

[19] Indeed, a major reason the Department's administrative position in this case is not entitled to any deference is that the Department has done nothing to explicate the application or operation of this statute which, while simple on its face, quickly becomes extremely complex in application once one begins to attempt to mesh the calculations of very different state tax systems to calculate the adjustment. Yet it appears the Department has only addressed the application of O.C.G.A. § 48-7-27(d)(1)(C) twice—as to taxes imposed by Tennessee and Texas—and each time only in conclusory answers to "frequently asked questions" posted on the Department's website. There are other jurisdictions that have entity level taxes on flow-through entities, at least one of which is an issue in this case. See Ely Chart. And, as noted, the calculations under this statute are susceptible to being computed in a number of alternative ways. And yet there appears to be no published guidance from the Department on any of these issues. So Respondent's argument that the Department's position on the issue in this case should be given deference rings hollow.

1112

When we look to other states, we see that a number of state taxing authorities have determined that the Texas Franchise Tax is a tax "on or measured by income" or even gone further and concluded it is an "income tax." Indeed, there do not appear to be any authorities that have considered the precise issue in this case that have determined that the Texas Franchise Tax is *not* a tax "on or measured by income."

First, in a letter of findings, the Indiana Department of State Revenue (the "Indiana Department") determined that the Texas Franchise Tax qualifies as a tax "based on or measured by income." Ind. Dep't of State Rev. Letter of Findings No. 02-20120562 (Apr. 24, 2013). To determine Indiana adjusted gross income, Indiana requires taxpayers to add to federal adjusted gross income "an amount equal to any deduction or deductions allowed by [the Internal Revenue Code] for taxes *based on or measured by income* and levied at the state level by any state of the United States." Ind. Code § 6-3-1-3.5(b) (emphasis added). The Indiana Department determined that taxpayers are required to add back taxes paid pursuant to the Texas Franchise Tax because the tax "starts with and is based on the entity's income as reported on the federal income tax." Ind. Dep't of State Rev. Letter of Findings No. 02-20120562. Accordingly, the Indiana Department concluded: "[i]t is apparent from the face of the law that the [Texas Franchise Tax is] 'based on or measured by income.'" Id.

Second, the Missouri Department of Revenue (the "Missouri Department") issued a letter ruling determining that the Texas Franchise Tax is an "income tax" under Missouri law. Mo. Private Letter Rul. No. LR 5309 (Dec. 12, 2008). To reach its conclusion, the Missouri Department extended to the Texas Franchise Tax the reasoning of Herschend v. Director of Revenue, 896 S.W.2d 458 (Mo. 1995). Herschend established that, in order to qualify as an "income tax" under Missouri law (and thus provide a credit against Missouri income tax),

35

another state's tax must satisfy two criteria. The tax must be (i) "based on federal taxable income" and (ii) must "pay compensation for benefits, such as roads, police, and fire protection," rather than tax the privilege of doing business in the state. Mo. Private Letter Rul. No. LR 5309. According to the Missouri Department, the Texas Franchise Tax is "based solely on various types of income reported on the federal income tax return" and "is a compensatory tax that operates as an income tax." Id. (internal quotation marks omitted). Therefore, according to the Missouri Department, the tax meets both criteria of Herschend and qualifies as an income tax.

Third, the Kansas Department of Revenue concluded that "the revised Texas franchise tax is based on income and is therefore in the nature of an income tax," at least as long as the cost of goods sold or compensation deduction methodologies are used. Kan. Op. Letter No. O-20009-005; Kan. Op. Letter No. O-2008-004 (Sept. 2, 2008). The Kansas Department of Revenue made its determination despite the fact that Texas itself describes the Texas Franchise Tax as a privilege tax, rather than an income tax. See also Ind. Dep't of State Rev. Letter of Findings No. 02-20120562 ("The Texas tax is designated as a 'margin tax' or 'franchise tax' but merely labeling the tax as such does not change the nature of the tax.").

Finally, the California Franchise Tax Board has determined that the Texas Franchise Tax, when computed using the cost-of-goods method, "qualifies as an income tax." Cal. FTB Technical Advice Memo. No. 2011-03 (Apr. 13, 2011).[20] When determining if taxes paid to another state by a pass-through entity create a credit against California income taxes, California law distinguishes between gross income taxes (which are eligible for the credit) and gross receipts taxes (which are not). Using the cost-of-goods method to calculate the base of the Texas

---

[20] The California Franchise Tax Board recently withdrew the guidance provided in Technical Advice Memorandum No. 2011-03, stating that it will be issuing "additional guidance." See Cal. FTB Technical Advice Memo. No. 2014-01 (Jan. 28, 2014). There is no indication that the FTB intends to change its view regarding the Texas Franchise Tax. Given that Memorandum No. 2011-03 also addressed the old "Michigan Business Tax," it would appear likely that the withdrawal is to provide updated guidance regarding the new Michigan tax regime.

36

Franchise Tax excludes all "return on capital"; therefore, the Franchise Tax Board determined that a taxpayer electing the cost-of-goods deduction under the Texas Franchise Tax is entitled to the credit because the tax for such taxpayers is "on or measured by income." Id.[21]

## K. Those authorities that have concluded that the Texas Franchise Tax is not a tax on "net income" are not persuasive.

Though no state has determined that the current version of the Texas Franchise Tax is not a tax "on or measured by income," some state departments of revenue have determined that individuals cannot take a credit or adjustment with respect to the Texas Franchise Tax. In every such case, however, state law required the departments to examine *specifically* whether the Texas Franchise Tax is a tax on *net* income. See Mass. DOR Directive No. 08-7 (Dec. 18, 2008) ("The [Texas franchise tax is] based on or derived directly from gross receipts and [is] not imposed on *net income*.") (emphasis added); Va. Pub. Doc. Rul. No. 08-169 (Sept. 11, 2008) ("[I]t is my conclusion that the Texas Business Margin Tax is not a tax based on, measured by, or computed with reference to *net income*.") (emphasis added); Minn. Rev. Notice No. 08-08 (July 21, 2008) ("It is the department's position that the Texas business margin tax is not a tax based on *net income*.") (emphasis added). In each case the department of revenue found that, because the Texas Franchise Tax does not allow for sufficient deductions for business expenses, it is not a tax on net income.

Because O.C.G.A § 48-7-27(d)(1)(C) does not limit its inquiry to taxes "on or measured by *net* income" the reasoning of these decisions is not persuasive. Every state authority that has

---

[21] At least two states have gone even further than these four states, concluding that the Texas Franchise Tax is not only on or measured by "income," but that it is actually measured by "net income." See S.C. Rev. Rul. No. 09-10 (July 17, 2009) (listing the Texas franchise tax as nondeductible from South Carolina taxable income because it is a tax "measured by net income"); Wisc. Dept. Rev. Tax Bulletin No. 156 (Apr. 1, 2008) ("[T]he Texas margin tax qualif[ies] for the credit for net income tax paid to another state . . . .").

1115

considered whether the Texas Franchise Tax is a tax "on or measured by income" (but not specifically a *net* income tax) has answered that question affirmatively.

**L.    The Financial Accounting Standards Board has also concluded that the Texas Franchise Tax is a tax "on or measured by income."**

State departments of revenue are not the only authorities that have decided that the Texas Franchise Tax as one "on or measured by income." The Financial Accounting Standards Board ("FASB") has similarly concluded that the Texas Franchise Tax should be treated as an income tax for purposes of FASB Interpretation Number 48.[22] FASB, Minutes of the August 2, 2006 Meeting on Potential FSP: Texas Franchise Tax. ("The staff received technical inquiries from constituents requesting the staff's opinion on whether the Texas Franchise Tax was an income tax that should be accounted for under Statement 109. After discussing the issue with constituents, *the staff concluded that the Texas Franchise Tax is an income tax because the tax is based on a measure of income.*") (emphasis added). This determination under FASB Interpretation Number 48 is important, because with respect to every "income tax" to which the standard applies, it governs the recognition of deferred tax liabilities and assets for the future tax consequences of events that have been recognized in an entity's financial statements or tax returns.

Not surprisingly, each of the nation's four major accounting firms has also issued guidance advising its clients that the Texas Franchise Tax is a tax that is "on or measured by income" and is therefore subject to FIN 48.[23]

---

[22] FASB Interpretation Number 48, commonly known as "FIN 48," is entitled "Accounting for Uncertainty in Income Taxes" and interprets FASB Statement 109 (ASC 740), "Accounting for Income Taxes." See FASB, FASB Interpretation Number 48, No. 281-B (2006).

[23] See:
- Guide to Accounting for Income Taxes, PricewaterhouseCoopers LLP, § 1.2.2.4 (2013), http://www.pwc.com/us/en/cfodirect/publications/accounting-guides/guide-to-accounting-for-income-taxes-2013-edition.jhtml ("As discussed in Section TX 1.2.1, we believe that a tax based on income has a

1116

**M.** **The authorities cited by Respondent to support the conclusion that the Texas Franchise Tax is not "on or measured by income" are not persuasive.**

To support his position that the Texas Franchise Tax is not a tax "on or measured by income," but is instead a privilege tax or a gross-receipts tax that operates in a fundamentally different manner than an income tax, Respondent relies principally on In re Nestle USA, Inc., Relator, 387 S.W.3d 610 (Tex. 2012) and Ardire v. Tracy, 674 N.E.2d 1155, 1156 (Ohio 1997). On close examination it can be seen that these cases are inapposite.

**1.** **In re Nestle USA, Inc., Relator.**

In Nestle, the petitioner challenged the constitutionality of the Texas Franchise Tax on the grounds that it bore no reasonable relationship to its object, which is the privilege of doing business in Texas, and therefore violates the Texas Constitution's mandate that "[t]axation shall be equal and uniform" (Tex. Const. art. VIII, § 1(a)), the Fourteenth Amendment's Equal

---

tax base that consists of income less deductible expenses. Because the margin tax has a base that possesses this characteristic, along with other characteristics of a tax based on income, the margin tax should be accounted for under ASC 740."); see also id., § 1.2.1 ("In general, practice has been that a 'tax based on income' would even apply to tax regimes in which revenues or receipts are reduced by only one category of expense.");

- A Roadmap to Accounting for Income Taxes, Deloitte & Touche LLP, § 2.05 (2011), http://www.deloitte.com/view/en_US/us/Services/audit-enterprise-risk-services/Financial-Statement-Internal-Control-Audit/Accounting-Standards-Communications/e9e4e4b44f5be210VgnVCM3000001c56f00aRCRD.htm ("[T]he scope of ASC 740 is limited to 'taxes based on income,' where income is determined after revenues and gains are reduced by some amount of expenses and losses."); see also id., §§ 2.13-2.15 (explaining that the Texas franchise tax "is determined by applying a tax rate to a base that takes both revenues and expenses into account; therefore, the new tax is considered an 'income tax.' . . . Therefore, the [Texas] margin tax has characteristics of an income tax and should be accounted for as such in accordance with ASC 740.");

- Financial Reporting Developments: Income Taxes, Ernst & Young LLP, § 5.6.4. (Sept. 2013), http://www.ey.com/Publication/vwLUAssetsAL/Financial ReportingDevelopments_BB1150_IncomeTaxes_19September2013/$FILE/FinancialReportingDevelopme nts_BB1150_IncomeTaxes_19September2013.pdf ("We believe the Revised Tax, while based on an entity's margins (as discussed above), is nonetheless, a tax based substantially on income, and as such is subject to the provisions of ASC 740."); and

- Accounting for Income Taxes, KPMG LLP, § 9.122 (June 2012) ("Because the tax base on which the Texas margin tax is computed is derived from an income-based measure, the margin tax is considered to be an income tax for financial reporting purposes and, therefore, the provisions of ASC Topic 740 regarding the recognition of deferred taxes apply to the Texas margin tax.").

39

1117

Protection and Due Process guarantees (U.S. Const. amend. XIV & 1) and the U.S. Constitution's Commerce Clause (U.S. Const. art. I, § 8). After a lengthy discussion of the Texas Franchise Tax (cited by both Respondent and Petitioner as supporting their respective positions), the Texas Supreme Court upheld the constitutionality of the statute as a privilege tax.

From the Texas Supreme Court's statement that the Texas Franchise Tax is a privilege tax, Respondent then jumps to the conclusion that because the Texas Franchise Tax is a privilege tax, it is not an income tax, and, therefore, because it is not an income tax, it cannot be a tax "on or measured by income." Respondent urges that because the Texas Franchise Tax is a "privilege" tax, the Texas tax "is not an income tax, but rather a gross receipts or a privilege tax."

There are multiple difficulties with Respondent's logic.

First, it is well-established that how a tax is labeled is not dispositive of a tax's measure. See, e.g., Complete Auto Transit, Inc. v. Brady, 430 U.S. 274 (1977) (rejecting formalistic rules which would determine the constitutionality of a tax based on its nomenclature, and instead looking to the tax's substance); Amerada Hess Corp. v. Dir., Div. of Taxation, 526 A.2d 1029, 1044 (N.J. 1987), aff'd., 490 U.S. 66 (1989) ("State taxes that are denominated franchise or excise taxes are often measured by income."); MacFarlane v. Utah State Tax Comm'n, 134 P.3d 1116, 1119-20 (Utah 2006) ("The Tax Commission's focus on the labels of the taxes as franchise, excise, or income taxes . . . is misplaced."); Beamer v. Franchise Tax Bd., 563 P.2d 238, 242 (Cal. 1977) ("In ascertaining whether the Texas taxes are on or measured by income . . . our task is to determine their true nature and not to be guided by labels.").[24] Indeed, even the Tennessee Excise Tax, Tenn. Code Ann. Section 67-4-2007, *et seq.* which Respondent agrees

---

[24] The most famous statement regarding the irrelevance of the "label" in defining the measure of a tax was recited by the U.S. Supreme Court in Trinova: "A tax on sleeping measured by the number of pairs of shoes you have in your closet is a tax on shoes." Trinova Corp. v. Mich. Dep't of Treas., 498 U.S. 358, 374 (1991) (citing Jenkins, State Taxation of Interstate Commerce, 27 U. Tenn. L. Rev. 239, 242 (1960)). Thus, a tax may be "measured by income," regardless of the label used to describe it.

40

1118

qualifies for the adjustment under O.C.G.A. § 48-7-27(d)(7)(C) is formally categorized as an excise, rather than income, tax.

Second, and more importantly, Respondent makes his logical jump without analyzing the relevant terms and without discussing any of the features that would distinguish a "gross receipts tax" or a "privilege tax" from a tax "measured by income," and without discussing or attempting to identify what a privilege tax is "measured by." Indeed, as Petitioner correctly notes, there is much in the Texas Supreme Court's opinion which is supportive of Petitioner's contentions in this case.[25]

And finally, as noted above, the issue in this case is *not* whether the Texas Franchise Tax is an "income tax." The issue is whether the Texas Franchise Tax is a tax "on or measured by income." There is no dispute that the Texas Franchise Tax is an atypical tax. But even if Respondent is correct, and even if the Texas Franchise Tax is not an income tax, the Texas Supreme Court's discussion in <u>Nestle</u> simply does not address the issue in this case.[26]

## 2. <u>Ardire v. Tracy</u>.

The other case on which Respondent relies heavily is <u>Ardire v. Tracy</u>, 674 N.E.2d 1155, 1156 (Ohio 1997). In that case the Supreme Court of Ohio held that the Michigan Single

---

[25] Among other things, the Texas Supreme Court noted that "total revenue" for purposes of computing the Texas Franchise Tax "*is income reported to the federal IRS with various deductions, limitations, and exceptions.*" <u>Nestle</u>, 387 S.W.3d at 615-16 (emphasis added); <u>see also</u> <u>Nestle</u>, 387 S.W.3d at 614 ("In 1991, the Legislature shifted the primary basis of the franchise tax profoundly, from capital to 'net taxable earned surplus'—*i.e.*, income."); <u>id.</u> at 615-16 ("The current franchise tax is the product of further legislative restructuring in 2006 . . . . The tax is still based primarily on revenue . . . . [and] [t]otal revenue is income reported to the federal IRS . . . ."); <u>id.</u> at 621 ("Over the years, the Legislature increased the number of exemptions, added adjustments and deductions, *and shifted the basis of the tax from capital to income*.") (emphasis added).

[26] While the Supreme Court of Texas in <u>Nestle</u> noted that the Texas Franchise Tax uses an income base, in a separate case, it avoided the specific question of whether the Texas Franchise Tax is an "income tax." See <u>In re Allcat Claims Serv., LP</u>, 356 S.W.3d 455 (Tex. 2011). The court noted, however, the legislature's express declaration that the Texas Franchise Tax "is not an income tax." See <u>id.</u> at 463. That issue is important because, as explained in <u>Allcat</u>, under the Texas Constitution, an individual income tax, unlike a privilege tax, requires approval by the voters in a statewide referendum.

41

Business Tax ("Michigan Single Business Tax") was not "on or measured by income" for purposes of the Ohio credit for taxes "on or measured by income."

There are several reasons why Ardire is not persuasive, however. First and foremost, the Ardire case dealt with the now repealed Michigan Single Business Tax. The Michigan Single Business Tax was a unique tax with many peculiarities. It had unusual overtones of, and was actually described as, a value added tax. It was roundly criticized in many circles as creating a hostile business environment. See, e.g., James R. Hines Jr., Michigan's Flirtation with the Single Business Tax, University of Michigan Ross School of Business (December 2002), http://www.bus.umich.edu/otpr/WP2003-1paper.pdf; see also What is the Single Business Tax?, Michigan Department of the Treasury, http://www.michigan.gov/taxes/0,1607,7-238-43533-154440--,00.html (last visited Nov. 13, 2014). Respondent has not shown whether or how the Michigan Single Business Tax is at all like the Texas Franchise Tax, however, so it is difficult to evaluate whether a holding involving the Michigan Single Business tax has any relevance to this case.[27]

Moreover, the analysis in Ardire appears to be flawed by the court's conflation of the phrase "on or measured by income" with the phrase "on or measured by net income." In particular, the Ohio court concluded that the Michigan Single Business Tax was not "measured by income" by relying *exclusively* on the Michigan court's analysis in Gillette Co. v. Dep't of Treasury, 497 N.W.2d 595 (Mich. Ct. App. 1993), without recognizing that the Michigan court *had only considered whether the SBT was on or measured by* "net" *income.* See Ardire, 674 N.E.2d at 1158-59 (reciting Gillette's conclusion that the SBT was not "measured by net

---

[27] At oral argument, Petitioner and Respondent both agreed that the Michigan Single Business Tax was such an unusual tax that it would be an example of a tax that would not trigger the application of the adjustment provision of O.C.G.A. § 48-7-27(d)(1)(C).

42

income" and then concluding for Ohio purposes: "Therefore, the Michigan appellate courts have clearly determined that the SBT is neither a tax on income nor a tax measured by income.").

Indeed, a careful reading of Ardire suggests that the Ohio court either did not appreciate the distinction or did not care to draw it given the highly unusual nature of the Michigan Tax. See Ardire, 674 N.E.2d at 1158-59 (reaching its holding in reliance on Gillette's holding with respect to "net income" and then string-citing a "number of authorities throughout this country [which] agree with the view that Michigan's SBT is neither a tax *on income* nor a tax *measured by income*," but proceeding instead to cite, in part, authorities that turned on whether the Michigan Single Business Tax was "on or measured by *net* income").

## IV.    SUMMARY

There may well be state taxes that sufficiently diverge from an income base such that they would not be eligible for adjustment under O.C.G.A. § 48-7-27(d)(1)(C). See, e.g., First Chicago NBD Corp. v. Dep't of State Revenue, 708 N.E.2d 631, 635 (Ind. Tax Ct. 1999) (stating that "[n]ot every tax that is measured by income subtracts costs of production . . . [but] no tax that is measured by income *adds* costs of production.") (emphasis in original). Indeed, the parties both agree that such would have been the case with the now repealed Michigan Single Business Tax. But while the drawing of the line may be difficult in some instances in the future, it is unnecessary to explore those boundaries here because the answer is clear.

## V.    CONCLUSION

Accordingly, for the reasons discussed above, this Tribunal finds that the Texas Franchise Tax is a tax that is "on or measured by income" for purposes of O.C.G.A. § 48-7-27(d)(1)(C).

43

1121

Therefore, Petitioner's Motion for Summary Judgment must be **GRANTED** and Respondent's Cross-Motion for Summary Judgment **DENIED**.

**SO ORDERED,** this 25th day of November, 2014.

_____
**CHARLES R. BEAUDROT, JR.**
**CHIEF JUDGE**
**GEORGIA TAX TRIBUNAL**

**H. ALAN ROSENBERG,**

*PETITIONER*

**MARY T. BENTON, CLARK R. CALHOUN,**

*ATTORNEYS FOR PETITIONER, H. ALAN ROSENBERG*

**SAMUEL S. OLENS, Attorney General, W. WRIGHT BANKS, JR., Deputy Attorney General, WARREN R. CALVERT, Senior Assistant Attorney General, ALEX F. SPONSELLER, Senior Assistant Attorney General**

*ATTORNEYS FOR RESPONDENT, DOUGLAS J. MACGINNITIE, Commissioner, Georgia Department of Revenue*